REDACTED VERSION

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* MICHAEL S. LORD, | Civil Action No.: 3:13cv2940 |
| *Plaintiffs/Relator,* | |
| - v. - | **FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| NORTH AMERICAN PARTNERS IN ANESTHESIA, LLP, NAPA MANAGEMENT SERVICES CORPORATION, NORTH AMERICAN PARTNERS IN ANESTHESIA (PENNSYLVANIA), LLC, and POCONO MEDICAL CENTER, | JURY TRIAL DEMANDED |
| *Defendants.* | |

FILED
SCRANTON

DEC 6 2013

PER _____
DEPUTY CLERK

## COMPLAINT

On behalf of the United States of America, Plaintiff and *qui tam* relator, Michael S. Lord

(the "Relator"), files this *qui tam* complaint against North American Partners in Anesthesia, LLP,

NAPA Management Services Corporation, North American Partners in Anesthesia

(Pennsylvania), LLC (collectively, the "NAPA Defendants") and Pocono Medical Center

("PMC" and collectively, with the NAPA Defendants, "Defendants") and alleges:

## NATURE OF THE ACTION

1.      Relator sues Defendants to recover treble damages and civil penalties on behalf of

the United States of America for Defendants' scheme to maximize income from its anesthesia

practices by submitting false claims to Medicare for physician services that Defendants knew did

not meet the established criteria set by Medicare and the Tax Equity and Fiscal Responsibility

Act of 1982 ("TEFRA").  Defendants engaged in this widespread fraud against the United States in violation of the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA").

2.    As a former employee of the NAPA Defendants, Relator personally observed Defendants engage in practices that made it impossible for the NAPA Defendants to satisfy Medicare's requirements for billing medically directed anesthesia services.  Under Medicare and TEFRA rules, in order to submit a claim for "medical direction" services, an anesthesiologist must perform critical portions of the anesthesia service and be immediately available throughout the procedure.  At PMC, NAPA physicians are regularly not immediately available to respond to exigent circumstances during the entire procedure, rarely monitor the course of anesthesia administration at frequent intervals or are often not present during critical portions of their procedures.

3.    Relator observed the NAPA Defendants routinely engage in the following systematic false claims practices, all of which violate Medicare and TEFRA rules: (i) anesthesiologists at PMC providing only "medical supervision" services, while billing Medicare for the more highly lucrative "medical direction" services, (ii) failing to fully perform patients' pre-anesthetic examinations and evaluations, and then submitting a claim to Medicare, (iv) pre-filling anesthesia records and the Medicare-required attestations prior to rendering anesthesia services and then submitting a claim to Medicare, and (iv) falsifying patient records to indicate physical assessments were completed when they were not, in violation of Medicare and TEFRA rules.

4.    Relator also sues the NAPA Defendants for retaliation in violation of Section 3730(h) of the FCA.  Relator repeatedly informed Defendants of this fraud from 2011 through 2013, but Defendants failed to adequately address these problems and the fraud continued

throughout Relator's employment. Instead, Defendants retaliated against Relator by disclosing his confidential reporting efforts to his superiors and others, creating a hostile work environment, refusing to allow Relator to work in the cardiovascular operating room during open heart surgeries, and refusing to timely conduct Relator's bi-annual review which put his medical staff privileges at risk. Eventually, the NAPA Defendants constructively discharged Relator based on staff anesthesiologists' unfounded allegations and documents falsified by at least one employee. Specifically, an anesthesiologist altered a pre-anesthetic evaluation form after the patient's surgical procedure in an attempt to create the appearance that Relator was insubordinate and/or incompetent.

5.    Relator has direct and personal knowledge that Defendants intentionally violated Medicare and TEFRA rules and regulations regarding the submission of claims for anesthesia services for Medicare beneficiaries. Claims for payment submitted by Defendants to Medicare for the provided anesthesia services, and related records and statements, were knowingly false and fraudulent. Defendants are liable to the federal government under the FCA.

## PARTIES

6.    Relator Michael S. Lord resides in Monroe County, Pennsylvania. Relator was employed by the NAPA Defendants at PMC as a full-time staff Certified Registered Nurse Anesthetist ("CRNA") from June 10, 2011 to on or about June 21, 2013, when he was constructively discharged by the NAPA Defendants.

7.    This Complaint is not based on a public disclosure as defined in 31 U.S.C. § 3730(e). Relator sues as the original source of information regarding Defendants' violations of the FCA, given that Relator has direct and independent knowledge of the information on which the allegations are based and/or knowledge that is independent of and materially adds to any

allegations or transactions which may have been publicly disclosed (although Relator knows of no such public disclosure).

8.     Defendant North American Partners in Anesthesia, LLP ("NAPA") is a limited liability partnership organized under the laws of the State of New York, which maintains the nerve center of its business operations at 68 South Service Road, Suite 350, Melville, NY 11747. Upon information and belief, NAPA was founded in 1986, and is the largest single specialty anesthesia and perioperative management company in the United States with over 1,000 anesthesia providers in over 45 hospitals, physician offices, and ambulatory surgery centers covering over 700,000 anesthesia cases per year. On further information and belief, NAPA owns and operates wholly-owned subsidiaries in seven states, including Connecticut, Illinois, Maryland, New Hampshire, New Jersey, New York, and Pennsylvania.

9.     Defendant NAPA Management Services Corporation ("NAPA Management") is a corporation organized under the laws of the State of New York, which maintains the nerve center of its business operations at 68 South Service Road, Suite 350, Melville, NY 11747. NAPA Management offers management, administrative, billing, and collection services that provide non-medical support for their clients. On information and belief, NAPA Management is owned and operated as a subsidiary of NAPA.

10.     Defendant North American Partners in Anesthesia (Pennsylvania), LLC ("NAPA Pennsylvania") is a limited liability company organized under the laws of the Commonwealth of Pennsylvania. NAPA Pennsylvania provides anesthesia services at PMC in East Stroudsburg, PA, where Relator was employed. Upon information and belief, NAPA owns and/or operates NAPA Pennsylvania as a wholly-owned subsidiary.

11.    Defendant Pocono Medical Center ("PMC") is a corporation created and existing under the laws of the Commonwealth of Pennsylvania, which maintains the nerve center of its business operations at 206 East Brown Street, East Stroudsburg, PA 18301.  PMC is a general medical and surgical hospital with 231 beds.  On information and belief, PMC's emergency room is visited by approximately 89,000 patients annually, and its physicians perform 2,200 inpatient surgeries and 4,000 outpatient surgeries.  According to its 2012 Annual Report, PMC received approximately $260 million from Medicare, Medicaid, and private carriers for its services.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1345 because this action involves a federal question and the United States is a plaintiff.  This Court also has subject matter jurisdiction under 31 U.S.C. § 3732(a).

13.    The Court has supplemental subject matter jurisdiction over the state law claims under 28 U.S.C. § 1367 because they are so related to the False Claims Act that they form part of the same controversy.

14.    The Court may exercise personal jurisdiction over the Defendants under 31 U.S.C. § 3732(a).  The Court has personal jurisdiction over Defendants because they regularly transact business within this District.

15.    Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) & (c) because Defendants transact business or are found within this District and a substantial part of the events establishing the alleged claims arose in this District.

16.    No allegation in this Complaint is based on a public disclosure of allegations or transactions in a criminal, civil, or administrative hearing; in a congressional, administrative, or

General Accounting Office report, hearing audit, or investigation; or from the news media. Rather, Relator is the original source of the discovery of the wrongdoing alleged.

17.     Under 31 U.S.C. § 3730(b)(2), this Complaint has been filed *in camera* and will remain under seal for a period of at least 60 days and shall not be served on the Defendants until the Court so orders.

18.     Pursuant to 31 U.S.C. § 3730(b)(2), contemporaneous with filing the Complaint, Relator is providing the Government with a copy of the Complaint and Relator's written disclosure statement, together with exhibits, of substantially all material evidence and material information in his possession referenced in and/or related to the Complaint.  Relator is complying with this provision by providing a copy of the Complaint and Relator's Disclosure Statement to Peter J. Smith, the United States Attorney for the Middle District of Pennsylvania, and to the Honorable Eric H. Holder, Attorney General of the United States.

19.     This disclosure statement is supported by material evidence known to Relator at the time of filing, establishing the existence of the Defendants' legal responsibility for those false claims.

## GOVERNING LAWS AND REGULATIONS

### A.     THE FEDERAL FALSE CLAIMS ACT

20.     Originally enacted in 1863, the FCA was substantially amended in 1986 by the False Claims Amendments Act.  The 1986 amendments enhanced the Government's ability to recover losses sustained because of fraud against the United States.

21.     The FCA imposes liability upon any person who "knowingly presents, or causes to be presented [to the Government] a false or fraudulent claim for payment or approval," or "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false

or fraudulent claim paid or approved." 31 U.S.C. § 3729(a)(1) and (2). Any person found to have violated these provisions is liable for a civil penalty of up to $11,000 for each such false or fraudulent claim, plus three times the damages sustained by the Government.

22.     The False Claims Act provides that:

(a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

*     *     *

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than [$11,000], plus 3 times the amount of damages which the Government sustains because of the act of that person.

*     *     *

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required. 31 U.S.C. § 3729.

*     *     *

(1) A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government. The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.

(2) A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.

(3) The Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal. 31 U.S.C. § 3730.

23. The FCA imposes liability where the conduct is "in reckless disregard of the truth or falsity of the information" and clarifies that "no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b).

24. The FCA also broadly defines a "claim" as one that "includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c).

25. The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to sue for the Government and to share in any recovery. The complaint must be filed under seal without service on any defendant. The complaint remains under seal while the Government conducts an investigation of the allegations and determines whether to intervene. 31 U.S.C. § 3730(b).

26. The FCA includes a provision creating a cause of action for employees who suffer retaliation for taking measures to prevent contractor fraud against the United States. 31 U.S.C. § 3730(h). The relevant part of this provision states:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

*See* 31 U.S.C. § 3730(h).

27.     The purpose of § 3730(h) promotes enforcement of the FCA by "assur[ing] those who may be considering exposing fraud that they are legally protected from retaliatory acts." S.Rep. No. 99–345, at 34, 1986 U.S.C.C.A.N. 5266, 5299 (1986).  Congress "recognize[d] that few individuals will expose fraud if they fear their disclosures will lead to harassment, demotion, loss of employment, or any other form of retaliation," and, accordingly, sought "to halt companies and individuals from using the threat of economic retaliation to silence 'whistleblowers.'"  *Id.*

## B.     THE FEDERAL HEALTH BENEFIT PROGRAM

28.     Medicare was created in 1965 by Title XVIII of the Social Security Act and is by far the largest health plan in the United States.  Medicare Part A (the basic Plan of Hospital Insurance) covers the cost of hospital inpatient stays and post-hospital skilled nursing facility care.  42 U.S.C. § 1395j to 1395w-4.  Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage (typically eighty percent) of the fee schedule amount of physician and laboratory services.  42 U.S.C. §§ 1395k, 13951, 1395x(s).  Through Part B, Medicare pays for anesthesia services in the hospital setting.

29.     Medicare is generally administered by the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services.  CMS establishes rules for the day-to-day administration of Medicare. CMS contracts with private companies to handle day-to-day administration of Medicare.

30.     CMS's payment and audit functions are contracted to insurance companies known as fiscal intermediaries.  Fiscal intermediaries determine payment amounts due the providers under Medicare law, regulations and interpretive guidelines published by CMS.  *See* 42 U.S.C. § 1395(h), C.F.R. § 413.20-413.24.

31.     Medicare only pays for services or equipment, including anesthesia services, that are reasonable and medically necessary. 42 U.S.C. § 1395 y(a)(l)(A). Further, all providers enrolled in the Medicare program must provide economical medical services. 42 U.S.C. § 1320c(a)(1). Providers must certify to Medicare that the services they provide are medically necessary and appropriate. *See* 42 U.S.C. §1320c-5(a)(3). The funds used to pay Medicare Part A Claims come both from federal payroll and general tax revenues. The funds to pay for Part B come from premiums paid by Social Security recipients and general U.S. tax revenues.

32.     Medicaid is a joint federal-state program that provides health care benefits for certain groups: primarily the poor and disabled. States administer their own Medicaid programs under federal regulations that govern what services should be provided, and under what conditions. CMS monitors the state-run programs and establishes requirements for service delivery, quality, funding, and eligibility standards. ·The federal government provides a portion of each state's Medicaid funding, known as the Federal Medical Assistance Percentage ("FMAP"). The FMAP is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). State Medicaid programs must cover inpatient hospital services.

33.     Medicare provides for payment of anesthesiologist services based upon three main categories: (1) personally performed, (2) medically directed, or (3) medically supervised.

34.     The personally performed rate, the highest of the three, entitles the physician to claim an unreduced physician fee. It applies where the physician personally performs the anesthesia services "alone", or monitors the work of a CRNA, or other medical staff, on a one-to-one basis. 42 C.F.R. 414.46 (c).

35.     The "medically directed" rate applies where the physician is directing two, three, or four concurrent anesthesia cases being performed by CRNAs, Anesthesia Assistants, or residents.  42 C.F.R. 414.46 (d).

36.     Medicare permits payment for anesthesia services at the "medically directed" rate *if and only if* the doctor:

> (1)     performed a pre-anesthetic examination and evaluation;
>
> (2)     prescribed the anesthesia plan;
>
> (3)     personally participated in the most demanding procedures in the anesthesia plan, including induction and emergence;
>
> (4)     ensured that any procedures in the anesthesia plan that he or she did not perform were performed by a qualified anesthetist;
>
> (5)     monitored the course of anesthesia administration at frequent intervals;
>
> (6)     remained physically present and available for immediate diagnosis and treatment of emergencies; and
>
> (7)     provided indicated post-anesthesia care.

42 C.F.R. 415.110 (a).

37.     These seven conditions were codified in TEFRA, and with the implementing regulations promulgated by Medicare are known in the industry as the "TEFRA" or "medical direction" rules.

38.     "Medical direction" is defined by Medicare Part B as a system for payment when the medically directing anesthesiologist meets the seven requirements specified above for anesthesia care otherwise furnished by a CRNA.

39.     The physician alone must document and attest in the patient's medical record that the seven conditions have been satisfied: "specifically documenting that he or she performed the pre-anesthetic exam and evaluation, provided the indicated post-anesthesia care, and was present

during the most demanding procedures, including induction and emergence where applicable." 42 C.F.R. 415.110 (b).

40. Medicare regulations further permit a provider to bill a service as "medically directed" only if the physician is directing anesthesia services in no more than four concurrent cases. 42 C.F.R. 415.110 (a). If a physician directs a student nurse anesthetist in any of the cases, the physician may not direct more than two cases concurrently. 42 C.F.R. 414.46 (d).

41. The "medically supervised" rate applies where the physician: (1) overseas more than four concurrent anesthesia procedures, or (2) performs other non-permitted services while directing four or fewer anesthesia procedures, or (3) does not meet all seven TEFRA requirements for medical direction.

42. On information and belief, Medicare requires providers to submit their Part B anesthesia services claims using the American Medical Association's Current Procedural Terminology ("CPT") Codes. Medicare claimants are required to provide accurate CPT Codes on all claims in accordance with the following rules:

a. For anesthesia services personally furnished by an anesthesiologist, the physician uses the "AA" modifier. Medicare provides payments at the unreduced physician fee rate.

b. For anesthesia services performed when an anesthesiologist and CRNA are involved in a single procedure and the physician is performing the medical direction, the physician uses the "QY" modifier and the CRNA uses the "QX" modifier. Further, for medical direction by a physician of two, three, or four concurrent anesthesia services, the physician uses the "QK" modifier. Medicare

provides payment for the "QY" and "QK" modified claims at the medically directed rate.

c. For medical supervision by a physician of more than four concurrent anesthesia services, the claimant uses the "AD" modifier. Medicare provides payment for the "AD" modified claims at the medically supervised rate.

43. Throughout at least 2011 through 201 and, on information and belief, since 2007, Defendants systematically billed Medicare for "medically directed" physician services, despite their knowledge that the services did not qualify for this increased payment under Medicare and TEFRA rules.

44. In order to be legitimately paid for medically directed anesthesia services, the NAPA Defendants were required to fulfill the Medicare requirements and TEFRA rules for medically directed anesthesia services for each claim. The "CMS Manual System" provides that:

> If anesthesiologists are in a group practice, one physician member may provide the pre-anesthesia examination and evaluation while another fulfills the other criteria. Similarly, one physician member of the group may provide post-anesthesia care while another member of the group furnishes the other component parts of the anesthesia service. However, the medical record must indicate that the services were furnished by physicians and identify the physicians who furnished them.
>
> \*     \*     \*
>
> A physician who is concurrently directing the administration of anesthesia to not more than four surgical patients cannot ordinarily be involved in furnishing additional services to other patients. However, addressing an emergency of short duration in the immediate area, administering an epidural or caudal anesthetic to ease labor pain, or periodic, rather than continuous, monitoring of an obstetrical patient does not substantially diminish the scope of control exercised by the physician in directing the administration of anesthesia to surgical patients. It does not constitute a separate service for the purpose of determining whether the medical direction criteria are met. Further, while directing concurrent anesthesia procedures, a physician may receive patients entering

the operating suite for the next surgery, check or discharge patients in the recovery room, or handle scheduling matters without affecting fee schedule payment.

