| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| *ex rel.* **MICHAEL S. LORD,** | : | |
| **Plaintiffs/Relator** | : | **CIVIL ACTION NO. 3:13-2940** |
| | : | |
| **v** | : | |
| | : | **(JUDGE MANNION)** |
| **NAPA MANAGEMENT SERVICES** | | |
| **CORPORATION, NORTH AMERICAN:** | | |
| **PARTNERS IN ANESTHESIA** | | |
| **(PENNSYLVANIA), LLC, and** | : | |
| **POCONO MEDICAL CENTER,** | | |
| | : | |
| **Defendants** | | |

# MEMORANDUM

Defendant Pocono Medical Center moves to completely dismiss the redacted complaint, (Doc. 26), filed by plaintiff/relator, a nurse anaesthetist formerly employed by one of the other defendants, in this *qui tam* action alleging that all defendants violated the False Claims Act by submitting claims to Medicare for reimbursement regarding anesthesiology services that were in violation of the rules and regulations. Relator also asserts False Claims Act and state law Whistleblower claims against all defendants alleging that they retaliated against him for reporting the wrongdoing, as well as state law employment and contractual claims involving his termination of employment. The United States has declined to intervene in this action. The court will grant defendant Pocono Medical Center's motion in its entirety. (Doc. 50).

## I. PROCEDURAL BACKGROUND

On December 6, 2013, plaintiff/relator Michael S. Lord ("relator") filed his original complaint under seal, (Doc. 1), against defendant Pocono Medical Center ("PMC") and defendants NAPA Management Services Corporation, North American Partners In Anesthesia, LLP ("NAPA"), and North American Partners In Anesthesia (Pennsylvania), LLC ("NAPA-PA"), (collectively "NAPA defendants"). On November 7, 2016, the United States filed a notice of election to decline intervention in this case under 31 U.S.C. §§3730(b)(4)(B) of the FCA and allowed relator to continue with this case in the name of the United States. (Doc. 24). The court then issued an Order on November 8, 2016 directing relator to file a redacted version of his complaint by December 7, 2016 and, directing that the redacted complaint be unsealed on December 14, 2016. (Doc. 25). The court also directed relator to serve the redacted complaint on defendants after it was unsealed. On December 7, 2016, relator filed his redacted complaint against PMC and NAPA defendants. (Doc. 26). Subsequently, relator served defendants with the redacted complaint.

On March 3, 2017, defendant PMC filed a motion to dismiss relator's claims asserted under the False Claims Act ("FCA"), 31 U.S.C. §3729, *et seq*., for failure to satisfy the heightened pleading requirements of Fed.R.Civ.P. 9(b). PMC also moves to dismiss all of the federal claims and the Pennsylvania state law claims pursuant to Fed.R.Civ.P. 12(b)(6) for failure to

2

state a claim upon which relief can be granted. (Doc. 50). NAPA defendants also jointly filed a motion to dismiss on March 3, 2017, (Doc. 52), regarding relator's complaint, (Doc. 26), pursuant to Fed.R.Civ.P. 9(b) and Fed.R.Civ.P. 12(b)(6). After being granted an extension of time, NAPA defendants filed their brief in support of their motion on March 22, 2017. (Doc. 59). In partial response to NAPA defendants' motion, relator filed a notice of voluntary dismissal on March 27, 2017, pursuant to Fed.R.Civ.P. 41(a)(1)(A)(i), dismissing defendant North American Partners In Anesthesia, LLP from this case without prejudice. (Doc. 60). Defendant North American Partners In Anesthesia, LLP was terminated from this case and a stipulation was filed to amend the caption by deleting this defendant from it. (Doc. 63). The stipulation was then approved by the court. (Doc. 66).

On April 7, 2017, PMC filed its brief in support of its motion to dismiss. (Doc. 65).

After being granted an extension of time, relator filed his omnibus brief in opposition to both motions to dismiss on May 3, 2017. (Doc. 69). PMC and NAPA defendants filed their respective reply briefs on May 17, 2017. (Doc. 70, Doc. 71).

As such, both motions to dismiss are ripe for review. The court shall address PMC's motion to dismiss in this memorandum.[1]

---

[1]NAPA defendants' motion to dismiss relator's complaint, (Doc. 52), shall be addressed in a separate memorandum.

3

The court has jurisdiction over this case pursuant to 28 U.S.C. §1331. The court can exercise supplemental jurisdiction over relator's state law claims under 28 U.S.C. §1367. Venue is appropriate in this court since the claims arose in this district and all parties are located here. *See* 28 U.S.C. §1391.

## II.    FACTUAL BACKGROUND[2]

Relator was a certified registered nurse anaesthetist ("CRNA") who was employed by NAPA-PA during the relevant time of this case, *i.e.*, June 2011 through June 21, 2013. NAPA-PA is owned by NAPA which is an anesthesia and perioperative management company employing over 1,000 providers in over 45 practice settings, including PMC. Relator alleges that NAPA-PA employees, including himself and other CRNAs and anesthesiologists, performed services "for [NAPA-PA] at PMC." (Doc. 26, ¶ 54). Relator alleges that NAPA defendants violated the FCA by submitting false claims to Medicare for reimbursement of anesthesiology services. Relator alleges that NAPA-PA submitted false claims to Medicare relating to NAPA anesthesiologists who performed procedures at PMC. Specifically, relator

---

[2]All facts are taken from plaintiff's complaint, (Doc. 26), unless otherwise noted. The facts alleged in plaintiff's complaint must be accepted as true in considering PMC's motion to dismiss. *See* Dieffenbach v. Dept. of Revenue, 490 Fed.Appx. 433, 435 (3d Cir. 2012); Evancho v. Evans, 423 F.3d 347, 350 (3d Cir. 2005).

alleges that during his employment with NAPA-PA when he worked at PMC, he witnessed NAPA's systematic practices to overbill Medicare by claiming it delivered "medically directed" services, when NAPA only provided "medical supervision" services to Medicare patients. (Doc. 26, ¶ 69). Relator alleges that these billing practices by NAPA defendants violated the regulations of the Centers for Medicare and Medicaid Services ("CMS") which administers the Medicare and Medicaid programs. 42 U.S.C. §§1302, 1395hh. Relator alleges that he told his supervisors, including Dr. Anthony Nostro, Chief of Anesthesiology at PMC but an employee of NAPA, about the false billing, and to the chief compliance officers at NAPA and PMC, and that they failed to take any action to correct the fraudulent conduct. Instead, relator alleges that defendants retaliated against him for reporting the violations.

