**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA,          :
*ex rel.* MICHAEL S. LORD,
                                   :
    **Plaintiffs/Relator**              CIVIL ACTION NO. 3:13-2940
                                   :
**v**
                                   :    **(JUDGE MANNION)**
NAPA MANAGEMENT SERVICES
CORPORATION, NORTH AMERICAN:
PARTNERS IN ANESTHESIA
(PENNSYLVANIA), LLC, and          :
POCONO MEDICAL CENTER,
                                   :
    **Defendants**

**MEMORANDUM**

NAPA defendants move to dismiss the remaining claims against them contained in Counts I and II of the redacted complaint, (Doc. 26), filed by plaintiff/relator, a nurse anaesthetist formerly employed by one of the defendants, in this *qui tam* action alleging that the defendants violated the False Claims Act by submitting false claims to Medicare for reimbursement regarding anesthesiology services. Relator alleges that defendants engaged in a scheme to defraud Medicare in order to receive higher reimbursement by knowingly and falsely billing it for anesthesiology services provided at its client hospital as "medical direction" services when they should have properly been billed as "medical supervision" services. Relator also asserts a False Claims Act Whistleblower claim against NAPA defendants as well as a state law breach of contract claim involving his termination from employment, Counts

III and VII, which are not subject to the motion to dismiss. The court will grant in part and deny in part the NAPA defendants' motion. (Doc. 52).

## I. PROCEDURAL BACKGROUND[1]

On December 6, 2013, plaintiff/relator Michael S. Lord's ("relator") filed his original complaint under seal, (Doc. 1), against defendant Pocono Medical Center ("PMC") and defendants NAPA Management Services Corporation, North American Partners In Anesthesia, LLP ("NAPA"), and North American Partners In Anesthesia (Pennsylvania), LLC ("NAPA-PA"), (collectively the "NAPA defendants"). After the United States filed a notice of election to decline intervention in this case, relator filed his redacted complaint (the "complaint") against PMC and NAPA defendants on December 7, 2016. (Doc. 26).

On March 3, 2017, the NAPA defendants filed a motion to dismiss, (Doc. 52), relator's complaint, (Doc. 26), pursuant to Fed.R.Civ.P. 9(b) and Fed.R.Civ.P. 12(b)(6); relator's claims asserted under the False Claims Act ("FCA"), 31 U.S.C. §3729, *et seq*., for failure to satisfy the heightened pleading requirements of Fed.R.Civ.P. 9(b) and for failure to state a claim upon which relief can be granted; and, relator's Pennsylvania state law claims. NAPA

---

[1]Since the court stated the full procedural and factual backgrounds of this case when it decided PMC's motion to dismiss relator's complaint, (Doc. 50), in a memorandum dated June 20, 2017, (Doc. 73), it shall not fully repeated them herein. *See* 2017 WL 2653164 (June 20, 2017, M.D.Pa.).

defendants filed their brief in support of their motion on March 22, 2017. (Doc. 59). Subsequently, defendant North American Partners In Anesthesia, LLP was dismissed from this case without prejudice. (Doc. 60).

Relator filed his brief in opposition to both PMC's and NAPA defendants' motions to dismiss on May 3, 2017. (Doc. 69). NAPA defendants filed their reply brief on May 17, 2017. (Doc. 71).

On June 20, 2017, the court issued a Memorandum, (Doc. 73), and Order, (Doc. 74), granting PMC's motion to dismiss, (Doc. 50), with prejudice. Additionally, the court dismissed Counts IV, V, and VI of relator's complaint against the NAPA defendants.

The court has jurisdiction over this case pursuant to 28 U.S.C. §1331. The court can exercise supplemental jurisdiction over relator's remaining state law claim under 28 U.S.C. §1367. Venue is appropriate in this court since the claims arose in this district and all parties are located here. *See* 28 U.S.C. §1391.


## II.    FACTUAL BACKGROUND

Relator was a certified registered nurse anaesthetist ("CRNA") who was employed by NAPA-PA during the relevant time of this case, *i.e.*, June 2011 through June 21, 2013. NAPA-PA is owned by NAPA which is an anesthesia and perioperative management company employing over 1,000 providers in over 45 practice settings, including PMC. Relator alleges that NAPA-PA

employees, including himself and other CRNAs and anesthesiologists, performed services "for [NAPA-PA] at PMC." (Doc. 26, ¶ 54). Relator alleges that NAPA defendants violated the FCA by submitting false claims to Medicare for reimbursement of anesthesiology services relating to NAPA anesthesiologists who performed procedures at PMC. Specifically, relator alleges that during his employment with NAPA-PA when he worked at PMC, he witnessed NAPA's systematic practices to overbill Medicare by claiming it delivered "medically directed" services, when NAPA only provided "medical supervision" services to Medicare patients. (Doc. 26, ¶ 69). Relator alleges that these billing practices by NAPA defendants violated the regulations of the Centers for Medicare and Medicaid Services ("CMS") which administers the Medicare and Medicaid programs. 42 U.S.C. §§1302, 1395hh. Relator alleges that he told his supervisors and the chief compliance officers at NAPA and PMC about the false billing and that they failed to take any action to correct the fraudulent conduct. Rather, relator alleges that the NAPA defendants retaliated against him for reporting the wrongdoing which culminated in his termination from employment.

Relator also asserts a FCA Whistleblower claim as well as a Pennsylvania breach of contract claim against NAPA defendants.

Specifically, Counts I and II of the complaint allege substantive violations of the FCA under 31 U.S.C. §3729(a)(1) and §3729(a)(2), respectively. In Count I, (Doc. 26, pp. 73-75), relator alleges that "since 2007,

the Defendants have been engaged in a scheme to defraud the United States Government into approving or paying false claims", that "[he] reported in good faith what he believed to be serious violations of [the FCA]", and that "[he] repeatedly advised the Defendants that the NAPA Break Model used by the NAPA Defendants did not comply with federal law." Relator states that the NAPA Break Model used at PMC was in violation of the law since it "does not provide for continued immediate availability of a medically directing anesthesiologist during CRNA breaks and consequently there is routinely no available replacement or any second anesthesiologist of record who has assumed (and documented) the responsibility for meeting the Medicare requirement of immediate availability while the attending anesthesiologist of record is unavailable while providing CRNA break relief."

