## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* **MICHAEL S. LORD,** | : | |
| | : | |
| **Plaintiffs/Relator** | : | **CIVIL ACTION NO. 3:13-2940** |
| | : | |
| **v** | : | **(JUDGE MANNION)** |
| **NAPA MANAGEMENT SERVICES CORPORATION, NORTH AMERICAN PARTNERS IN ANESTHESIA (PENNSYLVANIA), LLC, and POCONO MEDICAL CENTER,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Presently before the court is a motion for a protective order pursuant to Federal Rule of Civil Procedure 26(c), filed by the two remaining defendants, namely, NAPA Management Services Corporation ("NMSC"), and North American Partners In Anesthesia (Pennsylvania), LLC ("NAPA-PA"), (collectively the "defendants"). (Doc. 117).

Defendants move for a protective order claiming that good cause exists to preclude the discovery of certain communications and documents requested by plaintiff/relator Michael S. Lord ("plaintiff") since they are investigative materials prepared in anticipation of litigation protected from disclosure as work product or constitute privileged attorney-client communications.

In this *qui tam* action, plaintiff was employed as a certified registered nurse anesthesiologist ("CRNA") by NAPA-PA and was based at Pocono

Medical Center ("PMC") from June of 2011 until July 5, 2013.[1] Plaintiff alleges that the defendants violated the False Claims Act ("FCA"), 31 U.S.C. §3729, *et seq*., by submitting false claims to Medicare for reimbursement regarding anesthesiology services. Plaintiff alleges that defendants engaged in a scheme to defraud Medicare in order to receive higher reimbursement by knowingly and falsely billing it for anesthesiology services provided at PMC as "medical direction" services when they should have properly been billed as "medical supervision" services. In particular, plaintiff alleges, in part, that in some of the surgeries he was involved in, the assigned attending anesthesiologist doctor ("Attending") was not present in the operating room to place the patient under anesthesia and, that at the end of some surgeries, while the patient was being extubated from anesthesia, the Attending was not present in the operating room. Plaintiff also asserts a False Claims Act Whistleblower claim against the defendants as well as a state law breach of contract claim involving his termination from employment.

Based on the foregoing, the defendants' motion for protective order will be **GRANTED**, except with respect to one document, Dr. Strobel's PowerPoint presentation entitled "Compliance Talk 2013."

---

[1]In its June 20, 2017 memorandum, (Doc. 73), and order, (Doc. 74), the court granted PMC's motion to dismiss, (Doc. 50), and dismissed all claims against PMC with prejudice.

# I.   PROCEDURAL BACKGROUND[2]

On April 3, 2019, the defendants filed their motion for a protective order, (Doc. 117), with attached exhibits, namely, the Affidavits of Beth Green, Esquire and Leslie Russo, and a Declaration of Thomas J. Campenni, Esquire, counsel for defendants, dated April 3, 2019. (Docs. 117-1, 117-2 & 117-3, respectively). Attached to Campenni's Declaration as Exhibit B is an abridged version of defendants' privilege log containing the original 31 documents that were the subject of defendants' motion. (Doc. 117-3, Ex. B). Defendants simultaneously filed their brief in support of their motion. (Doc. 118). Plaintiff filed his brief in opposition to defendants' motion on April 17, 2017, (Doc. 122-1), with the attached Declaration of Richard E. Vuernick, Esquire, counsel for plaintiff, (Doc. 122-2). There are also exhibits, A-D, attached to Vuernick's Declaration. Defendants filed their reply brief on April 24, 2019, with the attached April 24, 2019 Declaration of Campenni and a copy of a December 26, 2012 email regarding "Regulations", which is largely redacted. (Docs. 123 & 123-1).

On September 9, 2019, defendants submitted revised privilege logs, attached to Campenni's September 9, 2019 Declaration as Exhibits A & B, with 73 documents attached for *in camera* review. The revised abridged

---

[2]Since the court stated the full procedural and factual backgrounds of this case in its memorandum dated June 20, 2017, (Doc. 73), and its memorandum dated November 14, 2017, (Doc. 76), it shall not fully repeated them herein. As such, the court goes directly to the heart of the issues presented in defendants' motion for protective order.

privilege log includes the original 31 documents submitted for *in camera* review along with 42 additional documents.[3]

The court has jurisdiction over this case pursuant to 28 U.S.C. §1331. The court can exercise supplemental jurisdiction over plaintiff's state law claim under 28 U.S.C. §1367. Venue is appropriate in this court since the claims arose in this district and all parties are located here. *See* 28 U.S.C. §1391.

## II.   STANDARD

Generally, the scope of discovery is broad. "Parties may obtain discovery regarding any *nonprivileged* matter that is relevant to any party's claim or defense and proportional to the needs of the case." FED. R. CIV. P. 26(b)(1) (emphasis added). The information need not be admissible to be discoverable. Id. Privileged information, however, is clearly not discoverable. The court must limit discovery if it determines that the information sought is outside the proper scope of discovery. FED. R. CIV. P. 26(b)(2)(iii).

A motion for a protective order is a proper method for challenging inappropriate discovery requests. The court's general authority to issue a protective order is governed by Federal Rule of Civil Procedure 26(c), which reads, in pertinent part:

> A party or any person from whom discovery is sought
> may move for a protective order in the court where

---

[3]Defendants submitted Campenni's September 9, 2019 Declaration with the revised privilege logs attached thereto as Exhibits A & B along with the 73 documents submitted for *in camera* review.

the action is pending—or as an alternative on matters relating to a deposition, in the court for the district where the deposition will be taken. The motion must include a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action. The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.

FED. R. CIV. P. 26(c)(1). The court may grant various forms of relief under Rule 26(c), including "forbidding disclosure of discovery" and "forbidding inquiry into certain matters, or limiting the scope of disclosure of certain matters." FED. R. CIV. P. 26(c)(1)(A), and (D). The decision to grant a protective order, like other rulings regarding the scope of discovery, is within the court's discretion. See Shingara v. Shiles, 420 F.3d 301, 305 (3d Cir. 2005); Mass. Sch. of Law at Andover, Inc. v. Am. Bar. Ass'n, 107 F.3d 1026, 1032 (3d Cir. 1997).