However, if the physician leaves the immediate area of the operating suite for other than short durations or devotes extensive time to an emergency case or is otherwise not available to respond to the immediate needs of the surgical patients, the physician's services to the surgical patients are supervisory in nature. Carriers may not make payment under the fee schedule.

45.     The NAPA Defendants' physicians routinely are not immediately available to respond to exigent circumstances during the entire procedure, rarely monitor the course of anesthesia administration at frequent intervals or are often not present during critical portions of their procedures.

## FACTS PERTINENT TO RELATOR

46.     Prior to joining PMC, Relator graduated first in his nursing class from Misericordia University (BSN, *summa cum laude*, with honors 2007). Relator was subsequently licensed as a Pennsylvania Registered Nurse in 2007 by the Pennsylvania State Board of Nursing and provided nursing services in Monroe County, Pennsylvania.

47.     From 2007 through 2008, Relator worked as a registered nurse in the Cardiovascular Unit ("CVU") at ESSA Heart and Vascular Institute at PMC. Relator was recognized as an exemplary employee and outstanding nurse in 2008 by receiving PMC's July 2008 Healthcare Hero Award (a hospital system-wide employee of the month award).

48.     From 2008 through 2009, Relator worked as a registered nurse in the Critical Care Unit of PMC ("CCU").

49.     In 2009, Relator entered the Nurse Anesthesia Program at the University of Pennsylvania School of Nursing. Relator graduated from the University of Pennsylvania School of Nursing's Nurse Anesthesia Program (MSN, 2011), having been awarded one of two merit-

based opportunities in his graduating class to train at the University of Maryland's R. Adams Cowley Shock Trauma Center in Baltimore, Maryland. Relator was also the recipient of the University of Pennsylvania School of Nursing's Norma Lang Dean's Award for Excellence in Scholarly Practice.

50.     In 2009, the Pennsylvania Association of Nurse Anesthetists ("PANA") selected Relator as the 2009-2010 State Student Representative, a non-voting PANA board member position appointed through PANA's review of nominations submitted by nurse anesthesia program directors from Pennsylvania's thirteen nurse anesthesia programs.

51.     On April 7, 2009, Relator signed an Employment Agreement with NAPA Pennsylvania. Relator's employment at NAPA Pennsylvania began on or about June 11, 2011 and was to continue for a period of five years. *See* Employment Agreement, Exhibit "A" to this Complaint.

52.     In May 2011, PANA recognized Relator as Pennsylvania's "Outstanding Student of the Year" for his accomplishments and contribution to his profession during his tenure as a student.

53.     In June 2011, Relator received his Certification as a CRNA from the National Board of Certification and Re-certification of Nurse Anesthetists ("NBCRNA"). In Pennsylvania, a CRNA is a registered advanced practice nurse who is supervised by a physician in the delivery of anesthesia for medical and surgical procedures.

54.     In June 2011, Relator began providing CRNA services for NAPA Pennsylvania at PMC, in East Stroudsburg, Pennsylvania. Relator's supervisor was Dr. Anthony Nostro ("Dr. Nostro"), NAPA Pennsylvania's Chief of Anesthesiology at PMC. Relator was employed by

NAPA Pennsylvania for over two years until he was constructively discharged by the NAPA Defendants (as discussed more fully below at ¶¶ 202-219).

55. During his tenure with NAPA Pennsylvania, Relator held the position of CRNA and was consistently recognized for excellent job performance.

56. NAPA Defendants provided Relator with the references necessary to obtain his medical staff credentials. The NAPA Defendants provided references to the University of Maryland Medical Center's R. Adams Cowley Shock Trauma Center in Baltimore, Maryland, where Relator worked per diem on weekends during his employment at NAPA Pennsylvania.

57. As a CRNA, Relator's job duties included caring for patients before, during and after a medical procedure or surgery by preparing the patient for anesthesia, administering and maintaining the anesthesia to ensure proper sedation and pain management, and caring for the patient's immediate post-operative pain management needs.

58. During his tenure at NAPA Pennsylvania, Relator was active with the American Association of Nurse Anesthetists ("AANA") and PANA and, notably, was named Pennsylvania's 2013 Clinical Instructor of the Year at PANA's Spring Symposium in May 2013, recognizing his skill for educating Student Registered Nurse Anesthetists training at PMC.

59. While employed at NAPA Pennsylvania, Relator applied to and was accepted at Yale University, where he is currently pursuing a Doctor of Nursing Practice (DNP) degree as one of two Jonas Nurse Leaders Scholars in his cohort. Relator planned to continue working at NAPA Pennsylvania while he pursued his doctoral degree, using paid time off to fulfill his on-campus requirements without interfering with his employment at NAPA Pennsylvania.

## DEFENDANTS' FRAUDULENT BILLING SCHEME

60.     From at least 2011 to the present, Defendants engaged in a systematic effort to submit false claims that do not reflect the actual services performed by its anesthesiologists to federally funded health insurance programs.

61.     During Relator's employment at NAPA Pennsylvania, NAPA Defendants routinely submitted false claims for medically directed anesthesia services despite their awareness they were not entitled to payment for those services under Medicare and TEFRA rules.

62.     Anesthesiologists and CRNAs employed by the NAPA Defendants at PMC primarily record their services for individual patients on two forms: the Anesthesia Record (the "Anesthesia Record") and the Anesthesia Evaluation and Consent (the "Evaluation Form").

63.     Each patient has an Anesthesia Record and an Evaluation Form.  The Anesthesia Record is a two-page form that identifies: (1) the names of the anesthesiologist(s) and CRNA(s) who performed services, (2) the date when the services were performed, (3) the times the patient entered the operating room and the time at which care was transferred in the Post Anesthesia Care Unit (the "PACU"), and (4) various patient vital signs and metrics both upon induction (placing a patient under anesthesia), throughout the entire course of the anesthetic, and up until the patient's vital signs are stable and care is transferred in the PACU.  Importantly, the Anesthesia Record contains an attestation by an anesthesiologist participating in the case that he was "present for induction, key portions of the procedure and emergence, and immediately available throughout."

64.     The Evaluation Form is another two-page written record of a patient's preoperative history recorded by an anesthesiologist prior to administering anesthesia.  In order

for an anesthesiologist and CRNA to safely administer anesthesia, it is critical the information be fully and accurately noted, evaluated, and recorded.

65. The Evaluation Form contains details gathered through a review of the patient's medical record, physical examination, and interview regarding a patient's medical history and presentation. Such details include medications the patient is taking, as well as a review of the patient's cardiovascular, respiratory, neurologic, renal, gastrointestinal, hematology, endocrine, musculoskeletal, and cancer history. It also contains information about a patient's social habits, including drinking and smoking. These details regarding the patient's status are evaluated by the assigned attending anesthesiologist.

66. The second page of the Evaluation Form contains a continued record of an anesthesiologist's pre-anesthetic examination and evaluation of the patient, including, among other information, physical examination and evaluation (including the patient's vital signs), airway examination and evaluation, and determination of a patient's "PO Status" (which means "per os" or "by mouth"). Review of a patient's "PO Status" determines whether the patient had anything to eat or drink before the surgery, an extremely important consideration for patient safety since such information may completely change the anesthetic plan or cancel the planned procedure altogether. The Evaluation Form is then signed by the anesthesiologist who completes the pre-anesthetic examination and evaluation.

67. If the Evaluation Form is partially completed earlier than the day of the proposed procedure, or unable to be completed due to unavailable information or otherwise, the form is then also reviewed and amended, where necessary, immediately prior to the patient being brought to the procedure area. The form is then signed a second time by the attending anesthesiologist assigned to the case before the patient leaves the preoperative area for his/her

procedure (the anesthesiologist who initially completes the Evaluation Form is not always the same anesthesiologist assigned as the attending physician of record for the case). The signature by the attending anesthesiologist assigned to the case denotes his determination and approval that an adequate pre-anesthetic examination and evaluation have been completed and, in the case of planned medical direction, this step complies with Medicare and TEFRA rules.

68. On information and belief, the Anesthesia Records and/or Evaluation Forms are utilized by the NAPA Defendants to submit claims for Medicare reimbursement. Importantly, under the "medical direction" model, Medicare requires the pre-anesthetic examination and evaluation to be completed by an anesthesiologist. The Evaluation Form is completed after appropriate medical record review and after the pre-anesthetic examination and evaluation have been completed.

## A. Anesthesiologists at NAPA Routinely Failed to Satisfy Medicare / TEFRA Rules When Medically Directing Concurrent Cases

69. Throughout Relator's employment, he repeatedly witnessed numerous instances where the NAPA Defendants provided direct care to patients, while at the same time medically directing one or more other CRNAs. When the NAPA Defendants submitted a claim for medical direction services, they violated Medicare and TEFRA rules.

70. Soon after the start of his employment at NAPA Pennsylvania, Relator learned that attending anesthesiologists at PMC routinely provided morning and lunch relief breaks to CRNAs, during which the anesthesiologist provided direct care to patients (*i.e.*, "personally performing" and thereby unable to leave a patient's bedside), even though the attending anesthesiologist would be simultaneously medically directing concurrent cases. The NAPA Defendants would then submit claims to Medicare for medical direction services, instead of medical supervision. This violated Medicare and TEFRA rules.

71.     CRNAs at PMC receive two rest breaks during an 8 hour shift including one morning break and one lunch break. The NAPA Defendants implemented a daily break model (the "NAPA Break Model") to provide CRNA break relief throughout the workday. Medically directing NAPA anesthesiologists are required to provide these breaks to CRNAs they oversee. These breaks frequently occur during concurrent medical direction of other Medicare cases.

72.     The NAPA Defendants' anesthesiologists do not arrange for another anesthesiologist to meet the immediate availability criteria for medical direction while the attending anesthesiologist of record is elsewhere providing CRNA relief. The NAPA Defendants' anesthesiologists provide CRNA break relief and personally perform anesthesia services for the duration of these breaks, while concurrently medically directing Medicare cases in other rooms. This renders the medically directing NAPA anesthesiologist unable to respond to exigent circumstances of concurrent Medicare patients since these anesthesiologists are unable to leave the bedside of the patient under their direct care while they are providing CRNA break relief. An anesthesiologist providing CRNA break relief is the sole anesthesia provider caring for the patient undergoing anesthesia and thus cannot possibly provide compliant medically directed services to other concurrent Medicare patients in other operating rooms since the anesthesiologist is unable to leave the bedside of the patient under direct care.

73.     Each time the NAPA Defendants' anesthesiologist provides CRNA break relief at PMC while medically directing concurrent cases - without arranging for available anesthesiologist coverage in his absence or noting his services were only supervisory - a false claim for medical direction is subsequently submitted by Defendants to Medicare. This break model is the usual practice for providing CRNA relief breaks by the NAPA Defendants' anesthesiologists at PMC. Relator has never observed a NAPA anesthesiologist charting his

services as supervisory, but, contrarily, Relator has always observed signed attestations

indicating all criteria have been met to substantiate reimbursement for the much more lucrative

medical direction model of Medicare anesthesia service provision.

74.     There are numerous specific instances where the NAPA Defendants violated

Medicare and TEFRA rules regarding reimbursement for "medical direction" services.

75.     On June 5, 2012, Dr. David Richlin ("Dr. Richlin") was medically directing

Relator on a case involving REDACTED a 74-year-old Medicare patient.  Dr. Richlin gave

Relator a break at approximately 8:33 a.m., meaning he was solely responsible for REDACTED

care, while at the same time medically directing CRNA Semyon Glukhoy during the concurrent

case of REDACTED a 69-year-old Medicare patient in another operating room.  Dr. Richlin

was not immediately available during the course of REDACTED anesthetic and did not arrange

adequate medical direction coverage in his absence as required by Medicare.  On information

and belief, the NAPA Defendants submitted a Medicare claim on Dr. Richlin's behalf for the

medically directed anesthesia services of REDACTED even though such claim was not

supported under Medicare and TEFRA rules.  *See* Relator's Handwritten Notes regarding REDACTED

REDACTED and REDACTED Exhibit 1 to the Disclosure Statement of Relator Michael Lord,

executed on December 4, 2013 (the "Lord Discl. Stmt.").

76.     On June 11, 2012, Dr. Laurence Rosenberg ("Dr. Rosenberg") was medically

directing Relator on a case involving REDACTED a 70-year-old Medicare patient.  While

medically directing Relator, Dr. Rosenberg gave CRNA Semyon Glukhoy a break between

approximately 11:40 a.m. and 12:10 p.m., during a concurrent case in another operating room.

Dr. Rosenberg was solely responsible for another patient's care, unable to leave that patient's

bedside, while medically directing Relator on a concurrent Medicare case that required Dr.

Rosenberg to remain immediately available at all times. Dr. Rosenberg was not immediately available throughout REDACTED anesthetic and did not arrange adequate medical direction coverage in his absence as required by Medicare. On information and belief, the NAPA Defendants submitted a Medicare claim on Dr. Rosenberg's behalf for the medically directed anesthesia services of REDACTED even though such claim was not supported under Medicare and TEFRA rules. *See* Daily Surgery Schedule and Relator's Handwritten Notes regarding REDACTED Exhibit 2 to the Lord Discl. Stmt.

77.     On July 24, 2012, Dr. Rosenberg was medically directing Relator on a case involving patient REDACTED a 66-year-old Medicare patient. While medically directing Relator, and after induction of anesthesia and intubation of REDACTED Dr. Rosenberg provided break relief to CRNA Elissa Shannon in another operating room during a concurrent case at approximately 11:15 a.m. Dr. Rosenberg was solely responsible for another patient's care, unable to leave that patient's bedside, while concurrently medically directing Relator during REDACTED REDACTED anesthetic. Dr. Rosenberg was not immediately available throughout REDACTED anesthetic and did not arrange adequate medical direction coverage in his absence as required by Medicare. On information and belief, the NAPA Defendants submitted a Medicare claim on Dr. Rosenberg's behalf for the medically directed anesthesia services of REDACTED even though such claim was not supported under Medicare and TEFRA rules. *See* Anesthesia Record, Daily Surgery Schedule, and Relator's Handwritten Notes regarding REDACTED Exhibit 3 to the Lord Discl. Stmt.

78.     On June 19, 2012, Dr. Richlin was medically directing Relator during a case involving REDACTED a 72-year-old Medicare patient. Dr. Richlin gave CRNA Santiago Betancourt a break, meaning he was solely responsible for another patient's care in a different

operating room while medically directing Relator for REDACTED care during this time. Dr. Richlin was not immediately available throughout REDACTED anesthetic and did not arrange adequate medical direction coverage in his absence as required by Medicare. On information and belief, the NAPA Defendants submitted a Medicare claim on Dr. Richlin's behalf for the medically directed anesthesia services of REDACTED even though such claim was not supported under Medicare and TEFRA rules. *See* Anesthesia Record, Daily Surgery Schedule, and Relator's Handwritten Notes regarding REDACTED Exhibit 4 to the Lord Discl. Stmt.

79.     On July 17, 2012, Dr. Jay Lee ("Dr. Lee") was medically directing Relator on a case involving REDACTED an 80-year-old Medicare patient. When Relator called Dr. Lee and requested assistance during emergence, Dr. Lee stated he was giving CRNA Kathi J. McGoldrick a break and said, "Go on without me and call back if there's an issue." Dr. Lee was not immediately available throughout REDACTED anesthetic and did not arrange adequate medical direction coverage as required by Medicare. On information and belief, the NAPA Defendants submitted a Medicare claim on Dr. Lee's behalf for medically directed anesthesia services of REDACTED even though such claim was not supported under Medicare and TEFRA rules. *See* Relator's Handwritten Notes regarding REDACTED Exhibit 5 to the Lord Discl. Stmt.

80.     On July 23, 2012, Dr. Musa Tangoren ("Dr. Tangoren") was medically directing Relator on a case involving patient REDACTED a 60-year-old Medicare patient. At approximately 8:37 a.m. Dr. Tangoren gave CRNA Elissa Shannon a break, meaning he was solely responsible for another patient's care while medically directing Relator during REDACTED REDACTED care. Dr. Tangoren was not immediately available throughout the course of REDACTED REDACTED anesthetic and did not arrange adequate medical direction coverage in his absence as required by Medicare. On information and belief, the NAPA Defendants submitted a Medicare

claim on Dr. Tangoren's behalf for the medically directed anesthesia services of REDACTED even though such claim was not supported under Medicare and TEFRA rules. *See* Daily Surgery Schedule and Relator's Handwritten Notes regarding REDACTED Exhibit 6 to the Lord Discl. Stmt.