Relator also raises state law claims regarding the termination of his employment with NAPA-PA as well as Pennsylvania breach of contract and Wage Payment and Collection Law claims against all defendants. Additionally, relator raises FCA claims against PMC and avers that he informed PMC of the alleged wrongful conduct of NAPA defendants and that PMC failed to take any action to correct it. Further, while relator does not allege that PMC directly submitted any false claims, he alleges that PMC caused the NAPA defendants to submit false claims and caused the NAPA defendants to make or use a false record or statement material to a false claim, in violation of 31 U.S.C. §§3729(a)(1), (2). Relator also asserts FCA

5

and state law Whistleblower retaliation claims against all defendants.

In particular, Counts I and II of the complaint allege violations of the FCA under 31 U.S.C. §3729(a)(1) and §3729(a)(2), respectively. In Count I, (Doc. 26, pp. 73-75), relator basically alleges that "since 2007, the Defendants have been engaged in a scheme to defraud the United States Government into approving or paying false claims", that "[he] reported in good faith what he believed to be serious violations of [the FCA]", and that "[he] repeatedly advised the Defendants that the NAPA Break Model used by the NAPA Defendants did not comply with federal law." Relator states that the NAPA Break Model at PMC was in violation of the law since it "does not provide for continued immediate availability of a medically directing anesthesiologist during CRNA breaks and consequently there is routinely no available replacement or any second anesthesiologist of record who has assumed (and documented) the responsibility for meeting the Medicare requirement of immediate availability while the attending anesthesiologist of record is unavailable while providing CRNA break relief."

In Count II, (Doc. 26, pp. 75-76), relator alleges "[f]or purposes of obtaining or aiding to obtain payment or approval of reimbursement claims made to federal health benefit programs, from at least the past six (6) years, the Defendants made or presented or caused to be made or presented to the United States false or fraudulent records, knowing these records to be false or fraudulent or acting with reckless disregard or deliberate ignorance thereof"

and, that "the United States, through its carriers, was unaware of the foregoing circumstances and conduct of the Defendants and in reliance on said false and fraudulent records authorized payments to be made to the Defendants, made such payments, and has been damaged."

Count III is an FCA whistleblower retaliation claim in violation under 31 U.S.C. §3730(h). Relater alleges that "[he] was engaged in protected activity by repeatedly advising his superiors that he believed that Defendants had violated the law by, among other things, submitting false claims for reimbursement from Medicare" and, that "[a]s a direct result of Relator having lawfully investigated and reported to his superiors what he believed to be fraudulent conduct or wrongdoing, Defendants discharged, demoted, threatened, harassed, and/or discriminated against Relator in the terms and conditions of his employment."

Count IV is a claim under the Pennsylvania Whistleblower Law ("PWL"), 43 P.S. §1423(a), in which relator alleges that he is a whistleblower "because he was a person who witnessed or had evidence of wrongdoing while employed by NAPA and who made good faith reports of said wrongdoing in writing and verbally to NAPA during his employment" and, that defendants NAPA-PA and NAPA Management retaliated against him by making his employment situation untenable and by creating a hostile work environment which resulted in his constructive discharge for reporting wrongdoing by NAPA.

Count V is a claim under the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 P.S. §260.1, *et seq*., in which relator seeks the repayment of unpaid wages and benefits that he would have earned if his employment with NAPA-PA had not ended prematurely.

Count VI is a common law claim for wrongful termination. Relator alleges that "[o]n or about June 21, 2013, the NAPA Defendants constructively discharged [him] from his employment with [NAPA-PA]" and, that "the NAPA Defendants terminated [his] employment in retaliation of [his] good faith reporting of billing fraud and abuse and the violations of the standard of care in the treatment of patients." In addition to seeking compensatory damages with respect to this claim, relator alleges that "[a]s a result of the NAPA Defendants' outrageous conduct, [he] is entitled to punitive damages."

In Count VII, relator raises a breach of contract claim in which he alleges that "[i]n 2009, [he] entered into a [5-year employment] contract with [NAPA-PA] so that he could: (a) obtain tuition reimbursement for the purpose of becoming a CRNA; and (b) continue to provide CRNA services at PMC which was close to his home." Relator also alleges that he "intended to work for [NAPA-PA] during the entire length of his contract while he pursued his doctorate at Yale." However, relator alleges that NAPA-PA breached several provisions of the Employment Agreement and, that it ultimately breached the Agreement by constructively discharging him when he had about three years

8

of employment left on the Agreement. He further alleges that his attempts to mitigate his damages by obtaining alternate employment have been hindered since the NAPA defendants "effectively black listed" him and have provided "negative references to prospective employers."