In Count II, (Doc. 26, pp. 75-76), relator alleges "[for purposes of obtaining or aiding to obtain payment or approval of reimbursement claims made to federal health benefit programs, from at least the past six (6) years, the Defendants made or presented or caused to be made or presented to the United States false or fraudulent records, knowing these records to be false or fraudulent or acting with reckless disregard or deliberate ignorance thereof" and, that "the United States, through its carriers, was unaware of the foregoing circumstances and conduct of the Defendants and in reliance on said false and fraudulent records authorized payments to be made to the Defendants, made such payments, and has been damaged."

Count III is a claim of wrongful employment discharge and harassment in violation of the FCA under 31 U.S.C. §3730(h). Relater alleges that "[he] was engaged in protected activity by repeatedly advising his superiors that he believed that Defendants had violated the law by, among other things, submitting false claims for reimbursement from Medicare" and, that "[as a direct result of Relator having lawfully investigated and reported to his superiors what he believed to be fraudulent conduct or wrongdoing, Defendants discharged, demoted, threatened, harassed, and/or discriminated against Relator in the terms and conditions of his employment." This claim is relator's whistleblower retaliation claim under the FCA.

Count VII is a state law beach of contract claim in which relator alleges that "[in 2009, [he] entered into a [5-year employment] contract with [NAPA-PA] so that he could: (a) obtain tuition reimbursement [for] the purpose of becoming a CRNA; and (b) continue to provide CRNA services at PMC which was close to his home." Relator also alleges that he "intended to work for [NAPA-PA] during the entire length of his contract while he pursued his doctorate at Yale." However, relator alleges that NAPA-PA breached several provisions of the Employment Agreement by constructively discharging him when he had about three years of employment left on the Agreement. He further alleges that his attempts to mitigate his damages by obtaining alternate employment have been hindered since the NAPA defendants "effectively black listed" him and have provided "negative references to

prospective employers."

### III.    STANDARD OF REVIEW

NAPA defendants' motion to dismiss is brought pursuant to the provisions of Fed.R.Civ.P. 12(b)(6). This rule provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated, Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005), and dismissal is appropriate only if, accepting all of the facts alleged in the complaint as true, the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face," Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007) (abrogating "no set of facts" language found in Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). The facts alleged must be sufficient to "raise a right to relief above the speculative level." Twombly, 550 U.S. 544, 127 S. Ct. at 1965. This requirement "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" necessary elements of the plaintiff's cause of action. Id. Furthermore, in order to satisfy federal pleading requirements, the plaintiff must "provide the grounds of his entitlement to relief," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008) (brackets and quotations marks omitted) (quoting Twombly,

550 U.S. 544, 127 S. Ct. at 1964-65).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. *See* Sands v. McCormick, 502 F.3d 263 (3d Cir. 2007). The court may also consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir. 2002). However, the court may not rely on other parts of the record in determining a motion to dismiss. *See* Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).

Generally, the court should grant leave to amend a complaint before dismissing it as merely deficient. *See, e.g.*, Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 252 (3d Cir. 2007); Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 116-17 (3d Cir. 2000). "Dismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility." Alston v. Parker, 363 F.3d 229, 236 (3d Cir. 2004).

## IV.    DISCUSSION

In their motion, NAPA defendants move to dismiss the remaining FCA claims in Counts I and II of relator's complaint against them with prejudice. NAPA defendants also moved to dismiss Counts IV through VI but these Counts were already dismissed against them. Since NAPA defendants do not move to dismiss Counts III and VII, these claims shall proceed against them. NAPA defendants argue that the FCA claims against them in Counts I and II should be dismissed under Rule 12(b)(6) for failure to state cognizable claims. They also argue that the FCA claims should be dismissed for failure to satisfy the heightened fraud pleading requirements of Fed.R.Civ.P. 9(b).

Relator states that he has alleged NAPA defendants "routinely billed Medicare for 'medical direction' services, the highest payment category for anesthesia reimbursement provided by Medicare, despite violating Medicare's basic conditional regulations – known as the TEFRA of Seven Steps rules – which are required prior to reimbursement for such service." (Doc. 69, p. 5). In particular, relator alleges, (Id., pp. 5-6), that:

> [he] routinely witnessed Defendants' anesthesiologists (1) fail to remain physically present and available for immediate diagnosis and treatment of emergencies; (2) fail to perform and accurately document the required pre-anesthetic exam and evaluation; and (3) fail to participate in the most demanding procedures, including "induction and emergence where applicable." Often, Defendants' anesthesiologists "pre-signed" their medical record attestations (certifying they complied with certain TEFRA Rules) before seeing the Medicare patient or at the beginning of an anesthetic, and without making sure that the TEFRA Rules would be satisfied. If a Medicare provider fails to meet these TEFRA Rules, they must

9

bill Medicare for "medical supervision" services at a lower reimbursement rate. However, Defendants ignored these rules and routinely billed Medicare at the higher reimbursement rate for "medical direction," costing U.S. taxpayers millions of dollars.

NAPA defendants, (Doc. 59, p. 13), summarize relator's FCA claims as follows:

> [Relator] alleges that NAPA violated the FCA by engaging in a "fraudulent billing scheme" in which false claims and records were submitted to Medicare. The crux of [relator's] allegations is that NAPA billed Medicare for "medically directed" services that were ineligible for reimbursement at that level because the anesthesiologists failed to satisfy the Seven Steps regulation [TEFRA rules]. Complaint at ¶¶ 2-3. [Relator] contends that NAPA should have been reimbursed at the lower "medically supervised" rate in those cases. Id. at ¶¶ 3, 70.

As such, relator contends that NAPA defendants' anesthesiologists "failed to meet the requirements of a billing regulation commonly known as the 'seven steps' regulation." United States ex rel. El-Amin v. George Washington University, 4 F.Supp.3d 30, 32 (D.D.C. 2013) (citing 42 C.F.R. §405.552). "[A] physician must perform each of the seven steps for each procedure to be eligible for the highest level of reimbursement and could not delegate performance of those tasks to residents or CRNAs." Id. (citation omitted).