The party seeking the protective order bears the burden of demonstrating "good cause" for that protection. Glenmede Trust Co. v. Thompson, 56 F.3d 476, 483 (3d Cir. 1995); Pansy v. Borough of Stroudsburg, 23 F.3d 772, 786–87 (3d Cir. 1994). "'Good cause' is established when it is specifically demonstrated that disclosure will cause a clearly defined and serious injury." Glenmede, 56 F.3d at 483. There must be a "particular need for protection." Cipollone v. Liggett Grp., Inc., 785 F.2d 1108, 1121 (3d Cir. 1986). "'Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning,' do not support a good cause

showing." Pansy, 23 F.3d at 786 (quoting Cipollone, 785 F.2d at 1121).

Here, the defendants move for protection, in part, because they believe the plaintiff seeks information that is not discoverable—*i.e.*, information that is protected by the attorney-client privilege. FED. R. CIV. P. 26(b)(1). Similar to the burden on the party seeking a protective order, the party asserting the attorney-client privilege bears the burden of showing that the materials or communications at issue are protected from disclosure. Memory Bowl v. N. Pointe Ins. Co., 280 F.R.D. 181, 186 (D.N.J. 2012); Scott Paper Co. v. United States, 943 F. Supp. 489, 499 (E.D. Pa. 1996). This comports with Rule 26 which explicitly provides that a party withholding information based on a privilege must "expressly make [that] claim" and must "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing the information . . .. will enable other parties to assess the claim." FED. R. CIV. P. 26(b)(2)(5)(A). "Whether the privilege applies is a question of law for the court to decide." Andritz Sprout-Bauer, Inc. v. Beazer East, Inc.,174 F.R.D. 609, 632 (M.D.Pa. 1997).

The purpose of the attorney-client privilege[4] is "to encourage full and

---

[4]Privilege law in federal courts is governed by the federal rules of evidence. Federal Rule of Evidence 501 provides that federal law governs a claim of privilege except in cases where state law supplies the rule of decision regarding a claim or defense. FED. R. EVID. 501 (incorporating Erie R. Co. v. Tompkins, 304 U.S. 64 (1983)). Where a federal claim is initiated in court with a state law claim, the federal rule will apply. Wm. T. Thompson Co. v. Gen. Nutrition Corp., Inc., 671 F.2d 100, 104 (1982). The plaintiff's complaint

frank communications between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). The traditional articulation of the attorney-client privilege adopted in this circuit contains the following elements:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (I) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

Maldonado v. New Jersey, 225 F.R.D. 120, 127 (D.N.J. 2004) (quoting In re Grand Jury Investigation, 599 F.2d 1224, 1233 (3d Cir. 1979)). "The privilege covers communications made by the client as well as the attorney and it 'exists to protect not the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice.'" Lawless v. Del. River Port. Auth., No. 11-7306, 2013 WL 180347, at *1 (E.D. Pa. Jan. 16, 2013) (quoting Upjohn, 449 U.S. at 390). The privilege belongs to the client and only the client may waive it. Haines v. Liggett Grp. Inc., 975 F.2d 81, 90 (3d Cir. 1992).

---

contains federal statutory claims along with a supplemental state law claim and is, thus, governed by federal privilege law. Id.

Generally, information within the scope of the attorney-client privilege will be "zealously protected." Id. (citation omitted). There are, however, limitations. The privilege extends to the communications between the attorney and his or her client, but not to the disclosure of underlying facts incorporated into the communication. Upjohn, 449 U.S. at 395–96. In addition, "[b]ecause the attorney-client privilege obstructs the truth-finding process, it is construed narrowly." Westinghouse Elec. Corp. v. Republic of Philippines, 951 F.2d 1414, 1423 (3d Cir. 1991). The application of the privilege must be determined on a "case-by-case" basis, Upjohn, 449 U.S. at 396–97, and it "protects *only* those disclosures—necessary to obtain informed legal advice—which might not have been made absent the privilege," Westinghouse, 951 F.2d at 1423–24 (quoting Fisher v. United States, 425 U.S. 391, 403 (1976)) (emphasis in original).

Additionally, defendants seek protection from disclosure of certain documents and communications based on the work product doctrine. The law is clear that "documents prepared in the regular course of business rather than for purpose of the litigation are not eligible for work-product protection, even if the prospect of litigation exists." Sullivan v. Warminster Tp., 274 F.R.D. 147, 152 (E.D.Pa. 2011) (citation omitted); Highland Tank & Mfg. Co. v. PS Intern, Inc., 246 F.R.D. 239, 246 (W.D.Pa. 2007) ("the work-product doctrine 'only protects documents prepared in anticipation of litigation, not in the regular course of business.'") (citation omitted).

The court in Sullivan, 274 F.R.D. at 150, addressed the work-product

doctrine as defined by the Third Circuit, and stated:

> The work-product privilege is codified by Federal Rule of Civil Procedure 26(b)(3), which states that: a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if: (I) they are otherwise discoverable under Rule 26(b)(1); and (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means. Fed.R.Civ.P. 26(b)(3). As with the attorney-client privilege, the party claiming that evidence is protected attorney work product has the burden of establishing that work-product protection applies. Holmes v. Pension Plan of Bethlehem Steel Corp., 213 F.3d 124, 138 (3d Cir. 2000). Unlike the attorney-client privilege, disclosure to a third party only waives the work-product privilege if it permits an adversary to gain access to the information. *See* Westinghouse Elec. Corp., 951 F.2d at 1428 ("Most courts hold that to waive the protection of the work-product doctrine, the disclosure must enable an adversary to gain access to the information.").

*See also* Mine Safety Appliances Co. v. North River Ins. Co., 73 F.Supp.3d 544, 569-70 (W.D.Pa. 2014).