81.    On August 14, 2012, Dr. Jay Lee was medically directing Relator on a case involving REDACTED an 81-year-old Medicare patient. When Relator called Dr. Lee for emergence at 8:56 a.m., Dr. Lee stated he was giving CRNA Charlene Johnson a break in operating room #5 where Dr. Lee was concurrently medically directing another Medicare patient. Dr. Lee directed Relator, "Go on without me and call back if there are any problems." Dr. Lee was not immediately available throughout the course of REDACTED anesthetic and did not arrange adequate medical direction coverage as required by Medicare. On information and belief, the NAPA Defendants submitted a Medicare claim on Dr. Lee's behalf for the medically directed anesthesia services of REDACTED even though such claim was not supported under Medicare and TEFRA rules. *See* Daily Surgery Schedule and Relator's Handwritten Notes regarding REDACTED Exhibit 7 to the Lord Discl. Stmt.

82.    On September 11, 2012, Dr. Michael Chua ("Dr. Chua") medically directed Relator on a case involving REDACTED a 73-year-old Medicare patient. Although Dr. Rosenberg started this case, Dr. Chua signed the attestation stating he was present for induction. Nonetheless, when Dr. Chua was called by Relator to assist with emergence and extubation at the end of the case, Dr. Chua was not immediately available and did not come to the operating room as required. CRNA Elissa Shannon assisted Relator with extubation and emergence in Dr. Chua's absence. Since Dr. Chua was not immediately available throughout the course of the anesthetic, and did not arrange for adequate medical direction coverage in his absence, Medicare

and TEFRA rules for medically directed anesthesia services were not met. On information and belief, the NAPA Defendants submitted a claim on Dr. Chua's behalf for the medically directed anesthesia services of REDACTED even though such claim was not supported under Medicare and TEFRA rules. *See* REDACTED Anesthesia Record and Daily Surgery Schedule, Exhibit 8 to the Lord Discl. Stmt.

83.     On August 6, 2012, Dr. Richlin was medically directing Relator involving patient REDACTED a 78-year-old Medicare patient. Relator called Dr. Richlin to notify him that he would be emerging the patient from anesthesia shortly and requested assistance at this time. Dr. Richlin promptly arrived in the operating room, but then Dr. Richlin immediately left and did not return for emergence and the removal of the laryngeal mask airway, which was Relator independently performed, despite his request for assistance. Since Dr. Richlin left the bedside and did not return after Realtor's call for assistance during wakeup, and since Dr. Richlin did not arrange for adequate medical direction coverage in his absence, Dr. Richlin did not meet the requirement of continued immediate availability throughout the course of REDACTED anesthetic as required by Medicare. On information and belief, the NAPA Defendants submitted a Medicare claim on Dr. Richlin's behalf for the medically directed anesthesia services of REDACTED REDACTED even though such claim was not supported under Medicare and TEFRA rules. *See* Daily Surgery Schedule and Relator's Handwritten Notes regarding REDACTED Exhibit 9 to the Lord Discl. Stmt.

84.     On October 15, 2012, Dr. Marcus was medically directing Relator involving patient REDACTED a 79-year-old Medicare patient. Relator called Dr. Marcus requesting assistance with extubation. Dr. Marcus informed relator he was giving CRNA Elissa Shannon a lunch break in another operating room. Dr. Marcus was not immediately available throughout

the course of REDACTED anesthetic and did not arrange adequate medical direction coverage in his absence as required by Medicare. On information and belief, the NAPA Defendants submitted a Medicare claim on Dr. Marcus' behalf for the medically directed anesthesia services of REDACTED even though such claim was not supported under Medicare and TEFRA rules. *See* Anesthesia Record, Daily Surgery Schedule, and Relator's Handwritten Notes regarding REDACTED Exhibit 10 to the Lord Discl. Stmt.

85.     On the same day, October 15, 2012, Dr. Marcus was medically directing Relator involving patient REDACTED a 69-year-old Medicare patient. Dr. Marcus had given Relator a break from approximately 12:40 p.m. to 1:20 p.m. and left the operating room upon Relator's return. Shortly thereafter Relator called Dr. Marcus back, requesting assistance with emergence and extubation. However Dr. Marcus was not immediately available and Relator performed the extubation alone, despite his request for assistance. Dr. Marcus was not immediately available throughout the course of REDACTED anesthetic and did not arrange for adequate medical direction coverage in his absence as required by Medicare. On information and belief, the NAPA Defendants submitted a Medicare claim on Dr. Marcus' behalf for the medically directed anesthesia services of REDACTED even though such claim was not supported under Medicare and TEFRA rules. *See* Anesthesia Record and Daily Surgery Schedule regarding REDACTED Exhibit 11 to the Lord Discl. Stmt.

86.     On December 19, 2012, Dr. Tangoren was medically directing Relator on a case involving patient REDACTED a 70 year old Medicare patient. Shortly after induction and intubation at 7:39 a.m., Dr. Tangoren gave CRNA Kathi J. McGoldrick a break during a concurrent case in another operating room, meaning Dr. Tangoren was solely responsible for another patient's care, unable to leave that patient's bedside, while at the same time medically

directing Relator during REDACTED anesthetic.  Dr. Tangoren was not immediately available throughout the course of REDACTED anesthetic and did not arrange adequate medical direction coverage in his absence as required by Medicare.  On information and belief, the NAPA Defendants submitted a Medicare claim on Dr. Tangoren's behalf for the medically directed anesthesia services of REDACTED even though such claim was not supported under Medicare and TEFRA rules.  *See* Anesthesia Record, Daily Surgery Schedule, and Relator's Handwritten Notes regarding REDACTED Exhibit 12 to the Lord Discl. Stmt.

87.     On February 1, 2013, Dr. Chua was medically directing Relator in a case involving REDACTED a 65-year-old Medicare patient.  At approximately 6:45 p.m., Dr. Chua gave Dr. Richlin, who was personally performing anesthesia care for another patient in a different operating room, a dinner break.  Dr. Chua, while providing a relief break for Dr. Richlin, was providing direct care to a different patient in another operating room, and unable to leave that patient's bedside.  Thus, Dr. Chua was not immediately available throughout the course of REDACTED anesthetic and did not arrange adequate medical direction coverage in his absence as required by Medicare.  On information and belief, the NAPA Defendants submitted a Medicare claim on Dr. Chua's behalf for the medically directed anesthesia services of REDACTED even though such claim was not supported under Medicare and TEFRA rules.  *See* Daily Surgery Schedule and Relator's Handwritten Notes regarding REDACTED REDACTED Exhibit 13 to the Lord Discl. Stmt.

88.     On April 8, 2013, Dr. Dusan Damjanovic ("Dr. Damjanovic") was medically directing Relator involving patient REDACTED a 41-year-old Medicare patient.  Relator called Dr. Damjanovic for assistance with emergence and the removal of the patient's laryngeal mask airway, however Dr. Damjanovic was not immediately available.  Relator emerged the

patient from anesthesia and removed the laryngeal mask airway at the appropriate time and indicated on the Anesthesia Record that the case involved a "CRNA only for removal" of the breathing device. Dr. Damjanovic was not immediately available throughout the course of REDACTED REDACTED anesthetic and did not arrange for adequate medical direction coverage in his absence as required by Medicare. On information and belief, the NAPA Defendants submitted a Medicare claim on Dr. Damjanovic's behalf for the medically directed anesthesia services of REDACTED REDACTED even though such claim was not supported under Medicare and TEFRA rules. *See* Anesthesia Record and Daily Surgery Schedule regarding REDACTED Exhibit 14 to the Lord Discl. Stmt.

89.     On June 17, 2013, Dr. Damjanovic was medically directing Relator on a case involving patient REDACTED a 74-year-old Medicare patient. Dr. Damjanovic gave Relator a break at approximately 9:36 a.m., meaning he was solely responsible for REDACTED care, while at the same time medically directing CRNA Kathi J. McGoldrick in the concurrent case of REDACTED REDACTED a 79-year-old Medicare patient. Dr. Damjanovic was not available throughout the course of REDACTED anesthetic and did not arrange adequate medical direction coverage in his absence as required by Medicare. On information and belief, the NAPA Defendants submitted a Medicare claim on Dr. Damjanovic's behalf for the medically directed anesthesia services of REDACTED even though such claim was not supported under Medicare and TEFRA rules. *See* Anesthesia Records and Daily Surgery Schedule regarding REDACTED and REDACTED Exhibit 15 to the Lord Discl. Stmt.

90.     On June 20, 2013, Dr. Tangoren was medically directing Relator on a case involving patient REDACTED At approximately 10:42 a.m. Dr. Tangoren gave Relator a break, meaning he was solely responsible for REDACTED care, while at the same time medically

directing CRNA Santiago Betancourt in the concurrent case of REDACTED a 67-year-old

Medicare patient. Dr. Tangoren was not immediately available throughout the course of REDACTED

REDACTED anesthetic and did not arrange adequate medical direction coverage in his absence as

required by Medicare. On information and belief, the NAPA Defendants submitted a Medicare

claim on Dr. Tangoren's behalf for the medically directed anesthesia services of REDACTED

even though such claim was not supported under Medicare and TEFRA rules. *See* REDACTED

REDACTED Anesthesia Records and Daily Surgery Schedule, Exhibits 16 and 17, respectively, to the

Lord Discl. Stmt.

### B. NAPA Permitted Anesthesiologists to Pre-Sign Attestations in Violation of Medicare Rules

91.     NAPA anesthesiologists at PMC routinely pre-signed attestations stating: "I was

present for induction, key portions of the procedure and emergence; and immediately available

throughout" at the beginning of cases prior to knowing whether they would meet these

requirements during any anesthetic. Relator repeatedly witnessed the NAPA Defendants'

anesthesiologists pre-sign attestations on the anesthesia record stating "I was present for

induction, key portions of the procedure and emergence: and immediately available throughout."

By signing the attestation, the NAPA Defendants' anesthesiologists attested they had met the

requirements of medical direction as set forth by Medicare and TEFRA rules for such anesthetics

involving Medicare patients.

92.     Relator also routinely witnessed the pre-writing of post-operative orders for the

patient's care in the recovery room. This occurred with enormous frequency, usually at the same

time that the attestation was pre-signed at the beginning of the case.

93.     Moreover, in the event these false attestations were discovered, no steps were

taken to make corrections. Instead, on information and belief, these false forms were forwarded

to the NAPA Defendant's billing department indicating that all Medicare requirements were fulfilled. This pattern and practice involved all patients, without regard to payer type. When involving Medicare patients, this violated Medicare and TEFRA rules. Relator routinely witnessed NAPA attending anesthesiologists pre-sign patient Anesthesia Records, prior to providing services to that patient. In most cases, the attestations were pre-signed at the time of induction of anesthesia and sometimes before the patient even arrived in the operating room.

94.     For example, on June 20, 2013, Dr. Tangoren was the attending anesthesiologist assigned to the case of REDACTED Relator witnessed Dr. Tangoren pre-sign the compliance attestation on the Anesthesia Record at 8:05 a.m., at the same time Dr. Tangoren pre-wrote the patient's post-operative orders for her care in the recovery room despite the fact that REDACTED REDACTED did not even enter the operating room until 8:30 a.m. *See* June 20, 2013 REDACTED REDACTED Anesthesia Records (pre-signed and post-procedure) and Post-Anesthesia Order Form, Exhibit 18 to the Lord Discl. Stmt.

95.     Pre-signing attestations violates Medicare rules since an anesthesiologist may not actually meet the TEFRA requirements attested to during the course of the patient's anesthetic. Furthermore, patients are put in danger when post-operative orders are pre-written since one cannot safely prescribe post-operative care without knowing what happened during the anesthetic, what physiologic changes, adverse events or circumstances might have occurred during the anesthetic, and without knowing what pharmaceuticals the patient received during the course of anesthesia. The NAPA Defendants' anesthesiologists were advised that these practices were unacceptable by NAPA's compliance department.

96.     In a letter from Leslie Russo ("Russo"), NAPA's Vice President of Human Resources and Compliance, dated March 12, 2013, Relator was informed that "[i]n reference to

your allegation that it is routine practice at PMC for anesthesiologist [sic] to pre-sign the attestation on the chart at the beginning of the case, this is a new allegation that was not previously discussed. As such I have reviewed with Dr. Nostro and will ensure that Dr. Nostro conducts an educational in-service with both attendings and CRNAs to ensure that this does not occur." *See* March 12, 2103 Letter from Russo, Exhibit 19 to the Lord Discl. Stmt. Yet, this practice was observed with regularity by Relator up to and including on his last day at PMC.

97.     Throughout Relator's employment at PMC, he routinely witnessed anesthesiologists pre-sign the Anesthesia Records in violation of Medicare and TEFRA rules and in furtherance of their scheme to fraudulently bill for medically directed services whether or not TEFRA rules were indeed fulfilled. The following are examples of pre-signed attestations by every NAPA anesthesiologist practicing at PMC at the time of Relator's wrongful termination of employment.

98.     On March 14, 2013, Relator witnessed Dr. Tangoren pre-sign the attestation on a patient's Anesthesia Record as is his usual practice. The image provided was taken by Relator on March 14, 2013 at 9:22 a.m. *See* March 14, 2013 Pre-signed Anesthesia Record of Dr. Tangoren, Exhibit 20 to the Lord Discl. Stmt.

99.     On March 15, 2013, Relator witnessed Dr. Abohawariat Tesfaye ("Dr. Tesfaye") pre-sign the attestation on a patient's Anesthesia Record as is his usual practice as observed by Relator. The image provided was taken by Relator on March 15, 2013 at 9:15 a.m. *See* March 15, 2013 Pre-signed Anesthesia Record of Dr. Tesfaye, Exhibit 21 to the Lord Discl. Stmt.

100.     On March 15, 2013, Relator witnessed a NAPA anesthesiologist pre-sign the attestation on a patient's Anesthesia Record. The image provided was taken by Relator on

March 15, 2013 at 7:46 a.m. *See* March 15, 2013 Pre-signed Anesthesia Record, Exhibit 22 to the Lord Discl. Stmt.

101.    On March 21, 2013, Relator witnessed a NAPA anesthesiologist pre-sign the attestation on a patient's Anesthesia Record. The image provided was taken by Relator on March 21, 2013 at 1:46 p.m. *See* March 21, 2013 Pre-signed Anesthesia Record, Exhibit 23 to the Lord Discl. Stmt.

102.    On March 21, 2013, Dr. Chua pre-signed the attestation on Medicare patient **REDACTED** Anesthesia Record as is his usual practice as observed by Relator. The image provided was taken on March 21, 2013 at 6:29 p.m. *See* March 21, 2013 Pre-signed Anesthesia Record of Dr. Chua, Exhibit 24 to the Lord Discl. Stmt.

103.    On March 22, 2013, Relator witnessed Dr. Richlin pre-sign the attestation on a patient's Anesthesia Record as is his usual practice as observed by Relator. The image provided was taken by Relator on March 22, 2013 at 7:54 a.m. *See* March 22, 2013 Pre-signed Anesthesia Record of Dr. Richlin and Daily Surgery Schedule, Exhibit 25 to the Lord Discl. Stmt.

104.    On March 22, 2013, Relator witnessed Dr. Richlin pre-sign the attestation on another patient's Anesthesia Record as is his usual practice as observed by Relator. The image provided was taken by Relator on March 22, 2013 at 10:00 a.m. *See* March 22, 2013 Pre-signed Anesthesia Record of Dr. Richlin, Exhibit 26 to the Lord Discl. Stmt.

105.    On March 26, 2013, Relator witnessed Dr. Wu Chen ("Dr. Chen") pre-sign the attestation on a patient's Anesthesia Record as is her usual practice as observed by Relator. The image provided was taken by Relator on March 26, 2013 at 10:26 a.m. *See* March 26, 2013 Pre-signed Anesthesia Record of Dr. Chen and Daily Surgery Schedule, Exhibit 27 to the Lord Discl. Stmt.

106. On March 27, 2013, Relator witnessed both Dr. Nostro and Dr. Damjanovic pre-sign the attestation on a patient's Anesthesia Record. The image provided was taken by Relator on March 27, 2013 at 7:51 a.m. *See* March 27, 2013 Pre-signed Anesthesia Record of Dr. Nostro and Dr. Damjanovic, Exhibit 28 to the Lord Discl. Stmt. Of particular concern here, Chief Nostro pre-signed this attestation after Russo advised Relator approximately two weeks prior to this incident that she required Dr. Nostro to conduct a departmental in service to "ensure that this does not occur."

107. On March 28, 2013, Relator witnessed Dr. Marcus pre-sign the attestation on a patient's Anesthesia Record as is his usual practice as observed by Relator. The image provided was taken by Relator on March 28, 2013 at 12:16 p.m. *See* March 28, 2013 Pre-signed Anesthesia Record of Dr. Marcus, Exhibit 29 to the Lord Discl. Stmt.

108. On March 28, 2013, Relator witnessed Dr. Marcus pre-sign the attestation on a patient's Anesthesia Record as is his usual practice as observed by Relator. The image provided was taken by Relator on March 28, 2013 at 2:42 p.m. *See* March 28, 2013 Pre-signed Anesthesia Record of Dr. Marcus, Exhibit 30 to the Lord Discl. Stmt.