## III.    STANDARD OF REVIEW

Defendant PMC's motion to dismiss is brought pursuant to the provisions of Fed.R.Civ.P. 12(b)(6). This rule provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated, Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005), and dismissal is appropriate only if, accepting all of the facts alleged in the complaint as true, the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face," Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007) (abrogating "no set of facts" language found in Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). The facts alleged must be sufficient to "raise a right to relief above the speculative level." Twombly, 550 U.S. 544, 127 S. Ct. at 1965. This requirement "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" necessary elements of the plaintiff's cause of action. Id. Furthermore, in order to satisfy federal pleading requirements, the plaintiff must "provide the grounds of his entitlement to relief," which "requires more

than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008) (brackets and quotations marks omitted) (quoting Twombly, 550 U.S. 544, 127 S. Ct. at 1964-65).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. *See* Sands v. McCormick, 502 F.3d 263 (3d Cir. 2007). The court may also consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir. 2002). However, the court may not rely on other parts of the record in determining a motion to dismiss. *See* Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).

Generally, the court should grant leave to amend a complaint before dismissing it as merely deficient. *See, e.g.*, Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 252 (3d Cir. 2007); Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 116-17 (3d Cir. 2000). "Dismissal without leave to amend is justified

only on the grounds of bad faith, undue delay, prejudice, or futility." Alston v. Parker, 363 F.3d 229, 236 (3d Cir. 2004).

## IV. DISCUSSION

In its motion, PMC moves to dismiss all Counts of relator's complaint with prejudice. PMC argues that all of the claims against it should be dismissed under Rule 12(b)(6) for failure to state cognizable claims. PMC also argues that the substantive FCA claims against it should be dismissed for failure to comport with the heightened fraud pleading requirements of Fed.R.Civ.P. 9(b).

In his brief in opposition to the pending motions to dismiss, (Doc. 69, p. 23 n. 7, relator states that "[s]ince certain of [his] state law claims are duplicative of his Federal whistleblower retaliation claims, [he] hereby withdraws Counts IV, V, and VI [of his complaint]." Thus, the court will dismiss Counts IV, V, and VI of relator's complaint, (Doc. 26), against all defendants.

### A. FCA Claims, Counts I-II

Initially, PMC argues that relator's substantive FCA claims, Counts I-II, against it should be dismissed with prejudice. In his single brief in opposition to the motions to dismiss of PMC and NAPA defendants, (Doc. 69), relator does not appear to specifically address his FCA claims raised in Counts I and II as they pertain to PMC. However, relator does not withdraw these claims as to PMC. PMC contends in its reply brief, (Doc. 70), that the failure of

11

relator to directly respond to its arguments seeking dismissal of Counts I and II constitutes an abandonment and a waiver of these claims. Relator does state in his brief in opposition that he defines the term "Defendants" to include both NAPA defendants and PMC. Thus, the court finds it more prudent to address the merits of PMC's arguments as to why the FCA claims in Counts I and II should be dismissed against it, especially since PMC seeks dismissal of these claims with prejudice.

"The False Claims Act enables the government to recover losses it has incurred as a result of fraud." U.S. v. Education Manage. Corp., 871 F.Supp.2d 433, 445 (W.D.Pa. 2012) (citation omitted). "[T]he False Claims Act 'provides a qui tam enforcement mechanism, which allows a private party (i.e., a relator) to bring a lawsuit on behalf of the government and against an entity to recover money the government paid as a result of fraudulent claims.'" Id. (citation omitted); Druding v. Care Alternatives, Inc., 164 F.Supp.3d 621, 627 (D.N.J. 2016) ("Under the FCA, private individuals can bring qui tam actions on behalf of the government in exchange for their right to retain some portion of any resulting damages award."(citation omitted). Relator brings his FCA claim in Count I under 31 U.S.C. §3729(a)(1). "A plaintiff, in order to establish a prima facie FCA violation under section 3729(a)(1), must prove that "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." U.S. ex rel.

12

Wilkins v. United Health Group, 659 F.3d 295, 304-305 (3d Cir. 2011); U.S. v. Thayer, 201 F.3d 214, 222–23 (3d Cir.1999)); Druding, 164 F.Supp.3d at 627. Liability may attach under the FCA on two different theories: the presentment of factually false claims and the presentment of legally false claims." Druding, 164 F.Supp.3d at 627 (citations omitted). "A claim is factually false when the claimant misrepresents what goods or services that it provided to the Government and a claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment." Wilkins, 659 F.3d at 305.

Additionally, "[t]he more-rigorous pleading standard in Fed.R.Civ.P. 9(b) also applies to the False Claims Act claims [under 31 U.S.C. §3729(a)(1) and (2)] because they allege fraud." U.S. v. Education Manage. Corp., 871 F.Supp.2d at 443 (citing Wilkins, 659 F.3d at 301 n. 9).[3] Thus, plaintiffs alleging claims under the FCA "must state with particularity the circumstances constituting fraud or mistake." Id. at 444 (quoting Wilkins, supra). "A plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.'" Id. (quoting Lum v. Bank of America, 361 F.3d 217,

---

[3]Rule 9(b) provides: "In alleging fraud ..., a party must state with particularity the circumstances constituting fraud.... Malice, intent, knowledge and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b).

223–224 (3d Cir. 2004) (abrogated on other grounds by *Twombly*)). "To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." Id. (citation omitted). Additionally, under Rule 9(b), when there are multiple defendants "the complaint must plead with particularity by specifying the allegations of fraud applying to each defendant." MDNet, Inc. v. Pharmacia Corp., 147 Fed.Appx. 239, 245 (3d Cir. 2005).

In Foglia v. Renal Ventures Management, LLC, 754 F.3d 153, 155 (3d Cir. 2014), the Third Circuit addressed "what a plaintiff, such as [Lord], must show at the pleading stage to satisfy the 'particularity' requirement of Rule 9(b) in the context of a claim under the FCA." In *Foglia*, the Third Circuit stated that "we had never 'held that a plaintiff must identify a specific claim for payment *at the pleading stage* of the case to state a claim for relief.'" (quoting Wilkins, 659 F.3d at 308) (emphasis in original).The Third Circuit followed the approach of the First, Fifth, and Ninth Circuits which have "taken a more nuanced reading of the heightened pleading requirements of Rule 9(b), holding that it is sufficient for a plaintiff to allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that [false] claims were actually submitted.'" Foglia, 754 F.3d at 156-57. However, "[d]escribing a mere opportunity for fraud will not suffice." Id. at 158. Rather, "[s]ufficient facts to establish 'a plausible ground for relief' must be alleged." Id. (citing Fowler v. UPMC Shadyside, 578 F.3d 203, 211

14

(3d Cir. 2009)).