"Medicare, a federally-funded health insurance program, generally covers the cost of reasonable and medically necessary services for persons over the age of 65, disabled persons, or persons who suffer from end stage renal disease." United States ex rel. Conroy v. Select Medical Corporation, 211 F.Supp.3d 1132, 1138 (S.D.Ind. 2016) (citing 42 U.S.C. §1395c;

§1395y(a)(1)). "Participating health care practitioners and providers must provide services 'economically and only when, and to the extent, medically necessary.'" Id. (citing 42 U.S.C. §1320c–5(a)(1)). Additionally, "[a] provider's participation [ ] requires certification that any claims made for reimbursement comply with all Medicare requirements" and the submission of a payment claim to Medicare "requires the provider to certify that the services rendered were 'medically...necessary to the health of the patient.'" Id.

The Centers for Medicare and Medicaid Services ("CMS") administers the Medicare and Medicaid programs. 42 U.S.C. §§1302, 1395hh. There is a CMS Medicare Claims Processing Manual.[2] "In reimbursing anesthesiology services, CMS regulations distinguish between four levels of services provided by anesthesiologists and CRNAs[.]" *See* United States ex rel. Donegan v. Anesthesia Associates of Kansas City, PC, 833 F.3d 874, 877 (8th Cir. 2016).

As NAPA defendants, (Doc. 59, p. 10), explain:

Medicare reimburses four categories of anesthesia services: (1) personally performed, (2) medical direction, (3) medical supervision, and (4) not medically directed. 42 C.F.R. §§414.46(c), (d), (f), 414.60(a). "Personal performance" occurs when the physician "performs the entire anesthesia service alone." 42 C.F.R. § 414.46(c)(1)(I). Personally performed services are reimbursed at a fee schedule amount set by Medicare. 42 C.F.R. §414.46(c)(2); Medicare Claims Processing Manual

---

[2]The CMS Manual is available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c01.pdf. This court has already taken judicial notice of the CMS Manual.

(MCPM), Ch. 12, §§50.K.

> "Medical direction" generally occurs when an anesthesiologist directs CRNAs in two to four concurrent [anesthesia] cases and satisfies [the Seven Steps regulation]. [*See* 42 C.F.R. §414.46(d)(ii); 42 C.F.R. §415.110(a)].

*See* Donegan, 833 F.3d at 877.

"Medical supervision" occurs when the anesthesiologist is involved in medically directing more than four concurrent cases or performs other services while directing concurrent cases." (Doc. 59, p. 11) (citing 42 C.F.R. §414.46(f); MCPM, Ch. 12, §50.D).

"Claims for medically supervised services are generally paid at a lower reimbursement rate than if the services were medically directed." (Id.) (citing 42 C.F.R. §414.46(f); MCPM, Ch. 12, §§50.D, 50.K).

With respect to his FCA claims, relator alleges that even though the attending anesthesiologist failed to comply with one or more of the Seven Steps regulation, NAPA defendants billed Medicare at the higher rate for medically directed services. Specifically, relator maintains that NAPA defendants improperly sought reimbursement for medical direction anesthesia services at PMC despite the fact that their anesthesiologists did not comply with the required Seven Steps which resulted in the defendants receiving more money from Medicare than they were entitled to.

The Seven Steps regulation is found at 42 C.F.R. §415.110(a)(1) and require the anesthesiologist to satisfy each of the following steps to receive

12

the highest level of reimbursement for each procedure:

1. Perform a pre-anesthetic examination and evaluation;

2. Prescribe the anesthesia plan;

3. Personally participate in the most demanding aspects of the anesthesia plan, including, if applicable, induction and emergence;

4. Ensure that any procedures in the anesthesia plan that he does not perform are performed by a qualified individual;

5. Monitor the course of anesthesia administration at frequent intervals;

6. Remain physically present and available for immediate diagnosis and treatment of emergencies; and

7. Provide indicated post-anesthesia care.

*See* Donegan, 833 F.3d at 877 ("To obtain reimbursement for Medical Direction, the Medicare regulations require the anesthesiologist to complete seven steps[.]").

Additionally, "[t]he anesthesiologist must document 'in the patient's medical record' that each step was completed, 'specifically documenting that he or she performed the pre-anesthetic exam and evaluation, provided the indicated post-anesthesia care, and was present during the most demanding

13

procedures, including induction and emergence where applicable.'" Id. (citing 42 C.F.R. §415.110(b)).

"The FCA proscribes the knowing submission of false claims for payment to the federal government and makes civil penalties and treble damages available as remedies." Conroy, 211 F.Supp.3d at 1141 (citation omitted). "The False Claims Act enables the government to recover losses it has incurred as a result of fraud." U.S. v. Education Manage. Corp., 871 F.Supp.2d 433, 445 (W.D.Pa. 2012) (citation omitted). "[T]he False Claims Act 'provides a *qui tam* enforcement mechanism, which allows a private party (i.e., a relator) to bring a lawsuit on behalf of the government and against an entity to recover money the government paid as a result of fraudulent claims.'" Id. (citation omitted); Druding v. Care Alternatives, Inc., 164 F.Supp.3d 621, 627 (D.N.J. 2016) ("Under the FCA, private individuals can bring *qui tam* actions on behalf of the government in exchange for their right to retain some portion of any resulting damages award." (citation omitted).