The court in Sullivan, 274 F.R.D. at 151, also stated:

> [I]t is the communications and not the underlying facts that are privileged. *See, e.g.*, Rhone–Poulenc Rorer, 32 F.3d at 862. Plaintiffs are entitled to discovery regarding the underlying facts of the investigation. It should be further noted, however, that: The protective cloak of [attorney-client] privilege does not extend to information which an attorney secures from a witness while acting for his client in anticipation of litigation. Nor does this privilege concern the memoranda, briefs, communications and other writings prepared by counsel for his own use in prosecuting his client's case; and it is equally unrelated to writings which reflect an attorney's mental impressions, conclusions, opinions or legal theories. Sampson v. School Dist. of Lancaster, 262 F.R.D. 469, 474 (E.D.Pa. 2008). Such communications are generally

protected by the work-product privilege instead. *See* id.

Further, "[t]he question whether a document was prepared in anticipation of litigation is often a difficult factual matter." United States v. Rockwell Int'l, 897 F.2d 1255, 1266 (3d Cir. 1990). A document is prepared in anticipation of litigation when, "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." Id. (citations omitted). As such, courts should determine "the state of mind of the party preparing the document or ... the party ordering preparation of the document." Martin v. Bally's Park Place Hotel & Casino, 983 F.2d 1252, 1260 (3d Cir. 1993). "This inquiry is limited by the requirement that the party's anticipation of litigation be objectively reasonable." Sullivan, 274 F.R.D. at 152 (citing Martin v. Bally's Park Place Hotel & Casino, 983 F.2d at 1260).

## III. DISCUSSION

As a brief backdrop, in January 2019, plaintiff sent a letter to defendants claiming that they improperly withheld certain documents in response to discovery requests as privileged. At issue were the following two categories of documents that defendants withheld as privileged, as reflected on their initial privilege log: (I) e-mail correspondence between non-attorney NAPA employees and officers that were "based upon, and discussing, advice received from counsel"; and (ii) e-mail correspondence with defendants' former outside counsel, David Vaughn.

Following a teleconference with the court on March 11, 2019, the court agreed to allow defendants to file a motion for a protective order and for the parties to file briefs with respect to the documents in the two stated categories which were withheld by defendants. The court also agreed to conduct an *in camera* review of the withheld documents.

After the March 11, 2019 conference, defendants represented that they attempted to identify all of the documents that might fit the two above stated categories. Defendants also stated that they updated their privilege log. Additionally, defendants indicated that they "prepared an abridged version of their privilege log, which includes only the 31 emails and/or other documents [they] determined are within the scope of this motion, numbered as documents 1 through 31." (citing Campenni's 4-3-19 Decl., Ex. B, Doc. 117-3).

On September 9, 2019, defendants submitted an updated abridged privilege log, attached to Campenni's September 9, 2019 Declaration as Exhibit B, with 73 documents attached for *in camera* review, including the original 31 documents.[5]

Further, defendants state that they have "specifically identified 10 emails and/or other documents that involve non-attorney NAPA employees or officers (Campenni Decl., Ex. B, Docs. 1-10), and 15 emails and/or other documents

---

[5]For its discussion below, the court will refer to the revised abridged privilege log attached to Campenni's September 9, 2019 Declaration as Exhibit B, and the 73 attached documents submitted for *in camera* review.

that involve David Vaughn (Campenni Decl., Ex. B, Docs.11-25)." Defendants also state that they "withheld six emails and/or other documents [as attorney-client communications] involving former NMSC employee Garrett Dowd—who was an attorney with NMSC—wherein Mr. Dowd provided legal advice to the Company during the subject time period (Campenni Decl., Ex. B, Docs. 26-31)."

Plaintiff opposes defendants' motion for a protective order and argues that some of the documents defendants seek to protect were not prepared in anticipation of litigation. Plaintiff also argues that since defendants produced similar and related documents to him, defendants waived their right to invoke the privileges. Further, plaintiff states that to the extent defendants are relying of the advice of counsel defense, they are improperly "attempting to utilize the attorney-client privilege as both a sword and a shield."

The court finds that the possibility of litigation was apparent to defendants on April 2, 2012, when plaintiff first contacted Leslie Russo, the former Vice President of Human Resources and Compliance for NAPA to raise several complaints regarding various improper and illegal practices, including Medicare Fraud, which he alleged were occurring at PMC. Plaintiff indicated to Russo that he was looking for another job and that he spoke to an attorney seemingly referring to his allegations. Russo "took [plaintiff's] allegations very seriously and began an investigation." (Doc. 117-2). Russo took handwritten notes of her conversation with plaintiff and her notes were

produced to plaintiff during discovery.[6]

As part of her investigation, Russo avers in her Affidavit that she contacted NAPA's attorney at the time, David Vaughn, and discussed plaintiff's allegations with him. (Doc. 117-2). Russo then states that on April 26, 2012, pursuant to Vaughn's suggestion, she interviewed Dr. Anthony Nostro, former Anesthesia Department Chair at PMC, regarding plaintiff's allegation that on March 6, 2012, Dr. Nostro refused to sign an anesthesia chart because his "ratio was too high," meaning that Dr. Nostro was medically directing too many Medicare patients at the same time to meet Medicare billing guidelines to charge for "medically directed" physician services. Dr. Charles Militana, Regional Director of NAPA-PA, was also present during Russo's interview with Dr. Nostro. Russo took handwritten notes of her interview with Dr. Nostro and later reduced her notes to a memorandum to file dated May 7, 2012.

Defendants contend that Russo's notes from her initial discussion with plaintiff on April 2, 2012 and her May 7, 2012 memorandum show that there was a threat of litigation which continued throughout Russo's initial investigation which concluded on June 18, 2012. At the completion of her investigation, Russo prepared a revised memorandum on June 18, 2012, and prepared another memorandum summarizing the investigations findings and

---

[6]Since the court stated in detail the nature of the plaintiff's claims raised in his complaint filed in this case in its memorandum dated November 14, 2017, (Doc. 76), it shall not repeated them herein.

sent it to plaintiff. Also, defendants point out that Dr. Militana's June 18, 2012 email reveals they were aware of the threat of litigation by plaintiff since he stated: "We know there is potential legal ramifications to [plaintiff's] accusations and we must make sure that our response is appropriate."