109. On April 1, 2013, Relator witnessed Dr. Marcus pre-sign the attestation on a patient's Anesthesia Record as is his usual practice as observed by Relator. The image provided was taken by Relator on April 1, 2013 at 8:10 a.m. *See* April 1, 2013 Pre-signed Anesthesia Record of Dr. Marcus and Daily Surgery Schedule, Exhibit 31 to the Lord Discl. Stmt.

110. On April 3, 2013, Relator witnessed Dr. Rosenberg pre-sign the attestation on a patient's Anesthesia Record. The image provided was taken by Relator on April 3, 2013 at 1:26 p.m. *See* April 3, 2013 Pre-signed Anesthesia Record and Daily Surgery Schedule, Exhibit 32 to the Lord Discl. Stmt.

111.    On April 4, 2013, Relator witnessed Dr. Rosenberg pre-sign the attestation on a patient's Anesthesia Record as is his usual practice as observed by Relator. The image provided was taken by Relator on April 4, 2013 at 11:13 a.m. *See* April 4, 2013 Pre-signed Anesthesia Record of Dr. Rosenberg and Daily Surgery Schedule, Exhibit 33 to the Lord Discl. Stmt.

112.    On April 5, 2013, Relator witnessed Dr. Chen pre-sign the attestation on a patient's Anesthesia Record as is her usual practice as observed by Relator. The image provided was taken by Relator on April 5, 2013 at 11:37 a.m. *See* April 5, 2013 Pre-signed Anesthesia Record of Dr. Chen and Daily Surgery Schedule, Exhibit 34 to the Lord Discl. Stmt.

113.    Also, on April 5, 2013, Relator witnessed Dr. Chen pre-sign the attestation on another patient's Anesthesia Record as is her usual practice as observed by Relator. The image provided was taken by Relator on April 5, 2013 at 8:25 a.m. *See* April 5, 2013 Pre-signed Anesthesia Record of Dr. Chen and Daily Surgery Schedule, Exhibit 35 to the Lord Discl. Stmt.

114.    On April 8, 2013, Relator witnessed Dr. Damjanovic pre-sign the attestation on a patient's Anesthesia Record as is his usual practice as observed by Relator. The image provided was taken by Relator on April 8, 2013 at 9:50 a.m. *See* April 8, 2013 Pre-signed Anesthesia Record of Dr. Damjanovic, Exhibit 36 to the Lord Discl. Stmt.

115.    On April 10, 2013 Relator witnessed Dr. Marcus pre-sign the attestation on a patient's Anesthesia Record as is his usual practice as observed by Relator. The image provided was taken by Relator on April 10, 2013 at 10:56 a.m. *See* April 10, 2013 Pre-signed Anesthesia Record of Dr. Marcus and Daily Surgery Schedule, Exhibit 37 to the Lord Discl. Stmt.

116.    On May 17, 2013, Relator witnessed Dr. Tesfaye pre-sign the attestation on a patient's Anesthesia Record as is his usual practice as observed by Relator. The image provided

was taken by Relator on May 17, 2013 at 12:44 p.m. *See* May 17, 2013 Pre-signed Anesthesia Record and Daily Surgery Schedule, Exhibit 38 to the Lord Discl. Stmt.

117.　On May 20, 2013, Relator witnessed Dr. Chua pre-sign a patient's Anesthesia Record and pre-write the patient's post-operative orders as is his usual practice as observed by Relator. The images provided were taken by Relator on May 20, 2013 at 3:13 p.m. and 3:25 p.m. *See* May 20, 2013 Pre-signed Anesthesia Record and Post Anesthesia Physician's Orders of Dr. Chua and Daily Surgery Schedule, Exhibit 39 to the Lord Discl. Stmt.

118.　On the same day, May 20, 2013, Dr. Chua was the anesthesiologist responsible for the medical direction of Relator assigned to provide anesthesia services for REDACTED a 67 year old Medicare patient. Relator witnessed Dr. Chua pre-sign the attestation on the Anesthesia Record. After observing this, Relator witnessed Dr. Chua pre-write post-operative orders for REDACTED care in the recovery room. Dr. Chua wrote these post-operative orders at 4:19 p.m., even though REDACTED only arrived in the operating room at 4:10 p.m. and induction of anesthesia and intubation did not even occur until 4:20 p.m. The image provided of the pre-signed attestation was taken by Relator on May 20, 2013 at 4:26 p.m. *See* May 20, 2013 Pre-signed Anesthesia Record, Evaluation Form, and Post Anesthesia Physician's Orders of Dr. Chua, and Daily Surgery Schedule, Exhibit 40 to the Lord Discl. Stmt.

119.　In addition, Dr. Chua also deliberately mislabeled a syringe containing ketamine, specifying that the medication in the syringe was etomidate, when it was not, instead of exercising adequate precaution to label it appropriately. Relator often witnessed Dr. Chua mislabel syringes in this fashion. The images of the syringe and the medication vial provided were taken by Relator on May 20, 2013 at 4:26 p.m. and 5:02 p.m. *See* images of syringe and medication vial Exhibit 41 to the Lord Discl. Stmt.

120.    On June 10, 2013, Relator witnessed Dr. Damjanovic pre-sign the attestation on a patient's Anesthesia Record as is his usual practice as observed by Relator. The image provided was taken by Relator on June 10, 2013 at 11:22 a.m. *See* June 10, 2013 Pre-signed Anesthesia Record of Dr. Damjanovic, Exhibit 42 to the Lord Discl. Stmt.

121.    On June 17, 2013, Dr. Damjanovic was the anesthesiologist responsible for the medical direction of Relator assigned to provide anesthesia services for Medicare patient ▮REDACTED▮ ▮REDACTED▮ Relator witnessed Dr. Damjanovic pre-sign the attestation on the patient's Anesthesia Record and then Relator witnessed Dr. Damjanovic pre-write post-operative orders for ▮REDACTED▮ ▮REDACTED▮ post-anesthesia care in the recovery room. Dr. Damjanovic signed these post-operative orders at 9:30 a.m., although the patient only arrived in the recovery area after surgery ended at 11:55 a.m. *See* June 17, 2013 Pre-signed Anesthesia Record and Post Anesthesia Physician's Orders of Dr. Damjanovic, Exhibit 43 to the Lord Discl. Stmt.

122.    On June 20, 2013, both Relator and CRNA Danielle McKnight witnessed Dr. Damjanovic pre-sign the attestation on the Anesthesia Record for his first case of the day. CRNA Danielle McKnight pointed this out to Dr. Damjanovic in front of Relator and declared, "You [Dr. Damjanovic] just committed fraud." Dr. Damjanovic ignored CRNA Danielle McKnight.

## C.    NAPA Anesthesiologists Routinely Failed to Perform Adequate Pre-Anesthetic Examinations and Evaluations as Required by Medicare and TEFRA

123.    Relator repeatedly witnessed NAPA anesthesiologists falsifying or ignoring key elements of pre-anesthetic examinations and evaluations. Medicare and TEFRA rules for medically directed anesthesia services require anesthesiologists to perform a complete pre-anesthetic examination and evaluation. At NAPA, anesthesiologists routinely fail to conduct

thorough and complete pre-anesthetic examinations and evaluations, yet sign the Evaluation

Forms signaling that such services were provided and that patients were appropriately cleared for

anesthesia. This practice was known and encouraged by NAPA's leadership, despite that when

claims were submitted to Medicare for reimbursement, Medicare and TEFRA rules were

violated.

124.     As evidence of this fraudulent practice, the NAPA Defendants' Anesthetic

Records and Evaluation Forms, which were supposedly complete, routinely contained blank

boxes and sections that were completely ignored, which indicate that various components of

physical examinations and patient evaluations were not performed by medically directing NAPA

anesthesiologists. The following are typical examples of how NAPA anesthesiologists routinely

falsified or ignored key elements of pre-anesthetic evaluations. Relator witnessed NAPA

anesthesiologists routinely sign off on incomplete Evaluation Forms, indicating services were

rendered and complete when they were not.

125.     REDACTED On September 19, 2012, Dr. Rosenberg was responsible for

performing a pre-anesthetic examination and evaluation on REDACTED a 91-year-old

Medicare patient, that was incomplete and substandard. Dr. Rosenberg failed to examine and

evaluate several extremely important patient metrics on the Evaluation Form, including failing to

address status of the patient's prescribed atenolol, a beta adrenergic receptor antagonist (or "beta

blocker"), regarding why it was withheld on the day of surgery (an important patient safety

parameter as required by the national Surgical Care Improvement Project or "SCIP Protocol").

Dr. Rosenberg also failed to evaluate the following parameters: respiratory, hepatic, renal,

gastrointestinal, hematology, musculoskeletal, cancer history, infection history and social habits

history. Relator wrote in the required information pertaining to the beta blocker after being

assigned to the case at the end of the procedure to comply with the SCIP Protocol. Dr.

Rosenberg failed to perform a neurologic examination as the physical examination section on

page 2 of the Evaluation Form reveals. On information and belief, the NAPA Defendants

submitted a Medicare claim on Dr. Rosenberg's behalf for medically directed anesthesia services

for REDACTED even though such claim was not supported under Medicare and TEFRA

rules. *See* REDACTED Anesthesia Record and Evaluation Form, Exhibit 44 to the Lord Discl. Stmt.

126.   REDACTED For a case scheduled to occur on May 17, 2013, Dr. Chen was

responsible for completing the pre-anesthetic examination and evaluation on REDACTED a

65-year-old female Medicare patient, that was incomplete and substandard. Dr. Tesfaye was

assigned to this case on the day of surgery and responsible for ensuring the completeness of Dr.

Chen's evaluation and, in addition, responsible for directly examining this patient. Dr. Chen

failed to indicate several extremely important patient metrics on the "Patient Questionnaire"

section of the Evaluation Form, including review of the following systems: gastrointestinal,

hematology, musculoskeletal, and cancer history. Even though the Evaluation Form indicated a

negative history of tobacco use, Relator learned by speaking with the patient she formerly

smoked three packs of cigarettes per week. Dr. Chen only listed two medications (Dilaudid and

Percocet) that REDACTED was taking, even though she was prescribed ten other medications,

including 500 mg of Toprol and lisinopril, Plavix, oxycontin, Humalog insulin and Zofran taken

every four hours for nausea. Each of these omitted medications has important implications for

appropriate anesthetic planning. Failing to obtain this information not only violated Medicare

and TEFRA rules, but also put the patient in danger. Even though the Evaluation Form was

wholly incomplete and certain specifics of the omitted information were available to Dr. Chen,

Dr. Chen signed the REDACTED Evaluation Form, without noting the date she signed it.

127.    Further, it is also disturbing that the second anesthesiologist responsible for the

pre-anesthetic examination and evaluation, Dr. Tesfaye, approved the REDACTED Evaluation Form

even though he had access to the same information.  In addition, Dr. Tesfaye had direct access to

the patient and also failed to determine the patient's smoking history and failed to document the

additional medications Dr. Chen omitted.  Dr. Tesfaye also failed to determine whether REDACTED

REDACTED had taken food or drink in the 8 hours preceding surgery.  Dr. Tesfaye also failed to

recognize that the patient had a peripherally inserted central catheter in her left arm, also very

important information.  He also failed to correct the patient's dentition status (part of the airway

assessment) as erroneously noted by Dr. Chen for which Dr. Chen stated the patient had full

dentures whereas she had upper dentures and lower missing teeth with some teeth still in place.

This information is of importance for anesthesia providers considering airway management.  He

then signed the form on May 17, 2013.  After the Evaluation Form was signed off by two NAPA

anesthesiologists and cleared for surgery, Relator rectified missing information. On information

and belief, the NAPA Defendants submitted a Medicare claim on Dr. Tesfaye's behalf for

medically directed anesthesia services for REDACTED even though such claim was not

supported under Medicare and TEFRA rules.  *See* REDACTED Anesthesia Record and Daily Surgery

Schedule, Exhibit 45 to the Lord Discl. Stmt.

128.   REDACTED On March 21, 2013, Dr. Chua was responsible for completing

the pre-anesthetic examination and evaluation on REDACTED Dr. Chua also was the

anesthesiologist assigned to the case on the day of surgery.  Dr. Chua failed to indicate several

important patient metrics on the Evaluation Form, including an airway assessment.  An airway

assessment is a physical examination of the patient's airway anatomy, which considers the

Mallampati score (a visual grading from I to IV) besides other measurements and parameters

used together to predict a "difficult airway" or the potential for "difficult ventilation" or a "difficult intubation" and to gauge the relative difficulty of maintaining an open airway for the patient. Airway evaluation is a critical assessment and this evaluation must be performed prior to every anesthetic to meet the standard of care. A disconcerting assessment may prompt additional considerations related to airway management, preparation of supplemental equipment, consideration of a change in anesthetic plan, coordination of availability of additional providers to assist, and/or consultation of surgical personnel to stand by for a potential emergency requiring surgical intervention.

129.    Failure to perform an airway assessment and/or to recognize a potential "difficult airway" puts a patient's life at risk since an unpredicted and/or unexpected "cannot ventilate/cannot intubate" circumstance is a serious life-threatening emergency and one that might be averted through proper evaluation and planning. Even though an airway assessment was not performed, Dr. Chua signed REDACTED Evaluation Form. Dr. Chua also pre-signed the attestation for this patient as is his usual practice. On information and belief, the NAPA Defendants submitted a Medicare claim on Dr. Chua's behalf for medically directed anesthesia services for REDACTED even though such claim was not supported under Medicare and TEFRA rules. The image provided was taken by Relator on March 21, 2013 at 6:29 p.m. *See* REDACTED Anesthesia Record and Evaluation Form, Exhibit 46 to the Lord Discl. Stmt.

130.    REDACTED On August 2, 2011, Dr. Yelena Korobkova ("Dr. Korobkova") was assigned as the attending anesthesiologist on the day of surgery for REDACTED REDACTED a 71-year-old Medicare patient. Dr. Korobkova was responsible for performing the pre-anesthetic examination and evaluation required by Medicare that was incomplete and substandard. Dr. Korobkova failed to conduct an adequate physical examination, failed to note

the patient's pre-anesthesia vital signs, failed to assess the patient's airway, and failed to determine the PO status of REDACTED The entire physical examination, airway assessment and PO Status sections of the Evaluation Form remain blank. Even though a full pre-anesthetic examination and evaluation were not performed, Dr. Korobkova signed the REDACTED Evaluation Form and induced anesthesia for this patient. This put the patient at great risk. Relator was assigned as the CRNA on call and was forced to assume the responsibility and risk of this anesthetic regarding this patient who did not receive the standard of care required by Medicare. This not only was of great risk to the patient, but put Relator in a position of great liability. This egregious behavior exhibited blatant and willful disregard for both patient safety and professional behavior. Remarkably, on more than one occasion when Relator pointed out to Dr. Korobkova missing information on Dr. Korobkova's Evaluation Forms she replied, "Who cares!" On information and belief, the NAPA Defendants submitted a Medicare claim on Dr. Korobkova's behalf for medically directed anesthesia services for REDACTED REDACTED even though such claim was not supported under Medicare and TEFRA rules. *See* REDACTED Anesthesia Record, Evaluation Form, and Physician's Rounding Report, Exhibit 47 to the Lord Discl. Stmt.

131. REDACTED On March 27, 2012, Dr. Rosenberg was responsible for performing a pre-anesthetic examination and evaluation on REDACTED a 9-year-old patient, that was incomplete and substandard. Dr. Rosenberg failed to conduct an adequate physical examination and failed to assess the airway of REDACTED without adequate reason or indication why such information was unattainable and, therefore, omitted. The physical evaluation and airway assessment sections of the Evaluation Form are completely blank except for vital signs filled in by Relator after Dr. Rosenberg sent the patient to the operating room.

Even though a full pre-anesthetic examination and evaluation were not performed, Dr. Rosenberg signed the REDACTED Evaluation Form. Although REDACTED is not a Medicare patient, this conduct is another example of blatant disregard for patient safety and willingness to ignore the standard of care as related to the anesthetic for this 9-year-old girl. *See* REDACTED Evaluation Form and Daily Surgery Schedule, Exhibit 48 to the Lord Discl. Stmt.