In his complaint, relator alleges that the NAPA defendants billed Medicare Part B for anesthesia services involving CRNAs as if the anesthesiologist had "medically directed" the services in multiple cases contemporaneously, when in fact the physician had only "medically supervised" these concurrent cases. (Doc. 26, ¶'s 61-68). Relator avers that physicians who "medically direct" anesthesia services are reimbursed by Medicare at a higher rate than those who "medically supervise" anesthesia services. (Id., ¶ 3). Relator alleges that on several occasions, a NAPA anesthesiologist who billed for medically directing concurrent cases would fill in for a NAPA CRNA to give the CRNA a break. (Id., ¶'s 69-90). Relator alleges that this rendered the physician ineligible to bill for medically directing other cases because he was not immediately available to assist in the other cases, which is a requirement for medical supervision billing. (Id., ¶'s 69-90). Despite this requirement, relator alleges that "the NAPA Defendants submitted a Medicare claim on [the physician's] behalf for the medically directed anesthesia services of [the physician] even though such claim was not supported under Medicare and TEFRA rules." (Id., ¶'s ¶ 75-90).

Relator alleges that the above stated improper bills were submitted in accordance with NAPA policy, and that this policy "was developed by NAPA and implemented at PMC, and at the NAPA Defendants' other facilities." (Id., ¶ 173). Relator also alleges that the NAPA defendants submitted false claims

to Medicare because NAPA anesthesiologists would sign required attestations regarding their involvement in anesthesia cases before the cases started. (Id., ¶'s 91-122). Additionally, relator alleges that often times NAPA anesthesiologists failed to perform adequate pre-anesthetic examinations and evaluations, and occasionally falsified related documentation, but still submitted bills for these services to Medicare. (Id., ¶'s 123-154). According to relator, the improper bills of the NAPA defendants were submitted to Medicare through "the NAPA Defendant[s'] billing department." (Id., ¶ 93).

Further, relator alleges that at some point "[i]n mid-2012, [he] notified Pamela Watkins, Director of Internal Audit and Corporate Compliance at PMC about the false claims that were being submitted by the NAPA Defendants." (Id., ¶ 168). Relator also alleges that in May 2013, he met with Klecha and Alexander Arenas, PMC Executive Director of Quality and Safety, and informed them that "he had reported various compliance and fraud related issues to the NAPA Defendants and PMC for well over a year." Relator alleges that Klecha and Arenas then told him that they would bring his concerns to Steve Cunningham, PMC Senior VP and Chief Business Development Officer, and to Dr. William Cors, PMC Chief Medical Quality Officer. (Id., ¶ 187).

Next, relator alleges that on June 20, 2013, he told Klecha, Arenas, and Cunningham that a NAPA anesthesiologist had falsified a medical record and that NAPA had retaliated against him for reporting this falsification. On June

24, 2013, relator alleges that Cunningham stated he advised a NAPA Senior VP that "PMC wants NAPA to 'resolve the disputes with their employees.'" (Id., ¶'s 208, 215). On June 25, 2013, relator states that Cunningham emailed him indicating that he "had discussed Relator's issues" with PMC's President. (Id., ¶ 188). Relator then alleges that despite his frequent statements to Cunningham, Klecha, and Arenas regarding his willingness to meet with PMC's President, no meeting ever occurred. (Id.).

PMC states that "Relator makes no allegations linking PMC to the anesthesiologists' billing, NAPA's billing policy, NAPA's case staffing, or the NAPA Defendants' submission of claims through their own billing department." (Doc. 65, p. 11-12). PMC states that Medicare rules preclude it from submitting bills for services rendered by NAPA providers, and that only NAPA can submit claims to Medicare on behalf of the physicians that it employs. PMC cites to the Centers for Medicare and Medicaid Services ("CMS"), Medicare Claims Processing Manual, Chapter 1 §30.2.[4] (Id., p. 12). Section 30.2 of the CMS Manual provides that "Carriers may pay assigned benefits only to the physician, practitioner, or supplier who furnished the service. They do not pay the benefits to any other person or organization under an assignment or reassignment, power of attorney, or under any other

---

[4]The CMS Manual is available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c01.pdf. The court takes judicial notice of the CMS Manual.

arrangement in which the other person or organization receives the payment directly." Section 30.2.1(D) of the CMS Manual provides that Medicare "may pay the employer of the physician or other supplier if the physician or other supplier is required, as a condition of his employment, to turn over to his employer the fees for his services." PMC points out that "Hospitals, like PMC, bill for separate hospital services (e.g., facility fees) under Chapter 4 of the Manual." (Id.).

PMC states that relator's FCA claims should be dismissed since he refers to all defendants together in his complaint and simply alleges that "the Defendants" engaged in improper conduct without specifying which particular defendant was responsible for which wrongful actions. Thus, PMC states that relator fails to make any specific allegations regarding its alleged conduct which was in violation of the FCA and that relator's generic reference to "the Defendants" is not sufficient.

PMC argues that relator's complaint fails to allege that it submitted any false claims or made or used a false document in connection with a false claim and, that relator's allegations in his complaint regarding the submission of false claims specifically refer only to the NAPA defendants. In fact, PMC states that under Medicare rules NAPA defendants could only submit bills for services provided by their physicians. As such, PMC states that "[c]onsistent with Rule 9(b)'s requirements, assertions that refer solely to the NAPA Defendants' alleged misconduct, cannot, without more, support a reasonable

18

inference that PMC engaged in the same misconduct." (Doc. 65, p. 20). Thus, PMC maintains that relator fails to allege its direct involvement with his FCA claims as required and that he fails to give it adequate notice of its allegedly unlawful conduct.