Relator brings his FCA claim in Count I under 31 U.S.C. §3729(a)(1). He brings his FCA claim in Count II under §3729(a)(2). "The FCA proscribes the knowing submission of false or fraudulent claims to the government for payment." Conroy, 211 F.Supp.3d at 1153 (citing 31 U.S.C. §3729(a)(1)). "A plaintiff, in order to establish a prima facie FCA violation under section 3729(a)(1), must prove that "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim

was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." U.S. ex Rel. Wilkins v. United Health Group, 659 F.3d 295, 304-305 (3d Cir. 2011); U.S. v. Thayer, 201 F.3d 214, 222–23 (3d Cir.1999)); Druding, 164 F.Supp.3d at 627. "In order to prove a claim under §3729(a)(2), a plaintiff must show [in addition to the three elements of a claim under §3729(a)(1)] that the defendant made or used (or caused someone else to make or use) a false record in order to cause the false claim to be actually paid or approved." United States ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 245 (3d Cir. 2004). The Supreme Court in Allison Engine Co. v. United States ex rel. Sanders, 553 U.S. 662, 128 S.Ct. 2123, 2130 (2008), stated that a claim under §3729(a)(2) requires a showing "that the defendant made a false record or statement for the purpose of getting 'a false or fraudulent claim paid or approved by the Government.'" Thus, "[t]he submission of a false claim is a necessary element to state a cause of action under §3729(a)(1) and §3729(a)(2)." U.S. ex rel. Gohil v. Sanofi-Aventis U.S. Inc., 96 F.Supp.3d 504, 518 (E.D.Pa. 2015) (citation omitted). Under the FCA, "[a] statement is 'false' when it is objectively untrue." U.S. ex rel. Thomas v. Siemens AG, 593 Fed.Appx. 139, 143 (3d Cir. 2014). Further, the false claims must be material. Universal Health Servs., Inc. v. United States ex rel. Escobar, —U.S.—, 136 S.Ct. 1989, 1996 (2016). Also, under the FCA, liability attaches "to the claim for payment" and "not to the underlying fraudulent activity." United States ex rel. Donegan v. Anesthesia Associates of Kansas

City, PC, 833 F.3d 874, 876 (8th Cir. 2016) (citation omitted). "Relators need not prove at the pleading stage that the statement represents an 'objective falsehood.'" Conroy, 211 F.Supp.3d at 1153 (citation omitted).

Liability may attach under the FCA on two different theories: the presentment of factually false claims and the presentment of legally false claims." Druding, 164 F.Supp.3d at 627 (citations omitted). "A claim is factually false when the claimant misrepresents what goods or services that it provided to the Government and a claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment." Wilkins, 659 F.3d at 305. Relator states that in this case he alleges factually false claims.

Additionally, "[t]he more-rigorous pleading standard in Fed.R.Civ.P. 9(b) also applies to the False Claims Act claims because they allege fraud." U.S. v. Education Manage. Corp., 871 F.Supp.2d at 443 (citing Wilkins, 659 F.3d at 301 n. 9).[3] Thus, plaintiffs' alleging claims under the FCA "must state with particularity the circumstances constituting fraud or mistake." Id. at 444 (quoting Wilkins, supra). "A plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.'" Id.

---

[3]Rule 9(b) provides: "In alleging fraud ..., a party must state with particularity the circumstances constituting fraud.... Malice, intent, knowledge and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b).

(quoting [Lum v. Bank of America, 361 F.3d 217, 223–224 (3d Cir. 2004)](#) (abrogated on other grounds by *Twombly*)). "To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." [Id.](#) (citation omitted). Additionally, under Rule 9(b), when there are multiple defendants "the complaint must plead with particularity by specifying the allegations of fraud applying to each defendant." MDNet, Inc. v. Pharmacia Corp., 147 Fed.Appx. 239, 245 (3d Cir. 2005).

In Foglia v. Renal Ventures Management, LLC, 754 F.3d 153, 155 (3d Cir. 2014), the Third Circuit addressed "what a plaintiff, such as [Lord], must show at the pleading stage to satisfy the 'particularity' requirement of Rule 9(b) in the context of a claim under the FCA." In *Foglia*, the Third Circuit stated that "we had never 'held that a plaintiff must identify a specific claim for payment *at the pleading stage* of the case to state a claim for relief.'" Id. (quoting Wilkins, 659 F.3d at 308) (emphasis in original). The Third Circuit followed the approach of the First, Fifth, and Ninth Circuits which have "taken a more nuanced reading of the heightened pleading requirements of Rule 9(b), holding that it is sufficient for a plaintiff to allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that [false] claims were actually submitted.'" Foglia, 754 F.3d at 156-57. However, "[d]escribing a mere opportunity for fraud will not suffice." Id. at 158. Rather, "[s]ufficient facts to establish 'a plausible ground for relief'

must be alleged." Id. (citing Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009)).

Initially, NAPA defendants argue that since relator worked for NAPA-PA from June 2011 to June 2013, his FCA claims in Counts I and II should be dismissed regarding any alleged wrongdoing before June 2011 and after June 2013. They state that "[relator] alleges, on information and belief, that NAPA's purported misconduct occurred since 2007, [Doc. 26] at ¶¶ 221, 234." But defendants argue that this 2007 date is based only on the FCA's six-year statute of limitations and not on facts known to relator. (Doc. 59, p. 14, Doc. 71, pp. 13-14) (citing 31 U.S.C. §3731(b)(1)). In particular, they maintain that the complaint "does not include a single factual allegation involving Counts I or II that pertains to NAPA's conduct outside the June 2011 to June 2013 time period" and, that "[t]he Complaint also fails to allege any facts showing that NAPA's alleged conduct continued after [relator] left the organization in June 2013." (Id.). NAPA defendants conclude that "[s]ince [relator] has failed to identify any facts that would lead to a 'strong inference' that NAPA submitted false claims before June 2011 or after June 2013, the Court should dismiss Counts I-II as to claims outside those dates." (Doc. 71, p. 14).

Relator counters by stating he alleges that NAPA defendants' illegal billing practices were continuing despite his repeated efforts to report the violations, Doc. 26 at ¶190, and that based on FCA policy reasons, he should be allowed to recover for the entire period of the alleged fraudulent scheme

and not only for the period during his employment with NAPA-PA. Relator cites to U.S. ex rel. Galmines v. Novartis Pharm. Corp., 88 F.Supp.3d 447, 456 (E.D.Pa. 2015). In Galmines, 88 F.Supp. 3d at 451, the court indicated "that Third Circuit appellate precedent does not require [relator] to have firsthand knowledge of 'all the relevant information' on which his allegations are based", and that "a relator's allegations need not be strictly limited to the information as to which she has direct and independent knowledge, provided that the relator has direct and independent knowledge of the critical elements of the alleged fraudulent scheme." The *Galmines* Court also stated that "[t]he precise start and end dates of a fraudulent scheme are not 'critical elements' of a False Claims Act claim" and that "[t]he precise duration of a fraudulent scheme goes not to liability but to damages—and not even to the existence of damages, but to the quantum of damages." Id. (citations omitted). The court concluded that "[o]ne would expect that a relator with direct and independent knowledge of the critical elements of the fraud might not know when the fraudulent scheme began or ended, and it would make little sense not to allow a relator to obtain these details during discovery and amend her complaint accordingly." Id.