Document number 6 attached to defendants' September 9, 2019 privilege log indicates that on December 30, 2012, Vaughn sent an email to Dr. Nostro as a follow-up regarding how to answer some of plaintiff's allegations. This email reveals that Vaughn was aware of plaintiff's initial allegations he raised with Russo.

Moreover, after her investigation into plaintiff's initial allegations, Russo had to investigate additional allegations made by plaintiff up until his departure from NAPA on July 5, 2013. Specifically, on February 3, 2013, plaintiff sent a letter to Russo regarding his follow-up reports of non-compliance by defendants' staff. (Doc. 122-2, Ex. A). On February 25, 2013, Dr. Nostro sent Russo a response to plaintiff's additional February 2013 allegations in an email and an attached document. The subject of the email states: "Fwd: attorney-client privileged [sic] information--Investigation." (Campenni's September 9, 2019 Decl., Ex. B, Docs. 7 & 8).

During her investigation into plaintiff's subsequent allegations, Russo had contact with various attorneys, including Vaughn, Garrett Dowd and Tara Daub. As part of her investigation, Russo also contacted a team of administrators at NAPA, including Dr. Militana, Dr. Nostro, Tom Delaney, Vice President of Client Services for NMSC, Dr. Alan Strobel, Director,

14

Healthcare Compliance Services for NMSC, Lloyd Straus, President and Chief Operating Officer for NMSC, Frederic Fabiano, Director of the Department of Anesthesia, Syosset Hospital, and Sheryl Blumberg, Director, Human Resources for NMSC.

Part of the documents which defendants submitted to the court for *in camera* review include emails from the team of administrators to each other and defendants' counsel regarding plaintiff's allegations about improprieties during his employment with NAPA and Russo's investigation. (Campenni's September 9, 2019 Decl., Ex. B).

Since defendants are seeking protection from disclosure for their communications and documents regarding Russo's investigations based on the attorney-client privilege and the work-product doctrine, they have the burden of proving these privileges apply. *See* Mine Safety Appliances Co., 73 F.Supp.3d at 571 (citations omitted). The court has reviewed the 73 documents submitted *in camera*, in conjunction with defendants' revised abridged version of their privilege log dated September 9, 2019.

### 1. WORK PRODUCT

First at issue are the disputed documents classified by defendants as the "Investigation Materials." Included in these materials are the documents Russo prepared regarding her investigation into plaintiff's allegations which defendants state consist of "her handwritten interview notes and multiple versions of a memorandum to file regarding her findings", as well as "two emails whereby Ms. Russo transmitted a copy of her draft investigation

memorandum, dated May 7, 2012 and May 10, 2012."

Defendants argue that all of the Investigation Materials are work product and, thus they properly did not produce them in response to plaintiff's discovery requests. Plaintiff maintains that these materials were not prepared in anticipation of litigation but for another purpose. He also contends that litigation was not imminent when he first contacted Russo, that his reference to consulting an attorney lacked the required immediacy, and that defendants could not have reasonably anticipated litigation at that point.

No doubt, that "[t]he [work product] doctrine 'extends to material prepared in anticipation of litigation by an attorney's 'investigators and other agents.'" Serrano, 298 F.R.D. at 278-80 (citations omitted). "The work-product doctrine 'protect[s] the confidentiality of papers prepared by or on behalf of attorneys in anticipation of litigation,' thus 'enabling attorneys to prepare cases without fear that their work product will be used against their clients.'" Grimsley v. Manitowoc Company, Inc., 2017 WL 2985119, \*10 (M.D.Pa. July 13, 2017) (citations omitted). Further, "[t]o determine whether a document is prepared 'in anticipation of litigation,' the appropriate inquiry is whether 'in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation.'" Id. (citations omitted). As such, courts should determine "the state of mind of the party preparing the document or ... the party ordering preparation of the document." Martin v. Bally's Park Place Hotel & Casino, 983 F.2d 1252, 1260 (3d Cir. 1993).

"Courts in this Circuit have adopted a 'two part test for ascertaining whether the documents (or things) at issue should be protected under the [work-product doctrine].'" CDK Global, LLC v. Tulley Automotive Group Inc., 2018 WL 4259843, *4 (D.N.J. June 28, 2018) (citing In re Gabapentin Patent Litig., 214 F.R.D. 178, 183 (D.N.J. 2003). As the court in CDK Global, LLC, id., explained:

> The first inquiry is the "reasonable anticipation test," which requires that the court determine whether "litigation could reasonably have been anticipated." "[T]he relevant inquiry is 'whether in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'" Although the litigation need not be imminent, Rockwell, 897 F.2d at 1266, "there must be an identifiable specific claim of impending litigation."

(internal citations omitted).

"The second inquiry is whether the documents were prepared "primarily for the purpose of litigation." Id. (citation omitted). "Documents prepared for other purposes that prove useful in subsequent litigation are not attorney work-product." Id. (quoting In re Gabapentin, 214 F.R.D. at 184. "Accordingly, documents created in the ordinary course of business, even if useful in subsequent litigation, are not protected by the work-product doctrine. Id. (citation omitted). "Even where the reasonable anticipation of litigation is established, whether the document comes within the purview of the work-product [doctrine] still depends primarily on the reason or purpose for the documents production." Id. (quoting In re Gabapentin, 214 F.R.D. at 184).

The court finds that defendants have met their burden and have shown

that the Investigation Materials were prepared in anticipation of litigation and not merely prepared in the ordinary course of business. Based on the very serious nature of plaintiff's allegations when he first contacted Russo, including Medicare fraud by senior NAPA employees, such as Dr. Nostro, and based on the fact that when Russo asked plaintiff to provide her with a written copy of his allegations, he told Russo he had spoken to an attorney and he did not want to give her his notes, and that he was looking for another job, as defendants state, "transformed Ms. Russo's response from an ordinary investigation of typical employee complaints to one where litigation was anticipated." Further, Russo avers that in light of plaintiff's allegations, she contacted Vaughn, the counsel NAPA had on retainer, for assistance and advice on how to proceed. Based on plaintiff's own statements in his initial discussion with Russo and the serious nature of his allegations involving illegal and fraudulent conduct, it was objectively reasonable for Russo to have believed that there was a substantial threat of litigation that was imminent. Although plaintiff also complained about Dr. Nostro's intimidation, harassment and constant use of profanity, Russo's notes indicate that plaintiff was not simply raising ordinary complaints about his treatment in the work place. Rather, he alleged unlawful and fraudulent activity by defendants' staff. In fact, the documents defendants submitted for *in camera* review reveal that Russo immediately conducted a follow-up investigation into plaintiff's allegations which she avers was "[a]t Vaughn's suggestion." Russo's follow-up emails indicate her recognition that immediate responses to plaintiff's

allegations were needed and that there was a real possibility that litigation would soon commence.