132.    REDACTED On April 5, 2012, Dr. Chua was responsible for performing a pre-anesthetic examination and evaluation on REDACTED an 85-year-old female Medicare patient that was incomplete and substandard. Dr. Chua failed to review and indicate the medications that REDACTED was taking, but instead wrote "see chart" on the Evaluation Form. Dr. Chua failed to evaluate the patient's hepatic and renal status and ignored the musculoskeletal history, cancer history and social habits history sections for REDACTED Even though a full pre-anesthetic examination and evaluation were not performed, Dr. Chua signed the REDACTED Evaluation Form. Notably, Relator reminded Dr. Chua, after Dr. Chua signed off the patient for anesthesia, that indicating "see chart" in the Medications section on the Evaluation Form was unacceptable since, in the interest of patient safety, such medications needed to be reviewed and considered as to their implication regarding the anesthetic plan. REDACTED was taking at least 11 prescribed medications, including a beta adrenergic receptor antagonist (beta blocker) and presented for a generator change of an implantable cardioverter defibrillator. Dr. Chua also failed to assess whether the patient had taken a dose of such beta blocker the day of the procedure, also extremely important information for patient safety. It was not until after Dr. Chua signed off on the patient and after Relator insisted on addressing the medication evaluation issue that Dr. Chua reviewed and filled out the medications on the Anesthesia Evaluation. In fact, Relator did not join the case until 11:45, after the patient had been brought to the procedure area and the case

had begun. Relator reported the incident to NAPA. On information and belief, the NAPA

Defendants submitted a Medicare claim on Dr. Chua's behalf for medically directed anesthesia

services for REDACTED even though such claim was not supported under Medicare and TEFRA

rules. *See* REDACTED Anesthesia Record and Evaluation Form, Exhibit 49 to the Lord Discl. Stmt.

133. REDACTED On April 5, 2012, Dr. Chua was responsible for performing a

pre-anesthetic examination and evaluation on REDACTED a 48-year-old male Medicare

patient. The evaluation was incomplete and substandard. Dr. Chua failed to indicate the

medications that REDACTED was taking, but instead simply wrote "see chart did not take a.m.

meds" on the Evaluation Form. In addition, Dr. Chua failed to indicate the respiratory,

neurologic, hepatic, gastrointestinal, musculoskeletal, cancer, infections and social habits

histories of REDACTED Dr. Chua also neglected to indicate any pre-anesthetic vital signs,

history of post-operative nausea and vomiting or any information on the patient's dentition, an

important indicator related to airway assessment on the patient's Evaluation Form. Failing to

include the respiratory information was alarming because REDACTED had a history of pneumonia

within the last five months. The patient was also on dialysis and Dr. Chua failed to assess or

indicate the patient's electrolytes or labs. Dr. Chua's failure to perform a thorough pre-anesthetic

examination and evaluation was of grave concern because Relator, upon questioning patient,

discovered that REDACTED had recently undergone a procedure to place a cardiac stent in an

artery of his heart. Even though an adequate pre-anesthetic examination and evaluation were not

performed, Dr. Chua signed the REDACTED Evaluation Form. Relator told Dr. Chua that indicating

"see chart" on the Evaluation Form was unacceptable and reported the incident to NAPA. Dr.

Chua's conduct violated Medicare and TEFRA rules. On information and belief, the NAPA

Defendants submitted a Medicare claim on Dr. Chua's behalf for medically directed anesthesia

services for REDACTED even though such claim was not supported under Medicare and TEFRA rules. *See* REDACTED Evaluation Form, Exhibit 50 to the Lord Discl. Stmt.

134. REDACTED On April 3, 2013, a pre-anesthetic examination and evaluation of REDACTED an 80-year-old female Medicare patient. The evaluation was incomplete and substandard. The Evaluation Form indicated a negative respiratory history for REDACTED even though she suffered from chronic obstructive pulmonary disease ("COPD") and smoked ½ a cigarette pack a day for 50 years. Relator filled in the patient's respiratory history after the attending anesthesiologist signed the patient off for surgery. Relator also added the patient's history of osteoporosis omitted by the physician in the musculoskeletal review. The physician also delineated the patient's cancer history as negative although she had prior surgery for cancer the year before. Even though a full pre-anesthetic examination and evaluation were not performed, the anesthesiologist signed the REDACTED Evaluation Form. On information and belief, the NAPA Defendants submitted a Medicare claim on the anesthesiologist's behalf for medically directed anesthesia services for REDACTED even though such claim was not supported under Medicare and TEFRA rules. *See* REDACTED Evaluation Form and Daily Surgery Schedule, Exhibit 51 to the Lord Discl. Stmt.

135. REDACTED On April 17, 2013, Dr. Chen conducted a pre-anesthetic examination and evaluation on REDACTED a 60-year-old male patient that was incomplete and substandard. Dr. Chen failed to conduct a physical examination and failed to assess the airway of REDACTED Even though a full pre-anesthetic examination and evaluation were not performed, no vital signs are noted, and the Physical Examination and Airway evaluation sections of the Evaluation From remain completely blank, Dr. Chen signed the REDACTED

Evaluation Form and sent the patient to the operating room.  *See* REDACTED Evaluation Form, Exhibit 52 to the Lord Discl. Stmt.

136.  REDACTED On May 23, 2013, Dr. Marcus conducted a pre-anesthetic examination and evaluation on REDACTED a 71-year-old female Medicare patient that was incomplete and substandard.  The Evaluation Form for REDACTED failed to indicate any gastrointestinal history, even though REDACTED had peritonitis, which was added to the form by Relator after Dr. Marcus signed off the patient for surgery.  Despite the planned surgery to repair an incarcerated hernia on this geriatric patient with a cardiac ejection fraction (an important indicator of cardiac function) of 35% (well below normal) and that the planned surgery would last over five hours and require meticulous fluid management throughout the course of the anesthetic, Dr. Marcus ignored REDACTED hepatic and renal history (necessary information by an anesthesia provider in order to formulate a safe anesthetic plan for such a patient).  Dr. Marcus also failed to address this patient's cancer history, hematology and infection status.  Even though a full pre-anesthetic examination and evaluation were not performed, Dr. Marcus signed the Evaluation Form.  On information and belief, the NAPA Defendants submitted a Medicare claim on Dr. Marcus behalf for medically directed anesthesia services for REDACTED even though such claim was not supported under Medicare and TEFRA rules.  *See* REDACTED Anesthesia Record and Evaluation Form, Exhibit 53 to the Lord Discl. Stmt.

137.  REDACTED On June 11, 2013, Dr. Richlin was responsible for performing a pre-anesthetic examination and evaluation on REDACTED an 80-year-old Medicare patient, that was incomplete and substandard.  The Evaluation Form failed to indicate that the patient had sustained a cardiac arrest in 2013 and failed to indicate that the patient had cardiac stents placed in February 2013.  The Evaluation Form also failed to indicate the patients cardiac ejection

fraction was only 20%, which is extremely low and of grave concern for any anesthetic. The case involved the placement of a pacemaker and automatic implantable cardioverter defibrillator. Relator took over this case from CRNA Kathi J. McGoldrick at approximately 1:41 p.m. and was shocked to discover this critical information was neither obtained by the anesthesiologist nor provided to Relator when transferring responsibility for the care of the patient, even though the patient was under anesthesia and the case was well under way. On information and belief, the NAPA Defendants submitted a Medicare claim on Dr. Richlin's behalf for medically directed anesthesia services for REDACTED even though such claim was not supported under Medicare and TEFRA rules. *See* Relator's Handwritten Notes regarding REDACTED Exhibit 54 to the Lord Discl. Stmt.

138. REDACTED On June 10, 2013, Dr. Damjanovic was responsible for conducting a pre-anesthetic examination and evaluation on REDACTED an 81-year-old female Medicare patient, that was incomplete and substandard. Dr. Damjanovic indicated that REDACTED REDACTED respiratory history was negative, even though her pre-operative imaging reports, which were immediately accessible to Dr. Damjanovic in REDACTED chart, showed she suffered from chronic obstructive pulmonary disease (COPD). Although a full pre-anesthetic examination and evaluation were not performed and/or were inaccurate, Dr. Damjanovic signed the REDACTED Evaluation Form. On information and belief, the NAPA Defendants submitted a Medicare claim on Dr. Damjanovic's behalf for medically directed anesthesia services for REDACTED even though such claim was not supported under Medicare and TEFRA rules. *See* REDACTED Evaluation Form and PMC Imaging Report, Exhibit 55 to the Lord Discl. Stmt.

139. REDACTED On June 12, 2013, Dr. Richlin was responsible for conducting a pre-anesthetic examination and evaluation on REDACTED a 34-year-old female Medicare

patient. Dr. Richlin failed to conduct an adequate physical examination leaving the cardiac, pulmonary and neurological physical examination sections blank and failing to assess the Mallampati airway class of REDACTED Rather than placing a pulse oximeter on a body part upon which this equipment could provide a reading, Dr. Richlin just wrote "long nails" under the vital signs section, indicating that because the patient had long fingernails (a pulse oximeter is usually placed on a finger), he could not determine the patient's oxygen saturation. Oxygen saturation is a required parameter of anesthesia monitoring and a preoperative oxygen saturation baseline is part of a patient's pre-anesthetic assessment. Of note, even though Dr. Richlin did not think he could obtain the patient's oxygen saturation, he still opted not to listen to the patient's lungs. Even though this patient's pre-anesthetic examination and evaluation were incomplete, Dr. Richlin signed the REDACTED Evaluation Form. On information and belief, the NAPA Defendants submitted a Medicare claim on Dr. Richlin's behalf for medically directed anesthesia services for REDACTED even though such claim was not supported under Medicare and TEFRA rules. *See* REDACTED Evaluation Form and Daily Surgery Schedule, Exhibit 56 to the Lord Discl. Stmt.

140. REDACTED On June 14, 2013, a pre-anesthetic examination and evaluation on REDACTED a 68-year-old male Medicare patient, that was incomplete and substandard. The Evaluation Form failed to indicate any information regarding REDACTED respiratory history. On information and belief, the NAPA Defendants submitted a Medicare claim on the anesthesiologist's behalf for medically directed anesthesia services of REDACTED even though the anesthesiologist responsible for performing the pre-anesthetic examination and evaluation violated Medicare and TEFRA rules. *See* Relator's Handwritten Notes regarding REDACTED Exhibit 57 to the Lord Discl. Stmt.

141. **REDACTED** On or about June 11, 2013, Dr. Chua was responsible for conducting a pre-anesthetic examination and evaluation on **REDACTED** an 82-year-old female Medicare patient that was incomplete and substandard. The Evaluation Form failed to indicate the PO status of **REDACTED** and ignored the respiratory, hepatic, renal, gastrointestinal, cancer, and infections history of this patient. On information and belief, the NAPA Defendants submitted a Medicare claim on the anesthesiologist's behalf for medically directed anesthesia services for **REDACTED** even though such claim was not supported under Medicare and TEFRA rules. *See* **REDACTED** Evaluation Form, Exhibit 58 to the Lord Discl. Stmt.

142. Relator witnessed patients cleared for the surgery and sent to the operating room by NAPA anesthesiologists with inadequate pre-anesthetic examinations and evaluations, even though Medicare requires compliance with TEFRA rules under the medical direction model which requires, among other criteria, that the anesthesiologist perform the pre-anesthetic examination and evaluation. The above referenced exhibits demonstrate how Medicare patients, among others, are signed off, cleared for anesthesia, and sent to the operating room by NAPA anesthesiologists without adequate pre-anesthetic examinations and evaluations. These are but a few examples of the routine noncompliance of NAPA anesthesiologists at PMC.

143. Relator continually reported this conduct to Dr. Nostro throughout his employment and grew weary of this substandard care and the NAPA anesthesiologists' reprehensible disregard for patient safety. He questioned Dr. Nostro directly why this conduct has not changed despite his repeated reporting, including why so many parameters of the pre-anesthetic examination and evaluation were routinely overlooked, omitted, completely disregarded, or falsified by NAPA anesthesiologists. Dr. Nostro informed Relator that the

department had the patients fill out the Evaluation Form themselves. Then when asked why the Evaluation Form completed by the patient was not consistently checked for accuracy and completeness and amended where necessary by the attending anesthesiologist through an appropriate patient interview and pre-anesthetic examination and evaluation, Dr. Nostro informed Relator that he (Dr. Nostro) had done everything in his power, including docking anesthesiologists' salary, but was unable to effectuate any behavioral change. Dr. Nostro agreed that such behavior was absolutely "unacceptable" and stated to Relator that "It's like trying to play Major League Ball with Minor League players."

144.    When Relator inquired why this behavior is continually tolerated, Russo maintained that as per Dr. Strobel and company policy, "Only an airway assessment and H & P [meaning a patient's history and physical] are legally required." Russo conveyed that according to the NAPA Defendants, it was "at the anesthesiologist's discretion" what to include or omit in the pre-anesthetic examination and evaluation. Relator pointed out that a patient's history and physical, by definition, included all of the items (such as a complete review of systems) that he had repeatedly addressed and complained of when such parameters were disregarded, and that NAPA anesthesiologists do not even consistently perform an airway assessment. Relator never received any adequate response nor observed any adequate remedy to such substandard practice.

**D.      NAPA Anesthesiologists Routinely Falsified Physical Examinations**

145.    One of the TEFRA requirements for medically directed anesthesia services mandates anesthesiologists perform pre-anesthetic physical examinations and evaluations of patients prior to providing anesthesia. However, Relator witnessed the NAPA Defendants routinely fail to conduct preoperative physical assessments and then falsify the Evaluation Form to indicate physical examinations and evaluations were completed when they were not. Relator

routinely came across Evaluation Forms during the normal course of his work that contained falsified physical examinations of patients that not only put the patients at risk, but also substantially increased Relator's potential liability. The falsification of a patient's pre-anesthetic physical examination violated the Medicare and TEFRA rules for medical direction in those cases which involved Medicare patients. In each case below, the NAPA Defendants' anesthesiologists falsified documents and/or failed to complete the physical assessment of a patient as indicated on the Evaluation Forms:

146. REDACTED On July 30, 2012, Dr. Chua was the anesthesiologist responsible for performing the pre-anesthetic examination and evaluation of REDACTED a 63-year-old Medicare patient. At approximately 7:20 a.m., Relator witnessed Dr. Chua charting "RRR" (meaning "regular rate and rhythm") and "CTAB" (meaning "clear to auscultation bilaterally") on the Evaluation Form for REDACTED However, Dr. Chua never performed this physical exam on REDACTED and then falsified the Evaluation Form to indicate otherwise. Dr. Chua signed the Evaluation Form despite the false information. On information and belief, the NAPA Defendants submitted a Medicare claim on Dr. Chua's behalf for medically directed anesthesia services for REDACTED even though such claim was not supported under Medicare and TEFRA rules. *See* Daily Surgery Schedule and Relator's Handwritten Notes regarding REDACTED Exhibit 59 to the Lord Discl. Stmt.

147. REDACTED On August 21, 2012 at approximately 10:47 a.m., Relator witnessed Dr. Lee chart "RRR S1 S2" (meaning "regular rate and rhythm" and normal heart beat) and "CTAB" on the Evaluation Form for patient REDACTED However, Dr. Lee never performed this physical examination on REDACTED and then falsified the Evaluation Form to indicate otherwise. Moreover, the Evaluation Form failed to indicate the heart rate, blood

pressure, POX (meaning "pulse oximetry" or the percent of the oxygen saturation of hemoglobin), respiratory rate, or "T" (temperature) of the patient. Dr. Lee signed the Evaluation Form despite the false and incomplete information. What is particularly disturbing about this incident is that when Relator checked REDACTED blood pressure, he found that it was 190 over 100, which is extremely high and would necessarily alter the course of treatment for anesthesia. Dr. Lee signed the Evaluation Form despite the false information. Relator reported this incident to Dr. Nostro the same day. *See* Evaluation Form and Relator's Handwritten Notes regarding REDACTED Exhibit 60 to the Lord Discl. Stmt.

148. REDACTED On February 20, 2013, Dr. Tangoren was the anesthesiologist responsible for the pre-anesthetic examination and evaluation of REDACTED a 45-year-old male. At approximately 7:15 a.m., Relator witnessed Dr. Tangoren charting "-M/G/R" (meaning negative for murmurs, gallops or rubs) and "CTA" (meaning "clear to auscultation") on the Evaluation Form for patient REDACTED However, Dr. Tangoren never performed this physical examination on REDACTED and then falsified the Evaluation Form to indicate otherwise. Dr. Tangoren signed the Evaluation Form despite the false information. Dr. Tangoren omitted all vital signs, leaving this section blank. After Dr. Tangoren signed off the patient for surgery, Relator filled in the vital signs on the Evaluation Form and filled in the accurate physical assessment of the patient in the specified area of the form. This case is disturbing because after Relator's physical assessment and auscultation of the patient's lungs it was apparent that he had significant wheezing in his upper and lower lungs. Failure to perform an adequate pre-anesthetic examination and evaluation and falsifying physical assessment put this patient at risk since this information would necessarily alter the course of treatment for anesthesia because such conditions require additional considerations by anesthesia

providers to provide a safe anesthetic.  *See* REDACTED Evaluation Form, Exhibit 61 to the Lord Discl. Stmt.

149.  REDACTED On April 2, 2013 Dr. Tangoren was the anesthesiologist responsible for the pre-anesthetic examination and evaluation of REDACTED a 49 year old female.  At approximately 2:00 p.m., Relator witnessed that Dr. Tangoren charted "-M/G/R" (meaning negative for murmurs, gallops or rubs) and "CTA" on the Evaluation Form for REDACTED However, Dr. Tangoren never performed this physical examination on REDACTED and then falsified the Evaluation Form to indicate otherwise.  Dr. Tangoren also omitted the evaluation of any pre-anesthetic vital signs, which Relator added to the form after Dr. Tangoren signed the patient off for surgery.  Relator also added additional information to the Evaluation Form that the patient had a clearly audible heart murmur since birth.  Dr. Tangoren signed the Evaluation Form despite the false information.  *See* REDACTED Evaluation Form and Daily Surgery Schedule, Exhibit 62 to the Lord Discl. Stmt.