PMC also contends that relator's allegations that he informed PMC of the wrongful conduct of the NAPA defendants is not sufficient to impose liability against it under the FCA. As indicated, relator alleges that he informed PMC officials of his concerns about the improper billing performed by the NAPA defendants. In particular, relator alleges that he informed Peggy Klecha, PMC Director of Risk Management, about the failure of a NAPA physician to obtain a patient's informed consent. (Doc. 26, ¶'s 155, 160). Relator also alleges that he informed "the compliance officers at both the NAPA Defendants and PMC" of an incident in March 2012 when a NAPA anesthesiologist allegedly falsified a case's Anesthesia Record to indicate that he, rather than another physician, was present at the induction of anesthesia for a non-Medicare patient. (Id., ¶'s 161-166). Relator does not specify the dates of when he advised NAPA defendants and PMC of the alleged improprieties.

The court finds that relator has not met the requirements regarding his FCA claims against PMC despite being only at the pleading stage. It is true that relator defined the generic term "the Defendants" in his complaint to include PMC. However, the court in Rapid Models & Prototypes, Inc. v.

Innovated Solutions, 71 F.Supp.3d 492, 504 n. 7 (D.N.J. 2014), noted that "Plaintiffs' collectivized allegations that 'Defendants' engaged in wrongful conduct, without specifying the nature of each defendant's alleged participation in the fraud, fails to satisfy the heightened pleading requirements of Rule 9(b)." (citing MDNet, Inc., 147 Fed.Appx. at 245; Snyder v. Dietz & Watson, Inc., 837 F.Supp.2d 428, 450 (D.N.J. 2011) ("A fraud claim will be dismissed where a 'Plaintiff lumps all [defendants] together as having engaged in wrongful conduct without specifying which defendant was responsible for which actions.'").

Moreover, relator does not allege in his FCA claims that PMC knowingly submitted any false or fraudulent claims to Medicare. Rather, he alleges that after he told PMC of NAPA-PA's violations, PMC was then aware of the improper Medicare billing practices being conducted by NAPA defendants regarding their physicians who performed services at PMC and did nothing to stop them. "In order to prove a claim under §3729(a)(2), a plaintiff must show [in addition to the three elements of a claim under §3729(a)(1)] that the defendant made or used (or caused someone else to make or use) a false record in order to cause the false claim to be actually paid or approved." United States ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 245 (3d Cir. 2004). The Supreme Court in Allison Engine Co. v. United States ex rel. Sanders, 553 U.S. 662, 128 S.Ct. 2123, 2130 (2008), stated that a claim under §3729(a)(2) requires a showing "that the defendant made a false record

or statement for the purpose of getting 'a false or fraudulent claim paid or approved by the Government.'" As the Supreme Court explained, "a subcontractor violates §3729(a)(2) if the subcontractor submits a false statement to the prime contractor intending for the statement to be used by the prime contractor to get the Government to pay its claim." Id.

Relator alleges that even though the parties who were actually presenting the false claims to the government were NAPA defendants, PMC was aware of the fraudulent conduct regarding the NAPA physicians who performed services at PMC and took no action to prevent it. Indeed, the FCA is intended to "reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." Schmidt, 386 F.3d at 243. Thus, PMC can be held liable under the FCA despite the fact that it did not actually present any false claims to the government. Id. at 242-44. The Third Circuit has held that someone other than the actual presenter of the false claims can be held liable under the FCA if he "knowingly caused" the actual presenter's false claims to be filed. Schmidt, 386 F.3d at 243-44. The court in *Schmidt* stated that liability under the FCA reaches "any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." Id. (citation omitted). In *Schmidt*, the Third Circuit indicated that relator's complaint was

21

sufficient since it alleged that the defendant "created and pursued a marketing scheme that it knew would, if successful, result in the submission by [others of false certifications which were] required by Medicare." Id. at 244. The Third Circuit stated that "[i]f this conduct and this knowledge were proven at trial, a jury could conclude that [defendant] knowingly caused [the other party's] false claims to be filed" even though the other party allegedly made its own decision to file the false certifications.

The critical question in this case is whether relator alleges that PMC knowingly assisted NAPA defendants in the submission of false claims to the government, i.e., whether relator alleges that PMC created a scheme that was a "substantial factor in bringing about [NAPA defendants' filing of false claims with Medicare] and that "[NAPA defendants'] filing[s] [were] a normal consequence of the situation created by [PMC's] scheme." Id. Further, the jury does not have to find that PMC had scienter to find that it "knowingly" caused the submission of false claims, rather it could be based on a "mere passive disregard that the jury finds to have been reckless." Id. at 245 n. 12. However, the Third Circuit in *Schmidt* stated that "mere awareness that another may, or even has, chosen to make [a false] claim does not alone constitute 'causing a false claim to be presented.'" Id. (citation omitted). PMC argues that this is precisely what relator alleges in his complaint regarding its conduct, i.e., mere awareness by PMC of NAPA defendants' false claims, and that these allegations fail as a matter of law to state a claim against it under

22

the FCA in Counts I and II.

As PMC explains:

> Relator alleges only that he told PMC his view that the NAPA Defendants' were allegedly submitting false claims and allegedly employing improper documentation practices. Relator does not allege that PMC had induced NAPA physicians to engage in these practices or directed or was otherwise involved with the NAPA Defendants' submission of claims to Medicare. Indeed, Relator's own allegations and the CMS Manual make clear that only the NAPA Defendants, not PMC, submitted bills for NAPA physicians' services. Even assuming that Relator's allegations that PMC was told of the NAPA Defendants' alleged misconduct, Relator has not alleged the essential requirement for liability – that PMC's conduct *caused* the NAPA Defendants' misconduct.