The relator in the instant case alleges that he has direct knowledge of the material facts underlying the actual fraudulent billing scheme being conducted by NAPA defendants. Relator alleges that he "observed the NAPA Defendants routinely engage in [ ] systematic false claims practices, all of

19

which violate Medicare and TEFRA rules[.]" (Doc. 26, ¶ 3). Relator then lists four specific types of violations, stated below, which he allegedly observed. Relator also alleges that "[t]hroughout at least 2011 through 201 (sic) and, on information and belief, since 2007, Defendants systematically billed Medicare for 'medically directed' physician services, despite their knowledge that the services did not qualify for this increased payment under Medicare and TEFRA rules." (Id., ¶ 43). Further, relator alleges that "[f]rom at least 2011 to the present, Defendants engaged in a systematic effort to submit false claims that do not reflect the actual services performed by its anesthesiologists to federally funded health insurance programs." (Id., ¶ 60). Relator provides examples of the alleged false billing scheme involving specific patients from June 5, 2012 through June 20, 2013. (Id., ¶'s 75-90). Additionally, relator alleges that "[t]hroughout [his] employment at PMC, he routinely witnessed anesthesiologists pre-sign the Anesthesia Records in violation of Medicare and TEFRA rules and in furtherance of their scheme to fraudulently bill for medically directed services whether or not TEFRA rules were indeed fulfilled." (Id., ¶ 97). He then cites to examples of the violations he allegedly witnessed from March 2013 up to June 20, 2013. (Id., ¶'s 91-122). Indeed, all of the specified examples of the different categories of the violations which relator allegedly observed occurred between June 2011 and June 20, 2013.

The court in Galmines, 88 F.Supp. 3d at 456 found that it should "allow original-source relators to pursue the entire fraudulent scheme for which they

have direct and independent knowledge of the operative substantive facts, and not to limit relators to the specific time periods for which they have direct and independent knowledge, particularly where the relator has alleged the scheme was 'continuing' as of the day they lost their direct and independent knowledge by reason of a cessation of employment or equivalent development." An "original source" is "an individual who has direct and independent knowledge of the information on which the allegations are based." 31 U.S.C. §3730(e)(4)(B). Relator in the present case is an original-source relator.

NAPA defendants contend that *Galmines* is distinguishable from the present case since our relator has failed to identify any facts showing that NAPA's allegedly improper conduct occurred before his employment started and that it continued after his employment ended, and that he merely alleges that his reports of the improper conduct "did not change [NAPA's] policies and practices." (Doc. 26, ¶ 190). NAPA defendants state that this broad allegation is insufficient to allow relator to pursue FCA claims for dates before his employment began and after his employment terminated.

The court finds the reasoning of *Galmines* to be persuasive. In that case, the relator asserted allegations that the marketing scheme continued after his employment ended and he pleaded specific facts that showed the continued nature of the defendant's scheme. Id. at 458. On the contrary, our relator has not identified any facts showing that NAPA defendants' allegedly

improper conduct began before his employment commenced in June 2011 and that it continued after his employment ended in June 2013. Rather, he simply alleges that, based on unspecified information and belief, the billing scheme began in 2007 and that it continued following the termination of his employment.

In Gohil, 96 F.Supp.3d at 517, the court explained:

> [T]he Third Circuit recently clarified the application of Rule 9(b) to *qui tam* actions. A relator is not required to plead the details of particular false claims which were submitted to the Government for payment. Rather, "it is sufficient for a plaintiff to allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" U.S. ex rel. Foglia v. Renal Ventures Mgmt., LLC, 754 F.3d 153, 155 (3d Cir. 2014) (citing U.S. ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 190 (5th Cir. 2009)). The allegations must suggest more than a "mere opportunity for fraud." Id. at 157. The complaint must contain "[s]ufficient facts to establish 'a plausible ground for relief'..." Id. (citing Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009)).

Relator has failed to plead any specific facts that would lead to a "strong inference" that NAPA defendants submitted false claims prior to June 2011 and after June 2013. Nor is there is any indicia of reliability with respect to relator's claims outside of this time period. Further, there is no strong inference that NAPA defendants actually submitted any false claims to Medicare during the period before June 2011 and after June 2013. As such, the court will dismiss his FCA claims for the period before June 2011 and after June 2013. At this juncture, relator will be limited to claims relating only to the time period during his employment with NAPA-PA. However, the court

will dismiss relator's FCA claims with respect to his allegations which occurred before June 2011 and after June 2013 without prejudice. Relator will be permitted to amend his complaint if he can ascertain during discovery and then plead specific facts that show the time period regarding the alleged fraudulent billing scheme by NAPA defendants began before his employment started and continued after his employment was terminated.[4]

Next, NAPA defendants state that relator fails to identify violations of the Seven Steps regulation in his complaint and that he fails to allege a false claim. In his complaint, relator details four categories of NAPA defendants' conduct that allegedly resulted in the presentment of false claims for Medicare reimbursement. NAPA defendants address each category of false claims billing practices that relator identifies in his complaint and, argue that they are insufficient to meet the heightened pleading requirements of Rule 9(b) and that they fail to state actionable claims under the FCA. They dissect each type of alleged false claim in much detail and contend that relator's allegations do not meet the fraud standards and the elements under §3729(a)(1) and (2).

In his complaint, (Doc. 26), relator makes many allegations detailing how NAPA defendants routinely failed to comply with the Seven Steps of the medical direction requirements. Specifically, (Id., ¶ 3), relator alleges that he

---

[4]The court issued a scheduling order on April 18, 2017 in which it set the final date for the amendment of pleadings to be June 29, 2018 and, it directed that all fact discovery had to be completed by September 14, 2018. (Doc. 68).

observed the NAPA defendants engage in the following types of false claims billing practices:

> (I) anesthesiologists at PMC providing only "medical supervision" services, while billing Medicare for the more highly lucrative "medical direction" services, (ii) failing to fully perform patients' pre-anesthetic examinations and evaluations, and then submitting a claim to Medicare, (iv) (sic) prefilling anesthesia records and the Medicare-required attestations prior to rendering anesthesia services and then submitting a claim to Medicare, and (iv) falsifying patient records to indicate physical assessments were completed when they were not, in violation of Medicare and TEFRA rules.