Russo's ensuing investigation, which she avers was commenced after consulting with Vaughn, was thus conducted in anticipation of litigation, including the contacts with other personnel who participated in her investigation, such as Dr. Miltana, who sent a June 18, 2012 email to Russo highlighting his belief that litigation was certainly a possibility, i.e., by stating that "We know there is potential legal ramifications to [Plaintiff's] accusations." Russo then states that plaintiff contacted her again on May 30, 2012, and he raised additional issues of improper conduct by defendants' staff. Plaintiff contacted Russo next on June 18, 2012, to follow up on his issues of improprieties he raised with her. Russo also indicates that in early January of 2013, plaintiff told Dr. Strobel he would prepare a list of non-compliance issues and, that she then sent plaintiff a letter dated January 29, 2013 requesting his list of issues. Plaintiff responded to Russo by letter dated February 3, 2013, detailing his issues. Finally, on March 13, 2013, Russo sent plaintiff a letter advising him that NAPA's investigation determined that his allegations were "unfounded."

Additionally, according to an email dated December 30, 2012, from Dr. Strobel and Vaughn regarding a follow-up to the investigation into plaintiff's allegations, (Campenni's September 9, 2019 Decl., Ex. B. Doc. 6), there are proposed detailed responses to plaintiff's allegations. The email indicates that Vaughn was aware of plaintiff's allegations of improper conduct by

defendants' staff. Vaughn's December 30, 2012 email also appears to discuss some of the legal theories that were developed for defendants in anticipation of litigation.

After Russo completed the investigation, plaintiff filed his complaint with this court on December 6, 2013. The court recognizes that "the mere fact that litigation does eventually occur, does not by itself bring documents within the ambit of the work-product doctrine." Leonen v. Johns–Manville, 135 F.R.D. 94, 97 (D.N.J. 1990). However, based on the above discussion, the court finds that the communications included with the Investigation Materials were "prepared in anticipation of litigation" and, thus are protected as work-product.

The court further finds that several documents included with the Investigation Materials contain opinion work product from defendants' counsel, such as their opinions in reviewing proposed responses to plaintiff's allegations and their opinions regarding the requirements of the law and regulations.[7] The Supreme Court has long held that the work product doctrine

---

[7]As the Court noted in Yeakel v. Werner Enterprises, Inc., 2008 WL 2120515, *2 n. 2 (M.D. Pa. May 19, 2008):

"Opinion work product includes such items as an attorney's legal strategy, his intended lines of proof, his evaluation of the strengths and weaknesses of his case, and the inferences he draws from interviews of witnesses." Sporck, 759 F.2d 314. Opinion work product is entitled to broader protection than ordinary work product: "[s]uch material is accorded an almost absolute protection from discovery because any slight factual content that such items may have is generally outweighed

"shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." <u>United States v. Nobles</u>, 422 U.S. 225, 238, 95 S.Ct. 2160 (1975).

As such, the court finds that all of the Investigations Materials that were the product from Russo's investigation, from its initiation with plaintiff's original allegations through its conclusion, viewed in an objectively reasonable manner by defendants, can fairly be said to have been prepared because of the prospect of litigation. However, the court will direct defendants to provide plaintiff with a copy of Dr. Strobel's PowerPoint presentation entitled "Compliance Talk 2013" which is marked as Doc. 45, Ex. B, Campenni's September 9, 2019 Decl. The work product doctrine is waived if "material is disclosed in a manner inconsistent with keeping it from an adversary" <u>In re Chevron Corp.</u>, 633 F.3d 153, 165 (3d Cir. 2011). Thus, a protective order is not appropriate for Doc. 45. As such, defendants will be directed to provide the "Compliance Talk 2013" PowerPoint presentation to plaintiff.

Next, Plaintiff contends that since defendants produced to him Russo's interview notes of himself and the CRNAs, they cannot withhold the production of Russo's interview notes with Dr. Nostro. Plaintiff states that defendants' production of some of Russo's interview notes constitutes a

---

by the adversary system's interest in maintaining the privacy of an attorney's thought processes and in ensuring that each side relies on its own wit in preparing their respective cases." <u>Id</u>.

waiver of the work-product privilege with respect to her interview notes with Dr. Nostro. Plaintiff also states that since Russo relied upon all of her interview notes when she sent him a memo dated June 18, 2012 responding to the issues he raised, defendants should be directed to disclose Russo's interview notes with Dr. Nostro.

"[T]he party asserting waiver of work-product immunity, rather than the party asserting the work-product protection, has the burden of establishing waiver." Maldonado v. New Jersey ex rel. Administrative Office of Courts-Probation Division, 225 F.R.D. 120, 132 (D.N.J. Dec. 15, 2004) (citations omitted). Further, "intentional disclosure of work-product documents will not necessarily constitute waiver to all such documents." Id. at 131 (citation omitted). "[A] waiver of the work-product privilege is a much tougher feat than a waiver of the attorney-client privilege", and "the purpose of the [work product] doctrine is to protect material from adversaries." Id.

The court finds that plaintiff has not met his burden to demonstrate a waiver by defendants regarding all of Russo's interview notes. The court finds that the disclosure to plaintiff of some of Russo's interview notes by defendants, particularly the notes from an interview in which he was involved, did not constitute a waiver of the work product protection for all of her interview notes, including her interview notes with Dr. Nostro, since defendants' production of interview notes involving plaintiff did not "substantially increase" the possibility of plaintiff obtaining all of the information in the Investigation Materials. See id.