150.  REDACTED On May 15, 2013, Dr. Chua was the anesthesiologist responsible for performing the pre-anesthetic examination and evaluation on patient REDACTED REDACTED who presented for surgery for an excision of recurrent left thyroid cancer and exploration of the right thyroid bed with intraoperative nerve monitoring.  At approximately 8:45 a.m., instead of performing the physical assessment, Dr. Chua falsified the Evaluation Form by indicating cardiac status was "RRR" and that the patient's pulmonary status was "CTA" and then signed the Evaluation Form.  However, both Relator and Registered Nurse ("RN") Kathleen Williams knew Dr. Chua falsified the Evaluation Form since they knew that Dr. Chua never performed this physical examination of the patient.  When Relator and RN Kathleen Williams questioned the patient together as to whether the anesthesiologist listened to her heart and lungs,

the patient denied that the anesthesiologist ever did so. Relator made a notation on a copy of the Evaluation Form indicating that the patient denied that Dr. Chua ever performed any such physical examination. Relator wrote "patient denies anesthesiologist auscultation" and both Relator and RN Kathleen Williams signed the copy of Evaluation Form, indicating agreement of this blatant falsification. The Evaluation Form did not indicate the patient's heart rate, blood pressure, POX, respiratory rate, or temperature. Dr. Chua signed the Evaluation Form despite the false and incomplete information, showing flagrant disregard for patient safety and exhibiting the willingness to put this patient at significant risk, while attesting to having furnished medical services never actually rendered. Relator reported the full details of this incident and provided a copy of this document to Dr. Nostro the same day. *See* REDACTED Evaluation Form, Exhibit 63 to the Lord Discl. Stmt.

151. REDACTED The next day, on May 16, 2013, Dr. Chua did the same thing, this time involving a patient named REDACTED As with patient REDACTED instead of performing the physical examination, at approximately 10:23 a.m. Dr. Chua again falsified an Evaluation Form by indicating the REDACTED cardiac status was "RRR" and pulmonary status was "CTA" and then signed the Evaluation Form. However, both Relator and RN Kathleen Williams knew Dr. Chua falsified the Evaluation Form because they were aware that Dr. Chua never performed this physical examination of REDACTED After Relator and RN Kathleen Williams questioned REDACTED whether Dr. Chua listened to her heart and lungs, REDACTED denied that Dr. Chua performed an examination. At Relator's request, RN Kathleen Williams signed a copy of the Evaluation Form, indicating that the patient denied that Dr. Chua ever performed a physical examination. Dr. Chua had signed the Evaluation Form although he falsely

attested to having furnished medical services never actually rendered. *See* ▮▮▮ Evaluation Form and Daily Surgery Schedule, Exhibit 64 to the Lord Discl. Stmt.

152.     On June 14, 2013, Relator was assigned to a case that involved a patient scheduled for a carotid endarterectomy. Dr. Chen was the attending anesthesiologist. Relator called Dr. Nostro for a second opinion based on Relator's auscultation of the patient's lungs, since Relator had concerns over the patient's presentation during the pre-anesthetic physical examination. Because of the severity of the patient's pulmonary presentation, Relator promptly notified the vascular surgeon, Dr. Eric Wilson, who later came to the patient's bedside, listened to the patient's lungs himself, and immediately delayed the surgery.

153.     Relator then requested a second opinion from Dr. Nostro, who refused to provide a physical assessment of the patient even though the patient had recently suffered from significant respiratory distress which was confirmed by the patient's family as pneumonia. Dr. Nostro was advised of this. Moreover, the patient was sitting completely upright in bed because he had difficulty breathing while lying down or with the head of the bed in any other position. Dr. Nostro was also advised of this. Dr. Nostro stated, from a distance, that that patient was "in no distress" and that the patient looked fine, although the patient required continuous oxygen to maintain his saturation levels in an acceptable range and also required a breathing treatment. After such an assessment, Dr. Nostro encouraged Relator to get the patient to the operating room. Both Relator and CRNA Danielle McKnight were shocked by Dr. Nostro's "hallway assessment" and refusal to perform a physical examination after being asked for a second opinion as the Chief of Anesthesiology. This put the patient at great risk. Relator encouraged Dr. Chen to order a chest X-ray, after which Dr. Nostro berated Relator multiple times for doing so, despite knowing that one of NAPA's approved and listed indications for ordering a

preoperative chest X-ray is "recent pneumonia," as delineated by a document directing such that had been posted in the anesthesia office. Breathing treatments were subsequently ordered for the patient and the surgery was delayed until later that day after the patient was stable and breathing more easily.

154. NAPA Defendants' anesthesiologists falsified pre-anesthetic examinations and evaluations, even though Medicare requires compliance with TEFRA rules under the medical direction model which require that the anesthesiologist perform the pre-anesthetic examination and evaluation. On information and belief, the same deficient practices occur at other sites where NAPA and/or its subsidiaries provide anesthesia services.

### E. The NAPA Defendants' Anesthesiologists Failed to Obtain a Patient's Informed Consent

155. Relator also witnessed instances in which patient informed consent was obtained from patients unable to consent to either surgery or anesthesia. On May 31, 2012, Relator was instructed by Dr. Tesfaye to take **REDACTED** a patient with dementia, to the operating room, despite not having obtained an adequate informed consent required by Medicare and documented on the Evaluation Form. Despite the patient not being oriented to time and place, not being able to state her birthdate, not being aware she was about to have surgery as assessed by Relator, Dr. Tesfaye had the patient sign the consent form and proceeded. When questioned, Dr. Tesfaye told Relator, "I gave her anesthesia last time and it was fine." Relator expressed his concern to Dr. Tesfaye, but Dr. Tesfaye replied, "Mike, why don't you sit this one out." Dr. Tesfaye indicated to Relator he would "take full responsibility for the case," yet shortly thereafter, once the procedure had begun, assigned CRNA Semyon Glukhoy to the care of the patient without informing him of the lack of informed consent.

156.     Relator requested that Dr. Nostro come to the preoperative area to examine ▮▮▮▮ ▮▮▮▮▮▮▮ who showed clear signs of dementia, to establish this patient could not consent for either surgery or anesthesia (anesthesia consent may require a higher level of cognition than surgical consent), as Relator hoped to thwart Dr. Tesfaye's clear intent to expeditiously transport the patient to the operating room.  Dr. Nostro came to the preoperative area, stated he did not "know" the patient, and refused to evaluate the patient.  Relator demanded that the anesthesiologists obtain appropriate informed consent from the power of attorney for the patient.  Neither Chief of Anesthesiology Dr. Nostro, nor Vice-Chief of Anesthesiology Dr. Tesfaye, also the attending anesthesiologist of record on the ▮▮▮▮ case, was willing to do so.  Rather than cancel or postpone the case, they sent the patient to the operating room without appropriate consent, completely disregarding the ample and vocal patient advocacy of Relator, and the planned surgery was performed with Dr. Tesfaye medically directing the case.

157.     Relator later learned that Defendants conducted a peer review of the ▮▮▮▮ ▮▮▮▮▮▮ incident, but the Defendants neither invited Relator to that meeting, nor requested any information from him knowing Relator was openly critical of the facts surrounding the case.

158.     On information and belief, the NAPA Defendants submitted a Medicare claim on Dr. Tesfaye's behalf for medically directed anesthesia services for ▮▮▮▮▮▮▮▮ even though such claim was not supported under Medicare and TEFRA rules.

159.     Notably, the patient returned the following week and both the new surgeon of record (Dr. Meir-Levi) and the new attending anesthesiologist of record (Dr. Tangoren) assigned to this latter case both required the patient's legal representative to sign the informed consent documents because they both assessed that the patient had dementia and that she was, therefore,

not competent to consent to either surgery or anesthesia on her own. The patient's son who holds power of attorney provided consent for his mother.

160.     Relator reported the ██REDACTED██ incident to both PMC and to the NAPA Defendants.  The Chief of Surgery at PMC, Dr. Charles Herman, and Peggy Klecha ("Klecha"), Director of Risk Management at PMC, later thanked Relator for informing them of this incident stating he had "done the right thing" and that PMC is fortunate to have Relator as a credentialed medical staff member.

**F.    The NAPA Defendants Knew Their Anesthesiologists Were Not Complying With Medicare and TEFRA Rules.**

161.     NAPA Defendants knew they were not compliant with Medicare and TEFRA rules because Relator routinely informed them their policies and practices violated Medicare and TEFRA rules.

162.     Within the first six months of his employment at NAPA Pennsylvania, Relator informed his direct supervisor, Dr. Nostro, that he believed the anesthesia practices at PMC violated Medicare and TEFRA rules.  However, Dr. Nostro did nothing to change these practices.

163.     Relator's concern about the NAPA Defendants practices became even more heightened when, on March 6, 2012, Dr. Nostro, Relator's supervisor and NAPA Pennsylvania's Chief of Anesthesiology at PMC, performed an induction (*i.e.*, placing a patient under anesthesia) on patient ██REDACTED██ in the presence of Relator.  However, Dr. Nostro refused to sign the patient's Anesthesia Record indicating he was present for this case because his "ratio was too high."

164.     After Dr. Nostro refused to sign the Anesthesia Record and he instructed Relator to find someone else to sign it, fraudulently indicating a different anesthesiologist was there for

the induction. Relator explained these circumstances to Dr. Tangoren, the attending anesthesiologist assigned to this specific case, who then falsified the Anesthesia Record to indicate he (Dr. Tangoren) was the actual attending anesthesiologist who cared for this patient for the entire procedure, even though Dr. Nostro was present for the induction and delivered a key part of the services to the patient and even though Dr. Tangoren was never in the operating room at any point during REDACTED surgery. *See* REDACTED Anesthesia Record, dated March 6, 2012, Exhibit 65 to the Lord Discl. Stmt.

165.    Although REDACTED was not a Medicare patient, Relator believed Dr. Nostro's comment - his "ratio was too high" - likely meant he was medically directing other Medicare patients at the time and was breaking medical direction rules since the REDACTED case involved an elective procedure (was not an emergency) and, if so, Dr. Nostro's participation was not allowable under the requisite criteria of the medical direction model. Dr. Nostro's departure from established requirements put Relator at great risk of liability. Dr. Nostro's disregard for protocol and willingness to falsify, and also attempt to involve Relator by directing Relator to find another anesthesiologist to falsify the chart, obligated Relator to report this incident to the compliance officers at both the NAPA Defendants and PMC pursuant to NAPA's compliance rules. *See* NAPA Defendants' Corporate Compliance Plan, Exhibit 66 to the Lord Discl. Stmt.

166.    Dr. Nostro's disregard for basic charting procedures and his willingness to falsify the Anesthesia Record attestation confirmed Relator's concerns that there was a complete disregard for compliance at PMC that was not limited to a few doctors, but instead was a widespread departmental and company-wide issue condoned by the Chief of Anesthesiology. Relator was further concerned by Dr. Nostro's directing him to find an anesthesiologist to falsify the document on Dr. Nostro's behalf.

167.    Relator reported the March 6, 2012 incident to Russo in early April 2013, specifically informing her that Dr. Nostro's conduct was fraudulent conduct that may have violated federal law if a claim was submitted to Medicare.

168.    Relator continued to fulfill his obligation to report the NAPA Defendants fraudulent conduct.  In mid-2012, Relator notified Pamela Watkins, Director of Internal Audit and Corporate Compliance at PMC about the false claims that were being submitted by the NAPA Defendants.  Still nothing changed at PMC.  As Relator continually informed compliance officers and senior management personnel at both NAPA Defendants and PMC, Relator's work environment became increasingly hostile.

169.    NAPA Defendants were further aware that their practices violated Medicare and TEFRA rules when, on March 26, 2012, Relator and NAPA Pennsylvania's medical staff were directed and encouraged by the NAPA Defendants to comply with all rules and regulations *during the specific week in which a compliance audit was being performed by inspectors* from the Joint Commission.  The NAPA Defendants posted its strategy on the wall in their office at PMC before anticipated Joint Commission audits.  The image provided was taken by Relator on March 19, 2013 at 3:03 p.m.  *See* NAPA's Instructions on "How to Pass a JCAHO Inspection," Exhibit 67 to Lord Discl. Stmt.

170.    Then again, on April 2, 2012, Relator informed Russo and Dr. Militana, that Relator believed Defendants were committing fraud by billing for medical direction, even though routine anesthesia services performed by NAPA anesthesiologists were merely supervisory since these services failed to meet the more stringent requirements mandated by Medicare to qualify for higher reimbursement billing under the medical direction model.

171. The information that Relator reported to the NAPA Defendants' compliance officers was supposed to be kept strictly confidential. However, Defendants failed keep Relator's fraud related complaints confidential, even among anesthesiologists at PMC. On May 23, 2012, CRNA Semyon Glukhoy informed Relator that Dr. Tangoren told Glukhoy, directly following an anesthesiologist-only departmental meeting, that Relator was "the one" reporting the "issues" to NAPA. Further, Dr. Tangoren later directly informed Relator that Dr. Nostro instructed him (Dr. Tangoren) not to "trust" Relator because Relator was the one reporting compliance violations to the NAPA Defendants.

172. On June 18, 2012, Relator called Russo to follow up on their previous conversations, which included Dr. Charles Militana ("Dr. Militana"), NAPA Defendants' Regional Director. Relator was subsequently informed by Dr. Militana that Relator's allegations were "not corroborated" by any peers. On the same day, Russo responded to Relator in writing, but failed to address Relator's core concern that the Defendants were committing fraud by violating TEFRA rules regarding its medical direction practices, and the submission of fraudulent bills to Medicare for reimbursement. *See* June 18, 2012 Letter from Russo, Exhibit 68 to the Lord Discl. Stmt.

173. Ultimately, Relator learned from Dr. Alan Strobel, NAPA's Director of Healthcare Compliance, that NAPA had a policy that if an anesthesiologist's ratio remains under one to four, the NAPA Defendants will submit bills to Medicare for reimbursement through the medical direction model, which was the first time his question was directly answered regarding how anesthesia services rendered at PMC are submitted for reimbursement. This policy, as developed by NAPA and implemented at PMC, and at the NAPA Defendants' other facilities, has violated Medicare and TEFRA rules for years and continues to do so. This new information

from Dr. Strobel, that the criteria for billing for medical direction was strictly based on ratio, alerted Relator to a widespread and systemic scheme of false claim submissions to Medicare.

174.    Despite Relator's numerous efforts to report and correct this fraud, Relator observed the NAPA Defendants ongoing failure to resolve the reported compliance issues and/or to address and rectify his reports of retaliation against Relator. The NAPA Defendants' demanded that Relator, and other NAPA Pennsylvania employees, sign a compliance audit form. On or about December 7, 2012, the NAPA Defendants circulated an e-mail to all CRNAs at PMC, attaching a supplemental compliance attestation. The NAPA Defendants mandated that every NAPA Pennsylvania CRNA execute this document, stating "**You MUST return the signed certificate to me no later than December 31, 2012**" (emphasis in original). *See* December 2012 E-mail from Tracy Galluscio with appended Certificate, Exhibit 69 to the Lord Discl. Stmt.

175.    The attestation, among other items, included item Section 15.8 which stated:

> The undersigned acknowledges that as of the date of signing this Certificate, that the undersigned knows of no violations of any health care laws, rule, or regulations that have not been rectified by this Compliance Plan, including its policies and procedures; or alternatively, if such violations are known to exist, they are stated below.

*Id.*

176.    The December 7, 2012 e-mail required Relator and all CRNAs to disclose all known compliance violations. However, the NAPA Defendant's Corporate Compliance Plan requires the NAPA Defendants to provide anonymous means to report compliance issues and provides that: "[t]o encourage reporting of compliance violations and prevent retribution against employees who report noncompliance, NAPA will establish a mechanism by which it may

receive any anonymous complaints an employee desires to make." *See* Exhibit 66, NAPA

Defendant's Corporate Compliance Plan, at Item 11.1.

177.    The NAPA Defendants failed to provide an anonymous reporting mechanism by

which Relator could report the fraud he routinely witnessed at PMC.

178.    Moreover, the NAPA Defendants also failed to comply with Item 2.7 of the

Corporate Compliance Plan by failing to "display a prominent notice at its facilities announcing

the appointment of the Compliance Officer and the necessity of reporting suspected misconduct

or deficient practices." No such notice was ever posted at PMC during the duration of Relator's

employment at NAPA Pennsylvania.

179.    In December of 2012, Relator advised the NAPA Defendants he would not sign

a NAPA Corporate Compliance form because he was aware of numerous compliance violations

by the NAPA Defendants. Relator had already reported numerous fraudulent practices to the

NAPA Defendants that did not meet Medicare and TEFRA rules or an acceptable standard of

care.