(Doc. 65, pp. 22-23) (emphasis original).

Further, it is clear that if a defendant falsely certifies compliance regarding claims submitted to Medicare which violate the law, this constitutes a false claim submitted to the government under the FCA. *See* U.S. ex rel. Bartlett v. Ashcroft, 39 F.Supp.3d 656, 665 (W.D.Pa. 2014). However, relator does not allege that PMC knowingly assisted in NAPA defendants' submission of false claims to Medicare by falsely certifying the acceptance of the services performed by NAPA-PA staff that caused the government to pay NAPA defendants for services in violation of the Medicare rules and CMS regulations.

In short, the court finds that Counts I and II of relator's complaint simply do not allege that PMC was involved in any fraudulent scheme involving NAPA defendants and that they do not contain sufficient factual allegations

that provide enough detail regarding PMC to impose liability against it under the FCA as required by Rule 9(b). *See* United States ex rel. Bartlett v. Tyrone Hospitals, Inc., 234 F.R.D. 113, 125-26 (W.D.Pa. 2006) (The court found that since the defendants only "stood and watched as the other defendants are alleged to have defrauded the Government," the awareness of a scheme by these defendants did not amount to causation to impose liability against them under the FCA.). To summarize, relator does not allege that PMC knowingly assisted NAPA defendants in causing the submission of false claims to the government. Nor does relator allege that PMC caused the submission of false claims by NAPA defendants to the government by participating in any scheme resulting in the submission of false claims by NAPA defendants. Rather, PMC's alleged involvement in the scheme by NAPA defendants amounts only to mere knowledge of it without any allegation that PMC actually participated in it.

As such, the court finds that relator's complaint fails to state a cognizable claim against PMC under §3729(a)(1) and (2). The court also finds that relator's allegations in Counts I and II do not satisfy Rule 9(b)'s requirement that fraud be pleaded with specificity as to PMC. Thus, the court will grant PMC's motion to dismiss Counts I and II of the complaint as against this defendant and it will dismiss these claims with prejudice. Based on the above discussion, the court finds futility as well as undue prejudice to PMC in allowing relator to amend his complaint as to Counts I and II against this

defendant.

### B. FCA Whistleblower Retaliation Claim, Count III

Count III is a claim of wrongful employment discharge and harassment in violation of the FCA under 31 U.S.C. §3730(h), i.e., FCA whistleblower retaliation claim. Relator alleges that his treatment by defendants after he reported the billing violations to them, which included harassment, discrimination in the terms and conditions of his employment, and false accusations against him, lead to his eventual constructive discharge and that this violated the anti-retaliation provision of the FCA, §3730(h). PMC argues that Count III fails to state a claim against it since relator was not its employee and PMC was not his employer in the context of §3730(h) during the relevant time of this case. PMC also argues that relator's FCA retaliation claim fails to state a cognizable claim against it since his retaliation allegations in his complaint relate exclusively to the NAPA defendants. (*See* Doc. 26, ¶'s 191-197). Relator specifically addresses PMC's arguments regarding his FCA retaliation claim in his brief in opposition.

"The statute at issue here, 31 U.S.C. §3730(h), created 'a private cause of action for an individual retaliated against by his employer for assisting an FCA investigation or proceeding.'" Campion v. Northeast Utilities, 598 F.Supp.2d 638, 647 (M.D.Pa. 2009) (quoting Graham County Soil and Water Conservation District v. Wilson, 545 U.S. 409, 422, 125 S.Ct. 2444 (2005)). Section 3730(h)(1), which was amended in 2009, provides:

Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

"Congress enacted §3730(h) to encourage any individuals knowing of Government fraud to bring that information forward," and "§3730(h) broadly protects employees who assist the government in prosecuting and investigating False Claims Act violations" from harassment, demotion, loss of employment, and any other form of retaliation. Id. (quoting Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 186 (3d Cir. 2001).

The court in Campion, 598 F.Supp.2d at 648, discussed what a plaintiff had to show to state a viable FCA retaliation claim under §3730(h) and stated:

To state a claim under §3730(h), a plaintiff must show that (1) he engaged in protected conduct and (2) that he was discriminated against because of his protected conduct. [Hutchins, 253 F.3d at 186]. Every FCA retaliation claim will share these two basic premises, but these essential elements are deceptively simple. The language of the statute itself encompasses a diverse array of conduct. Section 3730(h) prohibits retaliation in any of its varied forms, including discharge, demotion, suspension, threat, harassment, and "any other manner." The statute also protects a wide variety of conduct, "including investigation for, initiation of, testimony for, or assistance in" an FCA claim, and "[d]etermining what activities constitute 'protected conduct' is a fact specific inquiry", Hutchins, 253 F.3d at 187. Moreover, although a retaliation plaintiff need not develop a winning qui tam action, the plaintiff's protected conduct must have some "nexus" with the, at least potential, FCA claim to be furthered by such conduct. Hutchins, 253 F.3d at 187. The potential predicate FCA violations

26

"encompass numerous and diverse topics and subtopics", Wilson, 471 U.S. at 273, 105 S.Ct. 1938.

As such, "Plaintiff has the burden of proving that 'she was engaged in 'protected conduct,' that as a result she was subject to adverse employment action, and that there is a causal nexus between Plaintiff's actions and Defendant's alleged ... retaliatory behavior.'" Difiore v. CSL Behring, U.S., LLC, 171 F. Supp. 3d 383, 393 (E.D.Pa. 2016), appeal pending.