Relator states that he witnessed, on a regular basis, NAPA defendants' anesthesiologists: "(1) fail to remain physically present and available for immediate diagnosis and treatment of emergencies; (2) fail to perform and accurately document the required pre-anesthetic exam and evaluation; and (3) fail to participate in the most demanding procedures, including 'induction and emergence where applicable.'" (Doc. 69, pp. 5-6). The parties have labeled the different categories of relator's FCA claims in Counts I and II as follows: "(1) Immediate Availability Allegations; (2) Attestation Allegations; (3) Examination Allegations; and (4) Informed Consent Allegations." (Doc. 71, p. 2).

Since relator has failed to address the merits of NAPA defendants' arguments as to why Counts I and II should be dismissed regarding his Examination Allegations and his Informed Consent Allegations, (*see* Doc. 59, pp. 23-26 & Doc. 69, pp. 14-21), the court will deem relator as not opposing

defendants' arguments and will dismiss these Counts without prejudice insofar as they are based on the stated allegations.[5]

Moreover, the court finds merit to the arguments of the NAPA defendants regarding relator's Examination Allegations and his Informed Consent Allegations. The Seven Steps regulation requires the anesthesiologist to document in the patient's medical record "that he or she performed the pre-anesthetic exam and evaluation." 42 C.F.R. §415.110(b). Relator alleges that often times NAPA anesthesiologists failed to perform adequate pre-anesthetic examinations and evaluations, and occasionally falsified related documentation, but still submitted bills for these services to Medicare. (Doc. 26, ¶'s 123-154). For the most part, relator's Examination Allegations dispute the adequacy of the evaluation performed by NAPA anesthesiologists which are claims more akin to a medical malpractice action and not an FCA action. *See* Escobar, 136 S. Ct. at 2004 (a claim under the FCA is based on "allegations of fraud, not medical malpractice").

Additionally, relator merely alleges that in May 2012 NAPA submitted

---

[5]To the extent that relator attempts to address defendants' arguments seeking the dismissal of his Examination Allegations by simply stating in his brief in opposition, (Doc. 96, p. 21), that "[he] alleges that NAPA anesthesiologists routinely falsified physical examinations" and cites to his complaint, (Doc. 26 at ¶145), which alleges "[t]he falsification of a patient's pre-anesthetic physical examination violated the Medicare and TEFRA Rules for medical direction in those cases which involved Medicare patients", this conclusory allegation does not meet Rule 9(b) requirements. *See* Foglia, 754 F.3d at 158 ("[s]ufficient facts to establish 'a plausible ground for relief' must be alleged.").

25

a false claim to Medicare after doctors failed to obtain adequate informed consent from a dementia patient before anesthesia. (Doc. 26, ¶'s 155-160). Informed consent is not one of the requirements of the Seven Steps regulation. As defendants state, (Doc. 59, p. 25-26), "these [Informed Consent] allegations reflect, at most, a difference of opinion between Lord and the anesthesiologists involved about what constitutes informed consent under the circumstances" which does not constitute a false claim under the FCA.

### A. Immediate Availability Allegations, Step Six

To obtain reimbursement for medical direction, Step Six provides that the anesthesiologist is required to "[r]emain[] physically present and available for immediate diagnosis and treatment of emergencies." 42 C.F.R. §415.110(a)(1)(vi). Relator contends that he alleges NAPA anesthesiologists were not "immediately available" despite the fact that they billed Medicare for medical direction. He points to his allegations that "NAPA anesthesiologists routinely provided CRNAs multiple breaks, while medically directing other concurrent cases." (Doc. 69, p. 14) (citing Doc. 26, ¶'s 69-90). He states that "[w]hen personally treating patients while a CRNA is on [a] break, the anesthesiologist cannot leave the patient's side and therefore is not 'immediately available' to the other patients in his/her other concurrent cases." (Id.). NAPA defendants argue that these allegations do not describe a violation of the Seven Steps regulation and that they do not state a false

claim.

There is no dispute between the parties that the "immediate availability" requirement of the Seven Steps regulation may be met by:

> (a) a second anesthesiologist assuming temporary medical direction responsibility for the anesthesiologist providing temporary relief [to the CRNA]; (b) the relieved CRNA remaining in the immediate area so he can return immediately to the procedure; or (c) a specified anesthesiologist remaining available to provide substitute medical direction services for the anesthesiologist providing temporary relief.

(*See* Doc. 26, ¶ 225).

Specifically, relator alleges that the NAPA defendants billed Medicare Part B for anesthesia services involving CRNAs as if the anesthesiologist had "medically directed" the services in multiple cases contemporaneously, when in fact the physician had only "medically supervised" these concurrent cases. (Doc. 26, ¶'s 61-68). Relator alleges NAPA's anesthesiologists were not immediately available (Doc. 26, ¶'s 69-73), and he states several examples of specific instances where NAPA defendants failed to comply with Step Six of the regulation and nonetheless billed Medicare for medical direction. (Doc. 26, ¶'s 75-90). Relator avers that since physicians who "medically direct" anesthesia services are reimbursed by Medicare at a higher rate than those who "medically supervise" anesthesia services, NAPA defendants were improperly receiving more money than they should have received. Relator alleges that on several occasions, a NAPA anesthesiologist who billed for medically directing concurrent cases would fill in for a NAPA CRNA to give the

27

CRNA a break. (Id., ¶'s 69-90). Relator alleges that this rendered the physician ineligible to bill for medically directing other cases because he was not immediately available to assist in the other cases, which is a requirement for medical supervision billing. (Id., ¶'s 69-90). Relator alleges that the NAPA anesthesiologists who provided break relief "did not arrange adequate medical direction coverage in [their] absence." (Id., ¶'s ¶ 75-90). Despite this requirement, relator alleges that "the NAPA Defendants submitted a Medicare claim on [the physician's] behalf for the medically directed anesthesia services of [the physician] even though such claim was not supported under Medicare and TEFRA rules [Seven Steps regulation]." (Id., ¶'s ¶ 75-90).