22

As such, the court finds that plaintiff failed to establish a waiver of the work-product privilege by defendants.

Defendants also argue that plaintiff cannot show that there is a substantial need for the Investigations Materials and that he cannot obtain their substantial equivalent by other means without undue hardship, such as through depositions of Russo, the team of administrators who assisted with Russo's investigation into plaintiff's allegations, and the people Russo interviewed as part of her investigation.

After the party seeking protection meets the burden of proving the work product doctrine applies, "protected work product is 'afforded near absolute protection from discovery.'" Mine Safety Appliances Co., 73 F.Supp.3d at 569 (citation omitted). "A limited exception exists where the party seeking disclosure can demonstrate a substantial need for the material and the inability without undue hardship to obtain the substantial equivalent of it by other means." Id. Thus, plaintiff can overcome the work product protection by showing: "(1) the documents are otherwise discoverable, (2) [he] has a substantial need for the materials, and (3) [he] cannot obtain a substantial equivalent without undue hardship." Gregory v. Gregory, 2016 WL 6122456, *6 (D.N.J. Oct. 18, 2016) (citing In re Cendant Corp. Sec. Litig., 343 F.3d 658, 663 (3d Cir. 2003)). Further, work product that is "factual" in nature is discoverable upon a "showing of substantial need and inability to obtain the equivalent without undue hardship." In re Cendant Corp. Sec. Litig., 343 F.3d at 664. Additionally, "there is near absolute protection for [opinion work

23

product consisting of] the 'mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.'" Gregory, 2016 WL 6122456, *6 (citations omitted).

Plaintiff has the burden to show that "the documents are discoverable under the broad relevance standard of Rule 26(b)(1)", and "that [his] need for these [documents] is 'substantial' or that [he] cannot obtain the information therein by a less intrusive means." Id. at *7 (citation omitted). The court finds that the documents which defendants did not produce to plaintiff are indeed relevant under the broad standard. However, plaintiff has not established that he cannot obtain the information in defendants' unproduced documents by a less intrusive means, such as by deposing Russo and the people involved in her investigation. Nor is there any contention that the people who assisted Russo in her investigation are unavailable for deposition. Thus, even if plaintiff shows a substantial need to the documents at issue, he fails to state any reason for why he is unable to obtain the substantial equivalent without suffering undue hardship.

Moreover, the Medicare regulations and Federal Register guidelines, as well as similar public documents, that are included in the documents produced for *in camera* review are clearly documents that plaintiff can obtain on his own without undue hardship.[8] (Docs 34-36, 39, 40, 41, 44, 47, 48, 50, 51, 52, 55, 59, 60,61, 64, 66, 67, & 68, attached to September 9, 2019

---

[8]The CMS Manual is available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c01.pdf.

privilege log, Ex. B). However, the interpretations of the regulations and guidelines by defendants' counsel and their communications with defendants' employees as they relate to plaintiff's allegations of improper conduct by defendants that were attached to the stated documents, are protected as work product as well as attorney-client privilege, and are not subject to disclosure to plaintiff.

## 2. ATTORNEY-CLIENT PRIVILEGE

Defendants contend that most of the emails and the other documents plaintiff seeks to obtain are privileged "either because they are attorney-client communications, or privileged communications shared among non-attorney employees of NAPA." The defendants have the burden to establish the attorney-client privilege by satisfying the following elements: "(1) a communication (2) is made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client." New Jersey Manufacturers Insurance Company v. Brady, 2017 WL 264457, *8 (M.D.Pa. Jan. 20, 2017) (citation omitted). "[O]nce the party claiming privilege meets its burden, the party challenging the privilege bears the burden of demonstrating that a waiver of the attorney-client privilege has occurred." Id.

Defendants state that "there are three categories of communications at issue [with respect to its motion] that [they] withheld on the basis of attorney-client privilege." The court will consider each category *seriatim*.

The first category of communication as defined by defendants "are several emails and/or other documents exchanged with NAPA's outside

25

counsel David Vaughn." (Campenni September 9, 2019 Decl., Ex. B, Docs. 11-25). Defendants contend that these documents reflect "classic examples of attorney-client communications" that are protected by privilege and, therefore, not discoverable.

The court finds that defendants have demonstrated that the emails and documents sent to Vaughn and the emails Vaughn sent to defendants' staff in which he largely gives defendants legal advice and proposed strategies regarding plaintiff's allegations of improper and unlawful conduct, as well as advice regarding defendants' requirements under the law and regulations, are clearly communications protected by the attorney-client privilege.

The second category of documents "are several emails and/or other documents exchanged with former in-house NAPA attorney Garrett Dowd." (Campenni September 9, 2019 Decl., Ex. B, Docs. 26-31; Green Aff., at ¶2 Doc. 117-1, averring that Dowd was an attorney employed by NMSC in 2013 who provided legal advice with respect to plaintiff's complaints). The court has reviewed these emails involving Dowd and finds that they are also communications protected by the attorney-client privilege.

The third category of documents consist of three emails that are neither authored nor directed to Vaughn or Dowd but, according to defendants, are emails that were "sent internally among NAPA employees and reflect, relay, transmit, and concern legal advice from Mr. Vaughn." (Campenni September 9, 2019 Decl., Ex. B, Docs. 6, 9, 10).

As defendants point out, since they are corporations "privileged

communications may be shared by non-attorneys to relay information requested by attorneys, and may also be transmitted between non-attorneys so that the corporation may be properly informed of legal advice and act accordingly." See SmithKline Beecham Corp. v. Apotex Corp., 232 F.R.D. 467, 477 (E.D.Pa. 2005).

The court has reviewed the stated emails in the third category of documents withheld by defendants and finds that they are communications protected by the attorney-client privilege.

Further, the *in camera* documents defendants submitted on September 9, 2019 which consist of emails to defendants' staff from defendants' current counsel, are also protected by the attorney-client privilege. (Campenni September 9, 2019 Decl., Ex. B, Docs. 70, 71 & 73).

Thus, the court finds that defendants have met their burden to show that the attorney-client privilege applies with respect to the above stated categories of communications.