180.    On or about January 2013, Dr. Alan Strobel, NAPA's Director of Healthcare

Compliance, visited the PMC to provide the "annual" compliance training, even though this was

the first such compliance training by any NAPA officer during Relator's tenure at PMC. When

Relator reported NAPA Pennsylvania compliance violations to Russo, he made two requests: (1)

he not be questioned on premises at PMC regarding the allegations because he did not want his

confidentiality compromised, and (2) that he not be pulled out of a case during an anesthetic lest

he be distracted from his clinical responsibility to his patients.

181.    Nonetheless, after Dr. Strobel conducted the compliance training, he appeared in

the operating room while Relator was providing an anesthetic to a patient and asked Relator to

speak with him directly outside of the operating room. When Relator stepped out of the operating room (after the attending anesthesiologist assigned to the case allowed for break relief), Dr. Nostro was waiting for Relator in the hallway, clearly invited to participate in the discussion led by Dr. Strobel although he (Dr. Nostro) should not have known any of the reported information was related to Relator if his confidentiality had been respected. Dr. Strobel proceeded to openly discuss Relator's prior confidential conversations with both him and with Russo regarding the reported fraud allegations, including Relator's prior disclosures concerning NAPA Pennsylvania's improper billing practices. During this conversation, Dr. Strobel stated it was his job to ensure that nobody "goes to jail." This statement confirmed that NAPA Defendants were fully aware of the seriousness of the allegations. Nonetheless, despite NAPA Defendants' awareness of the magnitude of the allegations, Relator continued to observe the same routinely egregious conduct by the NAPA Defendants throughout the remainder of Relator's employment while at PMC.

182.    On January 24, 2013 at 9:37 p.m., Relator sent an e-mail to Tracie Galluscio, a Human Resources Assistant at Defendant NAPA Management in response to the NAPA Defendants' mandate that all CRNAs submit a signed compliance attestation to explain why he did not feel comfortable submitting it. Relator explained he would prepare a statement of the compliance violations he witnessed and attach it to the compliance attestation as an addendum. *See* January 24, 2013 E-mail from Relator to Tracie Galluscio, Exhibit 70 to Lord Discl. Stmt.

183.    On January 29, 2013, Relator received a certified letter from Russo demanding that Relator provide his complaints "in writing," despite the fact that Russo was fully aware that Relator was uncomfortable summarizing his complaints in written form given the fact that the confidentiality of Relator's prior reporting had already been compromised on several occasions

and Relator had already been subject to retaliation by NAPA anesthesiologists.[1] *See* January 29, 2013 Letter from Russo to Relator, Exhibit 71 to Lord Discl. Stmt. In this letter, Russo warned that:

> [i]f we do not receive your information, we cannot satisfactorily investigate the issues, nor can we assume that the issues were valid if you are not willing to put them in writing, and as such, we will close our investigation with a conclusion that the allegations were not substantiated or corroborated" and "[i]f we do not hear from you by Monday, February 4, 2013, we will close the investigation as unsubstantiated.

184.    This letter arrived on a Friday, February 1, 2013, which left Relator merely two days to draft and provide a written account of Relator's fraud claims. Relator complied and sent a letter marked "confidential" to Russo via e-mail on Sunday, February 3, 2013 at 9:34, providing a written account of Relator's allegations. *See* February 3, 2013 E-mail and Letter from Relator to Russo, Exhibit 72 to Lord Discl. Stmt

185.    The February 3, 2013 letter from Relator to the NAPA Defendants summarized the compliance violations he witnessed and continued to witness at PMC. Notably, these were the same continuing violations that Relator had repeatedly reported to the NAPA Defendants and PMC in 2011-2012. *Id.* Relator stated in the letter that the NAPA Defendants continued to bill Medicare improperly for anesthesia services and that he was not satisfied with NAPA's response. *Id.*

186.    On March 12, 2013, Russo sent a letter to Relator acknowledging many of the compliance and fraud issues Relator raised. *See* Exhibit 19 (March 12, 2013 Letter from Russo to Relator) attached to the Lord Discl. Stmt.

---

[1]  By January 2013, it was clear to Relator that the NAPA Defendants' Corporate Compliance Plan provided little in the way of protection for anonymous reporting of compliance issues, especially those that involve fraud committed by NAPA's anesthesiologists, as these did.

187.    On or about May 2013, Relator met with Klecha, Director of Risk Management at PMC and Alexander Arenas ("Arenas"), Executive Director of Quality and Safety at PMC. Relator informed Klecha and Arenas that, although he had reported various compliance and fraud related issues to the NAPA Defendants and PMC for well over a year, his reporting had done nothing to change the policies and practices at PMC. Relator informed Klecha and Arenas he was enduring continued retaliation and was fearful his job was at stake because of fulfilling his obligations to report to both the NAPA Defendants and PMC. Relator informed Klecha and Arenas this was his last "in house stop" in attempt to rectify the Defendants' conduct. Klecha likened the meeting to "drinking from a fire hose" and empathized with Relator, telling him, "I feel bad for you." Klecha and Arenas stated they would take Relator's concerns to Steve Cunningham, Senior Vice President and Chief Business Development Officer at PMC and Dr. William Cors, Vice President and Chief Medical Quality Officer at PMC. Klecha and Arenas stated that Relator would need to speak with both Cunningham and Cors, and also conveyed that Relator would likely need to speak with PMC President and CEO, Kathy Kuck. Dr. Cors neither contacted nor exhibited any interest in meeting with Relator.

188.    On June 25, 2013, Steve Cunningham advised Relator by e-mail that he had discussed Relator's issues with PMC's President and CEO, Kathy Kuck. *See* June 25, 2013 E-mail from Steve Cunningham, Exhibit 73 to Lord Discl. Stmt. Relator frequently declared his willingness to Cunningham, Klecha and Arenas to meet with Ms. Kuck. However, Ms. Kuck never contacted Relator to discuss his allegations, compliance issues, or retaliation.

189.    Throughout May and June of 2013, Relator continued to witness NAPA anesthesiologists falsely attest to providing medical direction services for Medicare patients, falsify physical assessments, fail to complete pre-anesthetic examinations and evaluations on

patients, pre-sign attestation forms and pre-write post-anesthesia medication orders either at the beginning of procedures or before the patient was even sent to the operating room.

190.     Relator's reports of this conduct did not change NAPA Defendants' policies and practices.

## NAPA'S RETALIATION AND
## WRONGFUL TERMINATION OF RELATOR

191.     As a direct result of Relator's reports of non-compliance with Medicare and TEFRA requirements the NAPA Defendants retaliated against him.

192.     Soon after the March 6, 2012 incident involving Dr. Nostro, *supra* at ¶¶ 162-64, Relator learned that Dr. Nostro advised NAPA anesthesiologists not to trust Relator because he was reporting compliance issues to the NAPA Defendants.  One anesthesiologist informed Relator she was told to "watch out for him [Relator] because he is the police."

193.     Dr. Nostro also no longer assigned Relator to his surgical cases in the cardiovascular operating room ("CVOR") subsequent to Relator reporting the March 6, 2012 incident.  Since Dr. Nostro is one of only a few cardiac anesthesiologists that perform cardiac anesthesia at PMC, this deprived Relator of any opportunity to work on cardiac cases.   Notably, Relator was the only CRNA at PMC who held both the cardiac surgery certification and cardiac medicine certification, both of which are subspecialty certifications of the critical care nursing certification.

194.     Unable to work in the CVOR with open-heart surgery patients, Relator was put in danger of losing his advanced cardiac certifications, which are based on the hours logged while providing care for this specific complex patient population.  The NAPA Defendants' decision to exclude Relator from the CVOR negatively impacted Relator.   CRNAs with advanced cardiac

certifications can demand higher salaries at most medical institutions. The NAPA Defendants' actions were aimed at jeopardizing Relator's advanced cardiac certification.

195.    On July 10, 2012, Relator had a telephone discussion with Russo to discuss the NAPA Defendants' continued retaliation and to ask for follow up on the Medicare compliance issues previously raised.

196.    The NAPA Defendants continued to retaliate against the Relator. The NAPA Defendants sabotaged Relator's potential employment opportunities by providing negative employment references to Relator's prospective employers:

- After Relator interviewed for a CRNA position at Penn State Hershey Medical Center ("PSHMC"), he was given every assurance by PSHMC that the position would be his. However, Relator was later informed by PSMC that, after they contacted the NAPA Defendants, Relator would no longer be hired.

- Relator applied for one of multiple available CRNA positions on several of Geisinger Health System's campuses in Northeast Pennsylvania ("Geisinger") in the summer of 2013. After his interviews at Geisinger, Relator initially received positive feedback about his prospects for a position at Geisinger. However, Relator was subsequently informed by telephone that he would not be hired for any open positions at Geisinger's facilities now or in the future.

197.    In furtherance of their efforts to retaliate, the NAPA Defendants pressured its CRNAs at PMC not to provide references for Relator. On July 20, 2013 Relator asked former NAPA colleague and CRNA Kathi J. McGoldrick via text message if she would write a professional reference to facilitate his search for new employment. Ms. McGoldrick replied "Sure!" and "Ok no problem." Yet when Relator requested this reference on August 12, 2013, during a text message conversation at 5:23 p.m., Relator stated, "Hi, KJ! Just checking in… I hadn't heard from you." Ms. McGoldrick responded:

> I know. I'm sorry! I didn't know what to say and I feel bad! I got a call from some man, who said I could be called as a witness against my employer if I write you a reference. Sounds ridiculous, but now I'm nervous!

> I got a call from some man…lawyer..I think. I was so nervous I
> didn't even get his name.

198.     At least two other clinicians (one CRNA and one operating room RN) at PMC

offered to provide Relator with employment references, but suddenly changed their minds after,

upon information and belief, they were convinced that doing so would negatively impact them.

199.     Not satisfied with providing negative references to Relator's prospective

employers, the NAPA Defendants also refused to provide Relator with an employment

evaluation, which was required for him to maintain his medical staff privileges at PMC.  On or

about April 2013, Relator requested that Dr. Nostro provide him with an employee evaluation to

maintain his medical staff privileges at PMC.  Dr. Nostro refused to complete the employee

evaluation and never provided Relator or the PMC medical staff office with the required

employee evaluation.

200.     Other NAPA anesthesiologists also retaliated against Relator by creating a hostile

work environment.  On April 16, 2013, Relator reported Dr. Damjanovic for mislabeling a

syringe as epinephrine when it was not epinephrine, for failing to complete a thorough pre-

anesthetic examination and evaluation, and for failing to document vital signs and medications

administered while personally performing anesthesia services when providing break relief to

Relator.  In retaliation, Dr. Damjanovic harassed Relator by following him around the operating

and exam rooms in a hostile manner.  Relator reported this incident but the retaliatory conduct

never ceased.

201.     The NAPA Defendants also retaliated against Relator by scheduling Relator for

the most "call shifts," as compared to any other CRNA at PMC.  CRNAs at PMC are required to

be "on call," meaning  that in addition to working their regular five eight-hour shifts during the

week and an equitable share of weekend and holiday shifts, the CRNA is also required to stay late, after normal shift hours, to complete unfinished cases as needed. The "on call" CRNA must carry a beeper and remain within thirty minutes of the hospital, ready to respond day or night, in the event the in-house anesthesiologist requires additional anesthesia staffing. The "on call" CRNA also reports at the normal time the following morning, ready to start work at 7:00 a.m. The NAPA Defendants repeatedly scheduled Relator for the most "on call" shifts of all CRNAs at PMC, including during pre-approved vacation time. Relator complained to Dr. Nostro but received no response, other than that Dr. Nostro would "look into it." After submitting a written complaint, which included a tabulation of the CRNA staff call shift totals, to Dr. Nostro and not receiving any response, Dr. Nostro required the Relator to work on Christmas Eve in 2012. Dr. Nostro did this even after informing the Relator that he was scheduled to be off that day, knowing another CRNA was already scheduled, at his own request, to be "on call" for this holiday. Relator worked this shift while the "on call" CRNA was dismissed.

**Relator's Constructive Discharge**

202. On June 14, 2013, Dr. Chen was assigned as the attending anesthesiologist and Relator was the CRNA on a case involving patient **REDACTED** On each patient's Evaluation Form, the right hand margin has space dedicated for the anesthesiologist to list each of the medications that the patient is taking (the "Medication Section"). The Medication Section on **REDACTED** Evaluation Form indicated he had not received metoprolol, a beta blocker that had been prescribed to **REDACTED** on the day of the surgery.[2]

---

[2] The Surgical Care Improvement Project (also referred to as the "SCIP Protocol"), among other measures, requires that patients receiving beta blockers receive a dose of beta blockade prior to surgery (unless there is a defined and documented contraindication for administering the beta blocker) in order to protect the patient's heart and to avoid rebound tachycardia, myocardial infarction and other dangerous complications that can result from the combined physiologic consequences of missing the dose and the ensuing physiologic stress of both the anesthesia and the surgery.

203.     Despite acknowledging that **REDACTED** did not receive a beta blocker, Dr. Chen instructed Relator to withhold the patient's beta blocker.  Relator reminded Dr. Chen of PMC's and the NAPA Defendants' strict adherence to the SCIP Protocol and that **REDACTED** needed to receive a dose of beta blocker since he did not meet any acceptable parameters for withholding the medication.  Dr. Chen did not object to Relator's rationale and intent to follow the established protocol. Relator, following this communication, administered a minimal intravenous dose (0.5 mg) of metoprolol to **REDACTED**

204.     Shortly thereafter, Dr. Chen reported Relator to Dr. Nostro for failing to follow her instructions to refrain from giving **REDACTED** a beta blocker, and claimed Relator was insubordinate.

205.     The following week, Dr. Nostro confronted Relator about the **REDACTED** case.  Dr. Nostro explained that **REDACTED** did receive a beta blocker on the day of surgery and handed Relator a copy of **REDACTED** Evaluation Form, which now indicated that **REDACTED** had taken metoprolol prior to the surgery.  *See* **REDACTED** Anesthesia Record and Altered Evaluation Form, Exhibit 74 to Lord Discl. Stmt.

206.     Relator explained to Dr. Nostro that he was 100% sure that on June 14th metoprolol was listed on the original Evaluation Form, but that the box for metoprolol was <u>not</u> <u>checked</u> and that he did not know why the box was now checked on the copy that Dr. Nostro possessed.  Shortly thereafter, on June 20, 2013, Relator located the original Evaluation Form for **REDACTED** The original Evaluation Form from June 14th shows that **REDACTED** had not received any dose of metoprolol.  Relator immediately provided a copy of the original Evaluation Form to Dr. Nostro, proving that the copy that Dr. Nostro presented to Relator had

been falsified. *See* REDACTED Original Evaluation Form and photograph of the Evaluation Form taken by Relator on June 20, 2013 at 12:04 p.m., Exhibit 75 to Lord Discl. Stmt.

207.    It was apparent then that Dr. Chen supplied Dr. Nostro with a copy of the Evaluation Form which was altered to falsely indicate that REDACTED had received metoprolol the morning of surgery in order to portray Relator as incompetent and insubordinate.

208.    Relator met with Dr. Nostro on June 20, 2013 and requested NAPA investigate the falsified document. Relator also immediately informed Russo, Klecha, Arenas and Cunningham about the falsified document and deliberate retaliation.

209.    Later that same day, Relator explained to Russo that he did not feel safe at work where he could not take responsibility for the life of a patient under anesthesia while simultaneously looking over his shoulder to guard against NAPA anesthesiologists maliciously falsifying records. Relator could not reasonably continue working for NAPA under these circumstances, unless and until NAPA engaged in an appropriate investigation.

210.    Rather than investigate, Russo attempted to persuade Relator to resign, indicating that the NAPA Defendants were willing to cancel his employment agreement without penalty. Russo stated in regard to Relator's contractual obligations: "What would be a good outcome for you?" and "What if I could make that all go away?" and "Sometimes providers and practices are not a good fit..." and "Is there somewhere else you want to work?"

211.    When Russo learned about the Chen's falsified document, she offered to terminate Relator's contract in exchange for 90 days severance and benefits in order to give Relator the opportunity to "find a job you like." Furthermore, Russo advised Relator that there was no reason to involve an attorney.

212.    The following week Relator received a written severance agreement from NAPA containing a confidentiality provision and a release of the NAPA Defendants from any and all claims that Relator might assert.

213.    On June 21, 2013, the day after Relator discovered the falsified document, Relator was scheduled for a day off. By this time, Relator had learned that the NAPA Defendants abruptly severed Relator's access to their e-mail system and computer records.

214.    On or about June 21, 2013, Russo informed Relator that, as of June 21, 2013, he would no longer receive a salary from NAPA Pennsylvania.

215.    On June 24, 2013, Steve Cunningham, PMC's Senior Vice President and Chief Business Development Officer, called Relator and indicated that he had spoken with Tom Delaney, Senior Vice President for Client Services at NAPA and advised him that PMC wants NAPA to "resolve the disputes with their employees."