Clearly, there is a "wide variety of retaliation prohibited by §3730(h) and conduct protected by the statute." Campion, 598 F.Supp.2d at 648. "Section 3730(h) is also a 'whistleblower' law, and both the federal and [Pennsylvania's Whistleblower Law, 43 Pa.S. §1424(a)] statutes protect employees against discharge and discrimination in retaliation for reporting or assisting in the investigation of employer wrongdoing." Id. at 651. Further, "[t]he FCA's anti-retaliation provision applies broadly to any employee-employer relationship" and not only to employees of government entities like Pennsylvania's Whistleblower Law. Id. (citations omitted). By its terms, §3730(h) now applies to "any employee, contractor, or agent." Also, §3730(h) clearly indicates that the claimed retaliatory conduct must relate to the "terms and conditions of [relator's] employment." *See* Difiore, 171 F. Supp. 3d at 393 n.4 (The court noted that it would follow the decisions of other circuits holding that the alleged change in the terms or conditions of employment for an FCA retaliation claim must "rise to the level of an 'adverse employment action' as

required in other federal statutory anti-retaliation provisions like Title VII and FMLA").

At the outset, there is no dispute that relator was not PMC's employee during the time at issue. Rather, relator was employed by NAPA-PA and he was assigned to work at PMC. In his brief, (Doc. 69, p. 27), relator states that "[he] was employed by NAPA, and NAPA was an independent contractor for PMC." (citing Doc. 26, ¶'s 6, 54). Thus, relator contends that "[he] was an agent of an independent contractor to PMC and, as such may state [a] claim for FCA retaliation against PMC." He concludes that "[e]ven though PMC is not Relator's 'employer,' PMC is still liable for its retaliation against the Relator." PMC states that relator did not allege in his complaint that he had a contractual or agency relationship with PMC." (Doc. 65, p. 25). As such, PMC maintains that relator was neither an agent nor a contractor of PMC. PMC maintains that relator's FCA retaliation claim against it fails under §3730(h) since relator's relationship with PMC was not an employee-employer relationship as required for such claim.

No doubt that with the 2009 amendment of §3730(h), "Congress expanded protection under the FCA from only employees to employees, contractors, and agents. Moreover, it removed any reference to retaliation 'by his or her employer,' leaving the potential categories of defendants under this section legally unsettled." Lampenfeld v. Pyramid Healthcare, Inc., 2015 WL 926154, at *4 (M.D.Pa. Mar. 4, 2015).

Relator contends that NAPA-PA was an independent contractor to PMC, and that he was an employee or agent of PMC's independent contractor. Indeed, relator's June 6, 2011 Employment Agreement was only with NAPA-PA and he admits in his complaint that this defendant was his employer. The court has reviewed the Employment Agreement, (Doc. 1-1), which is sealed, and it defines "employer" as NAPA-PA and relator as "employee." The Agreement provided, in part, that employee would "provide anesthesia care to patients under the direct supervision and/or medical direction of a physician and in accordance with the policies and guidelines of the Department of Anesthesia of the hospital in which such services are rendered," and that "EMPLOYEE shall provide [ ] professional services in Pennsylvania at the location(s) determined by EMPLOYER from time to time" and that "EMPLOYEE may be employed or engaged elsewhere ...." The Agreement also provided that NAPA-PA would directly pay relator, that it would provide relator with medical malpractice insurance, and that it would "deduct and withhold the appropriate Social Security, Medicare, Pennsylvania State Disability and withholding taxes, and such other taxes as may be required by law." In an addendum to the Agreement, relator "agrees to obtain temporary privileges at Pocono Medical Center by June 6, 2011" in addition to obtaining privileges at other facilities identified in the addendum. Indeed, the Agreement provided that relator would perform services for NAPA-PA at NAPA-PA's direction at PMC's hospital. The court finds that the Agreement simply does

not support a finding of an employment-like relationship between relator and PMC.

It is clear that the entity with which relator had contracted was NAPA-PA despite the fact that his services would be at PMC as well as other facilities to which NAPA-PA assigned him. Relator now essentially claims that NAPA-PA's relationship with PMC brings him within the purview of the amended §3730(h) and makes him an agent of PMC for purposes of this section. The court in Lampenfeld,2015 WL 926154, at *6, stated "despite the fact that Congress amended [§3730(h)] to explicitly include independent contractors as plaintiffs, there is no evidence either in the text of the statute or the legislative history behind its implementation that Congress intended to similarly expand the class of defendants to independent contractors." The court emphasized that "the legislative history behind the 2009 amendment serves only to highlight that Congress' purpose was to widen the class of plaintiffs, not the class of defendants." Id.; *see also* Cestra v. Mylan, Inc., 2015 WL 2455420, *7 (W.D.Pa. May 22, 2015)("Congress amended §3730(h) to further expand the scope of plaintiffs ...."). As such, the court in *Lampenfeld* stated that "keeping in line with pre-amendment case law, liability under §3730(h) of the FCA extends only to 'employers.'" Id.

Similar to the present case, the plaintiff in *Lampenfeld* did not allege that she was in an employee-employer relationship with the defendant. The court then concluded that "although the United States Court of Appeals for the Third

Circuit has not yet addressed this issue, this Court is persuaded by the majority reasoning that the legislative intent behind the 2009 amendment had nothing to do with individual liability or liability of independent contractors." Id. Simply put, in the instant case, PMC was not relator's employer and PMC lacked a contractor or agency relationship with relator. *See* Wichansky v. Zowine, 2014 WL 289924, at *3 (D.Ariz. Jan. 24, 2014) ("Cases that examine the legislative history have concluded that the 2009 amendments [to §3730(h)] were intended to retain the requirement that an FCA defendant have some employer-type relationship with the plaintiff."); United States ex rel. Fryberger v. Kiewit Pac. Co., 41 F. Supp. 3d 796, 814 (N.D.Cal. 2014) (citations omitted). Rather, PMC had a contractor relationship with NAPA-PA.