Thus, relator provides, in his complaint, examples of the alleged false billing practice regarding specific cases that he observed. NAPA defendants maintain that these examples are deficient for several reasons to plead FCA claims with the requisite particularity and to state cognizable claims. In viewing the allegations in a light most favorable to relator, the court finds that relator has sufficiently plead specific facts regarding his allegations that NAPA anesthesiologists were not "immediately available" and, sufficient facts to establish plausible grounds for relief on this basis in Counts I and II. As relator explains, (Doc. 69, p. 18), NAPA defendants' reliance on *Donegan* is misplaced since this case dealt with compliance with Step Three which requires that the anesthesiologist "[p]ersonally participates in the most demanding aspects of the anesthesia plan including, if applicable, induction

28

and emergence." *See* 42 C.F.R. §415.110(a)(1)(iii). The TEFRA rules require the anesthesiologist to comply with both Steps Three and Six as well as the other Steps to bill Medicare for medical direction. Moreover, the *Donegan* case was an appeal of the district court's decision granting defendant's summary judgment motion as opposed to a motion to dismiss. The court finds that relator Lord should be permitted to conduct discovery with respect to his allegations. (Doc. 26, ¶'s 75-90). Additionally, NAPA defendants' arguments, in large part, raise presently disputed factual issues, which may more appropriately be raised after discovery at summary judgment time.

As such, relator's claims in Counts I and II regarding his allegations that NAPA anesthesiologists were not "immediately available" as required by Step Six and that NAPA defendants improperly billed Medicare for medical direction, shall proceed.

### B. Attestation Allegations

Relator alleges that the NAPA defendants submitted false claims to Medicare because NAPA anesthesiologists would sign required attestations regarding their involvement in anesthesia cases before the cases started. (Doc. 26, ¶'s 91-122). Relator avers that the pre-signed attestations placed in patient medical records by NAPA anesthesiologists stated, "I was present for induction, key portions of the procedure and emergence; and immediately available throughout." (Id., ¶ 91). Relator states that since the NAPA anesthesiologists had not yet done what they represented they did when they

signed the attestations, the attestations were false. It is clear that "[t]he anesthesiologist must document 'in the patient's medical record' that each step [of the Seven Steps] was completed, 'specifically documenting that he or she performed the pre-anesthetic exam and evaluation, provided the indicated post-anesthesia care, and was present during the most demanding procedures, including induction and emergence where applicable.'" Donegan, 833 F.3d at 877 (citing 42 C.F.R. §415.110(b)).

Relator states that "[e]ach pre-signed attestation was patently false" and argues that "NAPA recklessly 'pre-signs' their attestations without making sure the TEFRA Rules have been met." He also states that "when the attestations were pre-signed, the anesthesiologists knew full well that they would be providing breaks to CRNAs throughout the day which would violate TEFRA." (Doc. 69, pp. 19-20). Additionally, relator alleges in his complaint, (Doc. 26, ¶ 97), that "[he] routinely witnessed anesthesiologists pre-sign the Anesthesia Records in violation of Medicare and TEFRA rules and in furtherance of their scheme to fraudulently bill for medically directed services …." Relator lists 25 examples of alleged pre-signed attestations in his complaint. (Id., ¶'s 98-118, 120-22).

Insofar as NAPA defendants argue that relator failed to allege that the patient was a Medicare patient, that NAPA submitted claims for Medicare reimbursement, or that any claims were for medically directed services, the court finds that relator's allegations are sufficiently particular since the

anesthesiologist's statement which relator quotes in paragraph 91 plainly indicates by its wording that it was placed in the patient's medical record to bill Medicare for medical direction services. Further, relator alleges in his complaint, Doc. 26, ¶ 93, that "on information and belief, these false forms [with the pre-signed attestations] were forwarded to the NAPA Defendant's billing department indicating that all Medicare requirements were fulfilled." Nor is relator required to identify in his complaint the names of every patient who had a pre-signed attestation placed in his or her record. *See* Foglia, 754 F.3d at 155-57. Moreover, as relator explains, (Doc. 69, p. 21), "[he] did identify the names and Medicare statuses for those pre-signed attestations that [he] could identify[,] [Doc. 26] ¶¶ 102, 118" and "the Complaint identifies every patient NAPA understood was a Medicare patient [Doc. 26] ¶¶ 74, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 89, 90, 102, 118." "An FCA claimant is not required to show 'the exact content of the false claims in question' to survive a motion to dismiss, as 'requiring this sort of detail at the pleading stage would be one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates.'" United States v. Executive Health Resources, Inc., 196 F.Supp.3d 477, 492 (E.D.Pa. 2016) (citing Foglia, 754 F.3d at 156); Gohil, 96 F.Supp.3d at 519 ("[A relator] is not required to plead the details of any false claim submitted for payment[.]"). As such, the court finds that relator's allegations with respect to the pre-signed attestations

support a strong inference that false claims were submitted to Medicare.

Thus, relator's claims in Counts I and II regarding his allegations that NAPA anesthesiologists' pre-signed attestations were placed in the patient's record to improperly bill Medicare for medical direction, shall proceed.

## C. Materiality of Alleged Seven Steps Violations

"[S]ection 3729(a)(1)(B) requires a plaintiff to plead that a defendant knowingly made, used or caused to be made or used 'a false record or statement material to a false or fraudulent claim." Executive Health Resources, Inc., 196 F.Supp.3d at 493. As such, to state an FCA claim, a relator must show that the defendant knowingly submitted a materially false claim to the government. *See* U.S. ex rel. Thomas v. Siemens AG, 991 F. Supp.2d 540, 567 (E.D.Pa. 2014). Additionally, "material" is defined by the FCA as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. §3729(b)(4). Thus, relator must allege that NAPA defendants' violations of the Seven Steps regulation was material to Medicare's payment decision. *See* Escobar, 136 S.Ct. at 2002. Also, "[t]he materiality standard is demanding" and "[m]ateriality, [ ], cannot be found where noncompliance is minor or insubstantial." Id. at 2003.