The court must now consider whether the attorney-client privilege has been waived with respect to any of the defendants' documents as plaintiff contends.

Plaintiff argues that defendants waived the attorney-client privilege with respect to communications with Vaughn based on the advice of counsel defense, i.e., when "the advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney client communication." Rhone-Poulenc,

32 F.3d at 863 (holding that "a party can waive the attorney client privilege by asserting claims or defenses that put his or her attorney's advice in issue in the litigation"). "Rhone–Poulenc identifies a two-step inquiry into whether the privilege has been waived due to advice of counsel: '(1) the assertion of a claim or defense, and (2) an attempt to prove that claim or defense by disclosing or describing an attorney client communication.'" Piazza v. County of Luzerne, 2015 WL 6690090, *3 (M.D.Pa. Oct. 30, 2015) (citation omitted). Plaintiff states that Vaughn had a lot of involvement in defendants' compliance process between December 2012 and May 2013, and that defendants' privilege logs and the documents they produced show that Vaughn was the only attorney with whom defendants consulted between the stated dates. Plaintiff contends that this shows defendants' defenses in this case claiming that they have complied with the applicable laws and regulations put Vaughn's advice at issue.

Defendants argue that they have not waived the attorney-client privilege because they have not asserted any defense based on advice of their outside counsel Vaughn.[9] In their reply brief, defendants unequivocally state that they are not relying on the advice of counsel defense. The court will indeed hold defendants to their representation that they are not relying on the advice of

---

[9]The court concurs with defendants that their 18th affirmative defense in their answer to plaintiff's complaint, (Doc. 82), averring that they "acted in good faith" and "did not engage in any unlawful conduct" is not the equivalent to them asserting an advice of counsel defense in this case, as plaintiff contends in his opposition brief.

counsel defense. The court finds that defendants did not waive the attorney-client privilege regarding Vaughn's communications based on the advice of counsel defense. Rather, in his communications, Vaughn was assisting defendants in responding to plaintiff's allegations about their wrongdoing. No doubt that the attorney-client privilege is not waived "by the mere fact of ... defending a suit." Greater New York Mut. Ins. Co. v. Philadelphia Indem. Ins. Co., 2014 WL 939454, *7 (M.D.Pa. March 11, 2014) (citations omitted). In fact, in Russo's June 18, 2012 follow-up memo to plaintiff and in her March 15, 2013 letter to plaintiff discussing his non-compliance allegations, she does not once state that her responses to his allegations were based on the advice of counsel.

Thus, defendants will not be directed to produce the documents plaintiff seeks by virtue of the advice of counsel waiver. (Docs. 11-25, Ex. B, Campenni's September 9, 2019 Decl.).

Plaintiff also states that defendants waived the attorney-client privilege with respect to communications with Vaughn since they have provided him with a 34-page PowerPoint presentation Vaughn prepared entitled "2013 Anesthesia Compliance Update." (Doc. 54, Ex. B, Campenni's September 9, 2019 Decl.). Plaintiff contends that since the PowerPoint presentation of Vaughn addressed the same topics that were the subject of his complaints and of Russo's investigation, defendants have waived the privilege with respect to all of Vaughn's communications.

Defendants point out that the PowerPoint contained over 30 pages of

29

"general guidance regarding [Centers for Medicare and Medicaid Services ("CMS")] updates to rules and regulations in 2013 concerning fee schedules, coding, and documentation." Defendants produced the cover email that attached the 2013 Compliance Update, (Doc. 123-1), since plaintiff did not include it with the copy of the PowerPoint he submitted. (Doc. 122-2, Ex. C). In the December 26, 2012 email, Dr. Strobel tells Dr. Nostro that he was providing him with "[a] 2013 update about CMS changes" referring to the PowerPoint presentation. Defendants also state that the Compliance Update did not include any specific legal advice regarding any of their particular legal issues and, that it did not mention either defendant.

In Westinghouse Elec. Corp. v. Republic of the Philippines, 951 F.2d 1414, 1424 (3d Cir. 1991), the Third Circuit stated that "voluntary disclosure to a third party of purportedly privileged communications has long been considered inconsistent with an assertion of the [attorney-client] privilege." "Thus, once a client has revealed privileged information to a third party, the basic justification for the privilege no longer applies." Id. Thus, "federal courts have held that, under some circumstances, voluntary disclosure of a communication protected by the attorney-client privilege may result in waiver of the privilege for all communications pertaining to the same subject matter ('subject matter waiver')." Greater New York Mut. Ins. Co. v. Philadelphia Indem. Ins. Co., 2014 WL 939454, *5 (M.D.Pa. March 11, 2014).

The court finds that even though defendants disclosed Vaughn's PowerPoint presentation to plaintiff during discovery this voluntary disclosure

did not constitute an express waiver of the attorney-client privilege by defendants with respect to all of Vaughn's communications. Any waiver by defendants was limited to the PowerPoint presentation. The court finds that the Compliance Update providing defendants' employees with updates on the applicable CMS rule and regulations does not contain protected communication between Vaughn and defendants and, it is not related to the subject matter of the documents to which defendants claim are protected by the attorney-client privilege. Further, the PowerPoint did not divulge any confidential information or communication between Vaughn and defendants. Thus, defendants' production of the 2013 Compliance Update PowerPoint to plaintiff did not waive the attorney-client privilege with respect to all of Vaughn's communications.

Further, plaintiff contends that the communications in which no attorney was involved or which were broadly shared by several of defendants' employees are not privileged attorney-client communications. Plaintiff identifies Docs. 1-10 of Ex. B, Campenni's Decl., (Doc. 117-3), and states that none of these documents show attorney involvement. Plaintiff also claims that defendants must prove that each employee needed access to the communications.