216.    On June 26, 2013, Relator requested, in writing, a dispute resolution meeting to resolve the dispute in connection with the falsified medical record, a remedy which was specifically provided for in his Employment Agreement.

217.    On July 5, 2013, Relator sent a notice to the NAPA Defendants indicating that since the NAPA Defendants did not schedule the dispute resolution meeting, he construed this as a constructive termination of his employment by the NAPA Defendants and, thus, he intended to mitigate his damages by seeking substitute employment.

218.    On July 12, 2013, the NAPA Defendants responded to this notice in a letter by mischaracterizing its constructive discharge of Relator. Instead, the NAPA Defendants claimed they were treating Relator as having resigned effective July 5, 2013, even though Relator never resigned.

219.     Since July 5, 2013, Relator has diligently applied for more than 18 CRNA

positions, but has been unable to secure full-time employment.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1):
### PRESENTING FALSE CLAIMS

220.     Relator repeats and re-alleges the allegations set forth in the preceding

paragraphs, as if fully set forth herein.

221.     For at least the last 2 ½ years and, on information and belief, since 2007, the

Defendants have been engaged in a scheme to defraud the United States Government into

approving or paying false claims.

222.     From time to time during his employment with NAPA, Relator reported in good

faith what he believed to be serious violations of 31 U.S.C. § 3721.

223.     Under the governing regulations, Medicare Part B reimburses group practices

substantially more for procedures that an anesthesiologist "medically directs" than for

procedures that the physician "medically supervises."

224.     As detailed above, however, there are limitations on the "medically directed rate."

For anesthesia claims that are reimbursed by Medicare, CRNAs providing anesthesia services

under the medical direction of an anesthesiologist must have uninterrupted immediate

availability of an anesthesiologist at all times.  This is impossible when medically directing

anesthesiologists provide CRNAs with a lunch break or other break during a procedure because

the anesthesiologist filling in for the CRNA cannot simultaneously be medically directing a

separate procedure in a separate operating room while providing direct patient care.  When an

anesthesiologist is medically directing a CRNA, Medicare requires the anesthesiologist to be

immediately available to respond to exigent circumstances. An anesthesiologist who is providing direct patient care at a patient's bedside while providing CRNA relief during a break cannot leave the bedside of the patient under his direct care and is no longer immediately available. Unless the anesthesiologist arranges adequate medical direction coverage in his absence, an anesthesiologist providing CRNA relief while medically directing concurrent cases does not fulfill Medicare requirements for medical direction.

225.    When a medically directing physician provides temporary relief to a CRNA, the "uninterrupted immediate availability test" may be met only by: (a) a second anesthesiologist assuming temporary medical direction responsibility for the anesthesiologist providing temporary relief; (b) the relieved CRNA remaining in the immediate area so he can return immediately to the procedure; or (c) a specified anesthesiologist remaining available to provide substitute medical direction services for the anesthesiologist providing temporary relief. *See CMS Payment for Anesthesiologist Services*, RUV. 1859, Issue November 20, 2009 (sometimes referred to as the "Break model.").

226.    Relator learned of the break model billing limitations on medically directed billing during his education at the University of Pennsylvania School of Nursing and through his training at various hospitals where the break model was handled under federal law.

227.    Relator repeatedly advised the Defendants that the NAPA Break Model used by the NAPA Defendants did not comply with federal law. The NAPA Break Model at PMC does not provide for continued immediate availability of a medically directing anesthesiologist during CRNA breaks and consequently there is routinely no available replacement or any second anesthesiologist of record who has assumed (and documented) the responsibility for meeting the

Medicare requirement of immediate availability while the attending anesthesiologist of record is unavailable while providing CRNA break relief.

228.    The Defendants knew or should have known (as defined in 3I U.S.C. § 3801(a)(5)) they had for years made, presented, or submitted, or caused to be made, false or fraudulent claims for payment by federal health care benefit programs, including Medicare and Medicaid.

229.    Each of the claims submitted or caused to be submitted by the Defendants is a separate false and fraudulent claim.

230.    The Defendants presented or caused to be presented these claims knowing their falsity, or in deliberate ignorance or reckless disregard that such claims were false.

231.    The United States, through its carriers, was unaware of the foregoing circumstances and conduct of the Defendants and in reliance on said false and fraudulent records authorized payments to be made to the Defendant, made such payments, and has been damaged.

232.    Because of these false or fraudulent claims submitted or caused to be submitted by Defendants, the United States has been damaged in an amount to be determined at trial.

## COUNT II
### VIOLATION OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(2)
### KNOWINGLY PRESENTING A FALSE OR FRAUDULENT RECORD

233.    Relator repeats and re-alleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

234.    For purposes of obtaining or aiding to obtain payment or approval of reimbursement claims made to federal health benefit programs, from at least the past six (6) years, the Defendants made or presented or caused to be made or presented to the United States

false or fraudulent records, knowing these records to be false or fraudulent or acting with reckless disregard or deliberate ignorance thereof.

235.    The United States, through its carriers, was unaware of the foregoing circumstances and conduct of the Defendants and in reliance on said false and fraudulent records authorized payments to be made to the Defendants, made such payments, and has been damaged.

236.    Such conduct constitutes a violation of the False Claims Act, 31 U.S.C. § 3729(a)(2).

237.    Because of these false or fraudulent claims submitted or caused to be submitted by Defendants, the United States paid the claims, resulting in single damages to the United States, in an amount to be determined at trial.

## COUNT III
## WRONGFUL DISCHARGE AND HARASSMENT
## IN VIOLATION OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3730(h)

238.    Relator repeats and re-alleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

239.    31 U.S.C. Section 3730(h) states in pertinent part:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of the lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed, or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

240.    As more particularly set forth in the foregoing paragraphs by virtue of the acts alleged herein, Relator was engaged in protected activity by repeatedly advising his superiors that he believed that Defendants had violated the law by, among other things, submitting false claims for reimbursement from Medicare.

241.    Relator informed Defendants on multiple occasions, both orally and in writing, that he believed Defendants were engaging in fraudulent conduct.

242.    As a direct result of Relator having lawfully investigated and reported to his superiors what he believed to be fraudulent conduct or wrongdoing, Defendants discharged, demoted, threatened, harassed, and/or discriminated against Relator in the terms and conditions of his employment in violation of 31 U.S.C. § 3730(h).

243.    As a further direct result of the aforesaid unlawful retaliatory employment practices engaged in by the Defendants in violation of 31 U.S.C. §3730(h), Relator sustained permanent and irreparable harm, resulting in the loss of his employment, which caused him to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, front pay, and interest due thereon.

244.    As a further direct result of the aforesaid unlawful retaliatory employment practices engaged in by the Defendants in violation of 31 U.S.C. § 3730(h), Relator suffered severe emotional distress and other health-related problems, embarrassment, and humiliation.

245.    Relator seeks compensatory damages, damages for emotional distress, and other appropriate statutory relief pursuant to this section.

## COUNT IV
## VIOLATION OF PENNSYLVANIA WHISTLEBLOWER LAW

246.    Relator repeats and re-alleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

247.    NAPA is a public body under 43 P.S. § 1421 *et seq.* because NAPA receives substantial payments from the federal government and the state government in the form of Medicaid and Medicare payments for anesthesia procedures.

248. Under 43 P.S. § 1422, Relator performed services for wages or other remuneration under a written contract for hire and was an employee of the NAPA Defendants.

249. Under 43 P.S. § 1422, Relator's oral and written reports to NAPA described herein were "good faith reports" because they were reports of wrongdoing Relator made without malice or consideration of personal benefits and which Relator had reasonable cause to believe were true.

250. The reports of wrongdoing by NAPA were not merely technical or minimal in nature because they were part of a code of conduct that was designed to protect the interest of patients who were entitled to receive conscientious medical care and prevent false claim of reimbursement.

251. Under 43 P.S. § 1422, Relator is a whistleblower because he was a person who witnessed or had evidence of wrongdoing while employed by NAPA and who made good faith reports of said wrongdoing in writing and verbally to NAPA during his employment.

252. As a result of Relator's good faith reporting, his employment situation was made untenable and he suffered retaliation in connection with his compensation terms, conditions and privileges.

253. This hostile work environment resulted in his constructive discharge from his employment in violation of 43 P.S. § 1423(b).

254. Relator has brought this civil action in a court of competent jurisdiction for appropriate injunctive relief and damages within one hundred eighty (180) days of the occurrence of the termination of his employment as required by 43 P.S. § 1424(a).

255. As a result of NAPA's violation of 43 P.S. § 1423(a) and (b), Relator suffered and continues to suffer actual legal damages in an amount in excess of $150,000.00.

## COUNT V
## VIOLATION OF THE PENNSYLVANIA WAGE PAYMENT ACT

256.     Relator repeats and re-alleges the allegations set forth in the preceding

paragraphs, as if fully set forth herein.

257.     The compensation and benefits that Relator would have earned if his employment

with NAPA had not ended prematurely are "wages" under Pennsylvania's Wage Payment and

Collection law ("WPCL").  43 P.S. § 260.20.

258.     Under WPCL, Relator is entitled to the unpaid wages described herein plus

twenty-five (25%) percent of the unpaid wages as liquidated damages because the failure of

NAPA to pay these wages was done in the absence of good faith.  43 P.S. § 260.10.

259.     In addition, Relator is entitled to an award of reasonable attorneys' fees and costs.

43 P.S. § 260.9.


## COUNT VI
## WRONGFUL TERMINATION

260.     Relator repeats and re-alleges the allegations set forth in the preceding

paragraphs, as if fully set forth herein.

261.     On or about June 21, 2013, the NAPA Defendants constructively discharged

Relator from his employment with NAPA Pennsylvania.

262.     As described in the paragraphs above, the NAPA Defendants terminated Relator's

employment in retaliation of this good faith reporting of billing fraud and abuse and the

violations of the standard of care in the treatment of patients.

263.     The NAPA Defendants' termination of Relator, in retaliation for his good faith

reporting of billing fraud and violations of the applicable standard of care, violated numerous

laws including the False Claims Act, 31 U.S.C. § 3730; the Pennsylvania Whistleblower law, 43

P.S. § 1423; a criminal retaliation against witnesses statute, 19 Pa. C.S.A. § 4953 and

Pennsylvania's common law against wrongful termination.

264.　　The NAPA Defendants' termination of Relator in retaliation for his good faith

reporting was against the public morals and welfare of this Commonwealth.

265.　　The NAPA Defendants' tortious conduct was outrageous and done with an evil

motive and with reckless indifference to Relator's interests, including his interest in ensuring

proper patient care.

266.　　As a direct and proximate result of the NAPA Defendants' actions, Relator

suffered and continues to suffer actual legal damages as described more fully in the paragraphs

above.

267.　　As a result of the NAPA Defendants' outrageous conduct, Relator is entitled to

punitive damages in an amount to be determined at trial.

## COUNT VII
## BREACH OF CONTRACT

268.　　Relator repeats and re-alleges the allegations set forth in the preceding

paragraphs, as if fully set forth herein.

269.　　In 2009, Relator entered into a contract with NAPA Pennsylvania so that he

could: (a) obtain tuition reimbursement of the purpose of becoming a CRNA; and (b) continue to

provide CRNA services at PMC which was close to his home.

270.　　During the time that he worked for NAPA Pennsylvania, Relator also entered into

a Doctor of Nursing Practice Program at Yale University School of Nursing to obtain his

doctorate in nursing. .

271.　　Relator entered into the 5-year Employment Agreement with NAPA Pennsylvania

because he was led to believe that the NAPA Defendants had a strong commitment to: (a) the

practice of anesthesia in a manner consistent with the appropriate standard of care; or (b) that the NAPA Defendants practiced ethical and legal billing with all payers, including Medicare.

272. Relator intended to work for NAPA Pennsylvania during the entire length of his contract while he pursued his doctorate at Yale. Instead, Relator has been forced to begin a job search where he has been effectively black listed by the NAPA Defendants. Relator has applied for over 18 positions in the northeast Pennsylvania community, but has failed to find permanent employment. In the meantime, Relator has temporarily been able to find work on a *per diem* basis.

273. For the two (2) years that Relator did work for NAPA, he earned an average income in excess of $150,000 per year and received substantial benefits including health insurance, continuing education reimbursement, bonuses, and Pension and Profit Sharing retirement contributions.

274. NAPA Pennsylvania breached the Employment Agreement by failing to maintain its billing practices in compliance with applicable regulations and laws as required by Paragraph 11.B of the Employment Agreement.

275. NAPA Pennsylvania also breached the Employment Agreement by allowing a hostile and disruptive work environment to develop in retaliation for Relator's whistleblowing which endangered patient care and allowed improper Medicare billing to continue.

276. NAPA Pennsylvania breached the Employment Agreement by failing to comply with its Corporate Compliance Plan, which pledged non-retaliation against employees who reported misconduct.

277. Lastly, NAPA Pennsylvania failed to address Relator's employment issues in a timely fashion and failed to comply with Relator's Employment Agreement. On June 20, 2013,

the NAPA Defendants were promptly advised of Relator's dispute regarding the blatant falsification of a copy of a patient record, which was then used to interfere with his employment. In particular, Relator's counsel at the time, David R. Dearden, notified the NAPA Defendants of such dispute on June 26, 2013, in writing, requesting a meeting to resolve such dispute in accordance of Paragraph 7 of Relator's Employment Agreement, which requires the NAPA Defendants to meet with Relator "within one (1) week of such notification to attempt to resolve the dispute." No such meeting was ever held. In fact, the NAPA Defendants refused to participate in any meeting whatsoever, including declining Relator's invitation to attend a meeting with PMC, which took place on July 29, 2013, over one month later. Relator has never been advised of any investigation related to this incident.

278. The NAPA Defendants failed to exercise good faith and reasonable efforts to respond to Relator's complaints and concerns. The falsification of medical records and the NAPA Defendants' failure to investigate made working so uncomfortable, stressful and intolerable that he was unable to return to work despite his best efforts to resolve the matter in accordance with the Employment Agreement.

279. For the numerous reasons stated herein, NAPA Pennsylvania breached the Employment Agreement with Relator by constructively discharging Relator prematurely while he still had approximately three years remaining on his Employment Agreement.

280. Relator has attempted to mitigate his damages by obtaining alternate employment on a per diem basis as a CRNA and is willing to consider reinstatement if the NAPA Defendants would adopt appropriate remedial measures.

281.    Upon information and belief, the NAPA Defendants have interfered with Relator's efforts to secure new employment by providing negative references to prospective employers.

282.    Relator has suffered damages as a result of the breach of the Employment Agreement in an amount in excess of $150,000.00.

## PRAYER FOR RELIEF

**WHEREFORE**, for each of these claims, the Qui Tam Plaintiff requests the following relief from each of the Defendants, jointly and severally, as to the federal claims:

A.      Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*;

B.      Defendants pay an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions;

C.      A civil penalty against Defendants in the amount of $11,000 for each violation of 31 U.S.C. § 3729;

D.      Award to Relator in the maximum amount permitted by statute, pursuant to 31 U.S.C. § 3730(d), for collecting the civil penalties and damages;

E.      Award of Relator's reasonable attorneys' fees and costs;

F.      Interest;

G.      Permanent injunction prohibiting Defendants from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

H.      Defendants disgorge all sums by which it has been enriched unjustly by its wrongful conduct;

I.      Such relief as is appropriate under the provisions of 31 U.S.C. § 3730(h) of the False Claims Act for retaliatory discharge, including: (1) two times the amount of back pay with appropriate interest; (2) compensation for special damages sustained by Relator in an amount to be determined at trial; (3) litigation costs and reasonable attorneys' fees; (4) such punitive damages as may be awarded under applicable law; and (5) reasonable attorneys' fees and litigation costs in connection with Relator's Section H claim; and

J.      Such further relief as the Court deems just and proper.

**WHEREFORE**, for each of these claims, the Qui Tam Plaintiff requests the following relief from each of the Defendants, jointly and severally, as to the claims under Pennsylvania law:

A.      Reinstatement of Relator to his CRNA position at NAPA with the same seniority that he would have had absent Defendants' illegal retaliation;

B.      A permanent injunction restraining and prohibiting NAPA from further retaliation;

C.      Back pay, doubled, with interest thereon;

D.      Compensatory damages, including damages for lost income (in an amount in excess of $150,000), lost benefits and emotional distress;

E.      Liquidated damages;

F.      Reimbursement of Relator's attorneys' fees and costs in connection with the prosecution of this action; and.

G.      Such further relief as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby requests a trial by jury.

Dated: December 6, 2013

**LOWEY DANNENBERG COHEN
& HART, P.C.**

By: _____
Gerald Lawrence, Esq.
     (PA Bar Number 69079)
Scott V. Papp, Esq.
     (*pro hac vice* pending)
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
West Conshohocken, PA 19428
Phone: (610) 941-2760
Fax:     (610) 862-9777

*Counsel for Relator Michael S. Lord*