Moreover, relator does not allege in his complaint that he had an agency relationship with PMC. PMC thus states that "[r]elator made *no* allegations on this jurisdictional requirement." (Doc. 65, p. 25) (emphasis original). In It's Intoxicating, Inc. v. Maritim Hotelgesellschaft mbh, 2013 WL 3973975, *6, (M.D.Pa. July 31, 2013), this court stated as follows:

> Pennsylvania recognizes four kinds of agency, but all "have three basic features in common: (1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) the understanding of the parties that the principal is to be in control of the undertaking." Rantnetwork, Inc. v. Underwood, 11–CV–1283, 2012 WL 1021326, *5 (M.D.Pa. 2012). While express authority "is directly granted by the principal to the agent ... apparent authority arises from representations that the principal makes to those third parties with whom the agent acts on the principal's behalf." Id. However, "[w]hether the alleged authority is actual, apparent or otherwise, the element of control

is the touchstone of a principle-agent relationship." [Rantnetwork, Inc. v. Underwood, 11–CV–1283, 2012 WL 1021326, *5 (M.D.Pa. 2012)](). In the context of a motion to dismiss, "[d]irect proof is unnecessary when the proffered evidence allows an inference of at least an implied intention to create the relationship of principal and agent." Id. Nevertheless, "the mere showing that one person does an act for another does not give rise to an inference that an agency relationship existed." Id. Under the federal rules, a plaintiff must plead "enough facts from which a plausible claim of an agency relationship can be inferred ... not simply assert in conclusory terms that a party is another party's agent for purposes of vicarious liability." [Johnson v. Dunkin' Donuts Franchising L.L.C., 2012 WL 1828028]() (W.D.Pa. 2012)(interpreting [Fed.R.Civ.P. 8]() ).

In U.S. ex rel. Bias v. Tangipahoa Parish School Bd., 816 F.3d 315, 324 (5th Cir. 2016), the Fifth Circuit Court of Appeals held that "Defendants, [for purposes of the 2009 amendment to §3730(h)(1)], must be those by whom plaintiffs are employed, with whom they contract, or for whom they are agents."). The court stated that "the common law definition of 'agency' [with respect to who plaintiffs can bring FCA retaliation claims against] anticipates 'a consensual relationship in which one person ... acts as a representative ... of another ... with power to affect the legal rights and duties of the other person.'" Id. at 325 (citing Restatement (Third) of Agency §1.01, cmt. c.). Relator does not allege such a relationship with PMC and, there is no claim that he had any power to affect the legal rights and duties of PMC. Nor are there sufficient allegations pled in his complaint to make such a relationship plausible notwithstanding the fact that "[a] plaintiff need not plead an FCA retaliation claim with particularity because no showing of fraud is required."

United States v. Northern Adult Daily Health Care Center, 205 F.Supp.3d 276, 297 (E.D.N.Y. 2016). It is clear that relator performed services for NAPA-PA, at the direction and under the control of NAPA-PA, during his assignment at PMC. Additionally, the allegations in relator's complaint with respect to his FCA retaliation claim pertain to the conduct of NAPA defendants and how they continued to retaliate against him after he reported the Medicare violations. (Doc. 26, ¶'s 191-201).

Thus, PMC's motion to dismiss will be granted as to PMC on Count III for retaliation under the FCA, without leave to amend since relator simply cannot show that he was an employee or a contractor of PMC and, since relator's complaint and his Employment Agreement with NAPA-PA does not indicate that he had any agency relationship with PMC . *See* United States ex rel. Conroy v. Select Medical Corporation, S.D.Ind., 211 F.Supp.3d 1132, 1157 (Sept. 30, 2016) ("The majority of courts, relying on the comprehensive analysis in Aryai v. Forfeiture Support Associates, 25 F.Supp.3d 376 (S.D.N.Y. 2012), take the view that amended §3730(h) did not expand the class of potential defendants [beyond employer] subject to liability for retaliation.") (citations omitted); U.S. ex rel. Petras v. Simparel, Inc., 2015 WL 337472, *11 (D.N.J. Jan. 26, 2015) ("[E]ven with the adoption of revised Section 3730(h), many courts have continued to require that the retaliatory conduct in question be performed by an 'employer entity' for a cause of action to lie under the revised Section 3730(h).") (citation omitted).

### C. Breach of Contract Claim, Count VII

In Count VII, (Doc. 26, pp. 80-83), relator alleges that in 2009 he entered into a 5-year Employment Agreement with NAPA-PA and that this defendant breached the contract for several reasons detailed in his complaint. No where does he allege that he had a contract with PMC which PMC breached. A breach of contract claim requires the existence of some form of contract between parties. Specifically, in order to establish a breach of contract claim under Pennsylvania law, plaintiff must demonstrate: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa.Super. 1999) (citation omitted); Gorski v. Smith, 812 A.2d 683, 692 (Pa.Super. 2002); Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003). There is no dispute that relator has not alleged any of these elements regarding his breach of contract claim insofar as it is against PMC. Additionally, the Employment Agreement, (Doc. 1-1), does not include PMC as a party to this contract. Thus, relator does not state a viable breach of contract claim against PMC. Nor does relator argue in his brief, (Doc. 69), that he has asserted such a claim against PMC.

As such, PMC's motion to dismiss will be granted with respect to Count VII for breach of contract, without leave to amend since relator cannot show that he had a contract with PMC.

## V.   CONCLUSION

Accordingly, PMC's motion to dismiss, (Doc. 50), will be granted and all of relator's claims in his complaint, (Doc. 26), against PMC will be dismissed with prejudice. PMC will be dismissed from this action entirely. Additionally, the court will dismiss Counts IV, V, and VI of relator's complaint, (Doc. 26), against NAPA defendants. An appropriate order will be issued.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Dated: June 20, 2017**