Relator states that NAPA defendants' alleged violations of the Seven Steps regulation by billing Medicare for medical direction services were material to Medicare's payment decision because under the CMS Manual

System when NAPA physicians were not immediately available, "the physician's services to the surgical patient are supervisory in nature" and cannot be billed as medical direction. In fact, relator repeatedly alleges in his complaint that NAPA defendants improperly billed Medicare for medical direction when they should have billed for medical supervision, and that they were not entitled to the higher reimbursement which they received. (Doc. 26, ¶'s 3, 60-61, 73, 170). He states that the CMS Manual System "makes clear that if an anesthesiologist [is] not immediately available, whether because he left the room or is personally performing another anaesthesia case while a CRNA is on a break, then 'the physician's services to the surgical patients are supervisory in nature' and cannot be billed as 'medical direction.'" (Doc. 69, p. 24).

NAPA defendants argue, in part, that the violations of the Seven Steps which relator alleges they committed were not material to the government's decision to pay their claims since a 2013 guidance issued by a Medicare Administrative Contractor ("MAC"), indicates that certain "not medically directed" category of services billed under the modifier "QZ" would still be paid the same amount as "medical direction" services. Attached to the brief of NAPA defendants, (Doc. 59-1), is the Declaration of David M. Vaughn, Esq., with five exhibits attached, including a copy of the MAC.[6] NAPA defendants

---

[6] Vaughn avers that "CMS contracts with private entities known as [MAC] to assist in administering Medicare."

rely upon Vaughn's Declaration to support their contention.

The court finds that the stated submissions by NAPA defendants are outside of the pleadings and should not be considered at this stage of the case with respect to the pending motion to dismiss. *See* Tri3 Enterprises, LLC v. Aetna, Inc., 535 Fed.Appx. 192, 195 (3d Cir. 2013) ("Unless the court converts a motion to dismiss into a motion for summary judgment, it is generally confined to the four corners of the complaint when evaluating its sufficiency.") (citation omitted). The court also finds that NAPA defendants raise factual discrepancies via Vaughn's Declaration with relator's allegations which may more appropriately be addressed at a later stage of the case. Indeed, relator states that the CMS Manual System "directly contradicts Mr. Vaughn's contention [regarding the MAC guidance]." (Doc. 69, p. 24). Stated simply, whether relator and NAPA defendants merely disagree about how to interpret the regulations and whether there is a genuine issue with respect to the defendants knowing presentation of false claims, are matters to be addressed after discovery. It is premature at this stage of the case to determine whether any reasonable juror could conclude that NAPA defendants made knowingly false statements to Medicare. As such, the court will not consider Vaughn's Declaration and the attached exhibits with respect to the NAPA defendants' motion to dismiss.

Finally, the court finds that NAPA defendants' reliance on *Escobar* is not availing since that case pertained to legally false claims under the implied

false certification theory of FCA liability. In *Escobar*, 136 S.Ct. at 2001, the Supreme Court held that "the implied certification theory can be a basis for liability." *See also* Wilkins, 659 F.3d at 305 (Under the implied false certification theory, "liability [ ] attaches when a claimant seeks and makes a claim for payment from the Government without disclosing that it violated regulations that affected its eligibility for payment."). Also, under the implied false certification theory, a relator "must show that if the Government had been aware of the defendant's violations of the Medicare laws and regulations that are the bases of a plaintiff's FCA claims, it would not have paid the defendant's claims." Wilkins, 659 F.3d at 307. As stated, relator in our case alleges factually false claims since he contends that NAPA defendants continually misrepresented the anesthesiology services that it provided to its patients, i.e., it provided medical supervision services as opposed to medical direction services. Further, as relator states, "[t]he issue [in this case] is not whether NAPA's misrepresentations about compliance with the regulatory requirement were material to the government's payment decision; rather, the issue is that NAPA sought – and received – Medicare reimbursement for a more expensive service (medical direction) after performing less costly services (medical supervision)." (Doc. 69, p. 25). Thus, relators' claims that NAPA defendants violated the Seven Steps regulation are material because they "go[] to the 'very essence' of Medicare reimbursement for NAPA's anesthesia services." (Id.). Additionally, relator alleges that the fraudulent bills

35

were submitted in accordance with NAPA policy, and that this policy "was developed by NAPA and implemented at PMC, and at the NAPA Defendants' other facilities." (Doc. 26, ¶173). Also, relator alleges that the improper bills prepared by the NAPA defendants were submitted to Medicare through "the NAPA Defendant[s] billing department." (Id., ¶93).

In short, the court finds that relator's detailed allegations of NAPA defendants' billing scheme with respect to providing anesthesia services at PMC and the scheme's influence on Medicare regarding its decisions to pay them for medical direction services are sufficient to plead the violations of the Seven Steps were material.

## V.   CONCLUSION

Based on the foregoing, NAPA defendants' motion to dismiss, (Doc. 52), will be granted in part and denied in part as follows.

The court will grant NAPA defendants' motion to partially dismiss Counts I and II based on relator's FCA claims regarding alleged wrongdoing before June 2011 and after June 2013, and the claims outside of the stated dates will be dismissed without prejudice.

The court will grant NAPA defendants' motion to partially dismiss Counts I and II based on relator's claims regarding his Examination Allegations and his Informed Consent Allegations, and it will dismiss these claims without prejudice.

NAPA defendants' motion to dismiss relator's claims in Counts I and II regarding his allegations that NAPA anesthesiologists were not "immediately available" as required by Step Six and improperly billed Medicare for medical direction will be denied, and these claims will proceed.

NAPA defendants' motion to dismiss relator's claims in Counts I and II regarding his allegations that NAPA anesthesiologists' pre-signed attestations were placed in the patient's record to improperly bill Medicare for medical direction will be denied, and these claims will proceed.

NAPA defendants' motion to dismiss Counts IV through VI of relator's complaint will be denied as moot since these Counts were already dismissed against them.

An appropriate order will issue.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Dated: November 14, 2017**