The court in S.E.P.T.A. v. Caremarkpcs Health, L.P., 254 F.R.D. 253, 257-58 (E.D.Pa. 2008), discussed the attorney-client privilege when the client is a corporation and explained:

The fact that the client is a corporation does not vitiate the

31

attorney-client privilege. "[T]he privilege applies to communications by a corporate employee concerning matters within the scope of his duties purposefully made to enable an attorney to provide legal advice to the corporation." "Likewise, it is clear that the privilege may apply where the communication is to in-house counsel rather than to outside counsel retained for a particular matter." The "primary purpose" of the communication at issue must be "to gain or provide legal assistance" for the privilege to apply due to the fact that "in-house counsel may play a dual role of legal advisor and business advisor." In this regard, the Third Circuit has held that even when "the decision include[s] consideration of" various business concerns, the attorney-client privilege still applies to the communications if the decision "was infused with legal concerns and was reached only after securing legal advice."

(internal citations omitted).

Additionally,

"[T]he 'scope of an individual's employment is ... highly relevant to the question of maintenance of confidentiality.'" "The communications retain their privileged status if the[] information is relayed to other employees or officers of the corporation on a need to know basis." As such, "[t]he 'privilege is waived if the communications are disclosed to employees who did not need access to' them." "Only when the communications are relayed to those who do not need the information to carry out their work or make effective decisions on the part of the company is the privilege lost."

Id. at 258 (internal citations omitted).

"A document need not be authored or addressed to an attorney in order to be properly withheld on attorney-client privilege grounds." Id. (quoting SmithKline Beecham Corp. v. Apotex Corp., 232 F.R.D. 467, 477 (E.D.Pa. 2005)). In cases like the instant one in which the clients are corporations, "privileged communications may be shared by non-attorney employees in order to relay information requested by attorneys." Id. (citations omitted).

Further, "documents subject to the privilege may be transmitted between non-attorneys ... so that the corporation may be properly informed of legal advice and act appropriately." Id. at 258-59 (citations omitted). "[T]he privilege may also extend to certain 'documents, [that] while not involving employees assisting counsel, still reflect confidential communications between client and counsel or subordinates of counsel for the purpose of either (1) providing legal services or (2) providing information to counsel to secure legal services.'" Id. at 259 (citations omitted).

However, "routine, non-privileged communications between corporate officers or employees transacting the general business of the company do not attain privileged status solely because in-house or outside counsel is 'copied in' on correspondence or memoranda", rather, "to successfully assert the attorney-client privilege, the corporation 'must clearly demonstrate that the communication in question was made for the express purpose of securing legal not business advice.'" Id. (internal citations omitted).

Defendants have established that the communications identified by plaintiff in which no attorney was involved were not disclosed to employees who did not require access to the communications. In the Affidavit of Beth Green, Esq., Executive Vice President and General Counsel of defendants, (Doc. 117-1), she avers that the seven people employed by defendants who were specified in her Affidavit and who were included in the communications with Vaughn, Dowd and Daub "were involved with investigating and addressing plaintiff's complaints during and after [his] employment." The

33

communications at issue were not widely distributed and the recipient lists were small. (See Doc. 117-3, Ex. B). As such, the communications are protected from disclosure by the attorney-client privilege since defendants "clearly demonstrate that the communication[s] in question [were] made for the express purpose of securing legal." See id.

Finally, plaintiff contends that he is entitled to receive the facts underlying the attorney-client communications. Specifically, plaintiff states that defendants should produce the underlying and peripheral facts regarding Vaughn's communications and five emails with Dowd, dated between May 17, 2013 and August 6, 2013, Docs. 26-31, Ex. B, Campenni April 3, 2019 Decl., (Doc 117-3), even if their legal advice and mental impressions are protected. Plaintiff seeks disclosure of the facts that are in the communications with the legal advice redacted. For support, plaintiff cites to this court's decision in Valenti v. Allstate Ins. Co., 243 F.Supp.2d 200, 218 (M.D.Pa. 2003) (the attorney-client privilege "only protects disclosures of communications between attorney and client and does not protect against disclosures of the facts underlying the communication.").

No doubt that "the attorney-client privilege usually protects 'the communications themselves.'" S.E.P.T.A., 254 F.R.D. at 258 (citation omitted). "'Documents sent to or prepared by counsel incorporating such information for the purpose of obtaining or giving legal advice, planning trial strategy, etc. are protected from compelled disclosure[,]' but '[t]o the extent that purely factual material can be extracted from privileged documents

without divulging privileged communications, such information is obtainable.'" Id. (citation omitted).

Defendants state that they do not contend that plaintiff cannot seek discovery of the underlying facts that Vaughn and Dowd considered in formulating their legal advice. They state that plaintiff must ascertain these facts through testimony, including from plaintiff, Russo, and NAPA employees as well as from non-privilege documents. However, defendants maintain that plaintiff is not entitled to any part of the communications with Vaughn and Dowd that they have withheld from disclosure based on the attorney-client privilege.

"Facts gathered by counsel in the course of investigating a claim or preparing for trial are not privileged and must be divulged if requested in the course of proper discovery", and "[o]pposing counsel is entitled to obtain through discovery the names of witnesses, facts underlying the cause of action, ..., [and] investigations ..., and other factual information." Andritz Sprout-Bauer, 174 F.R.D. at 632 (internal citations omitted). Plaintiff is certainly entitled to seek discovery of the facts upon which defendants' counsel relied in their communications, however, "[d]ocuments sent to or prepared by counsel incorporating [] information [and facts] for the purpose of obtaining or giving legal advice, planning trial strategy, etc. are protected from compelled disclosure." Id. at 633. In this case, since the court finds that the purely factual material cannot be extracted from the privileged communications involving Vaughn and Dowd without divulging privileged

communications, plaintiff is not entitled to any of the stated communications.

## IV.     CONCLUSION

Based on the foregoing, defendants' motion for protective order, (Doc. 117), will be granted. All of the documents, numbered 1 through 73, identified in defendants' abridged privilege log attached as Exhibit B to Campenni's September 9, 2019 Declaration, and submitted for *in camera* review, will be protected from disclosure to plaintiff except for Doc. 45. The court will direct defendants to provide plaintiff with a copy of Dr. Strobel's PowerPoint presentation entitled "Compliance Talk 2013" which is marked as Doc. 45, Ex. B, Campenni's September 9, 2019 Decl. An appropriate order will issue.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Dated: November 7, 2019**

13-2940-04.wpd