## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* **MICHAEL S. LORD,** | : | |
| | : | **CIVIL ACTION NO. 3:13-2940** |
| **Plaintiff/Relator,** | : | **(JUDGE MANNION)** |
| **v.** | : | |
| **NAPA MANAGEMENT SERVICES CORPORATION,** *et al.,* | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## <u>MEMORANDUM</u>

Presently before the court are the parties' cross motions for summary judgment. (Docs. 201, 213). The motions are fully briefed and ripe for disposition. This case is about medical billing for anesthesia services. Relator Michael Lord claims Defendants knowingly billed Medicare and Medicaid for "medically directed" anesthesia services when Defendants' anesthesiologists did not actually perform medically directed anesthesia services. Then Defendants fired Lord for pointing out their alleged fraud, Lord says. If the parties' motions demonstrate anything, they demonstrate most of Lord's claims involve genuine disputes. Disputes must be resolved by a trier of fact. So, for the reasons explained below, the court will **DENY** Lord's motion and **GRANT in part** and **DENY in part** Defendants' motion.

I.    <u>FACTUAL BACKGROUND</u>

The following essential, undisputed facts are taken from the parties' submissions to the extent they are consistent with the evidence in the record. (*See* Docs. 201, 202, 213, 215, 222, 223, 231, 232, 234, 235, 243, 249).

Defendant NAPA-PA is an anesthesiology group that employs both anesthesiologists and certified registered nurse anesthetists (CRNAs). The anesthesiologists and CRNAs assign to NAPA-PA their rights to receive reimbursements from third-party payers, including Medicare and Medicaid, for the anesthesia services they provide at Pocono Medical Center (PMC). Relator Michael S. Lord, R.N., CRNA, DNP, was employed by Defendant NAPA-PA as a CRNA at PMC from June 2011 through June 2013. During that time, he observed what he believed to be fraudulent billing of Medicare and Medicaid by his employer for anesthesia services.

A.    **Anesthesia billing generally**

The Centers for Medicare and Medicaid Services (CMS) is the federal agency that administers the Medicare and Medicaid programs. CMS contracts with Medicare Administrative Contractors and Medicare HMOs (collectively, "MACs") to receive claims and issue payments to healthcare providers, including anesthesiologists and CRNAs. CMS publishes manuals to help administer the Medicare program under applicable federal statutes

and regulations. The Medicare Claims Processing Manual (MCPM), of which the court takes judicial notice, sets forth information on the correct billing of Medicare claims, including claims for anesthesia services.

Medicare requires the use of anesthesia claims modifiers on claims for anesthesia services. Anesthesia modifiers inform CMS of the level of an anesthesia provider's involvement in a case. The modifiers include:

- AA – Anesthesia service personally performed by an anesthesiologist;
- QK – "Medical direction" by an anesthesiologist of two to four concurrent anesthesia procedures;
- QY – "Medical direction" by an anesthesiologist of one anesthesia procedure;
- AD – "Medical supervision" by an anesthesiologist of more than four concurrent anesthesia procedures;
- QX – Anesthesia service by a CRNA or anesthesiology assistant with "medical direction" by an anesthesiologist; and
- QZ – Anesthesia service by a CRNA without "medical direction" by an anesthesiologist.

The focus of this case is on the contours and requirements of "medical direction." Medical direction occurs when an anesthesiologist directs a qualified individual, such as a CRNA, in not more than four concurrent cases, and the anesthesiologist performs the so-called "seven steps" of medical direction. 42 C.F.R. §§414.46(d), 415.110(a); MCPM, Ch. 12, §§50.C, 50.I. As a condition for payment for medical direction, the anesthesiologist must perform the following seven steps:

1) Perform a pre-anesthetic examination and evaluation;
2) Prescribe the anesthesia plan;
3) Personally participate in the most demanding procedures in the anesthesia plan, including, if applicable, induction and emergence;
4) Ensure that any procedures in the anesthesia plan that he or she does not perform are performed by a qualified individual;
5) Monitor the course of anesthesia administration at frequent intervals;
6) Remain physically present and available for immediate diagnosis and treatment of emergencies; and
7) Provide indicated post-anesthesia care.

42 C.F.R. §415.110(a)(1); MCPM, Ch. 12, §50.C. 42 C.F.R. §415.110(b) provides further:

> The physician alone inclusively documents in the patient's medical record that the conditions set forth in paragraph (a)(1) of this section [the seven steps] have been satisfied, specifically documenting that he or she performed the pre-anesthetic exam and evaluation, provided the indicated post-anesthesia care, and was present during the most demanding procedures, including induction and emergence where applicable.

*See also* MCPM, Ch. 12, §50.C.

Medicare's system of paying claims relies upon providers to submit accurate and truthful claims with supporting documentation. A claim for a service that is not truthfully and adequately documented in the medical record is generally not eligible for payment by CMS. Indeed, by enrolling in the Medicare program, and by submitting claims, a practitioner agrees to submit truthful and accurate claims. CMS requires practitioners to preserve the medical records supporting each claim for six years. MACs will then

select certain claims to review for support after payment is made. CMS employs contractors to also review claims for support after payment is made.

In general, if, on post-payment review, a claim is determined to be invalid or the review reveals the medical records do not support the service that was billed, CMS will deny the claim or require the provider to repay the money that Medicare may have paid. Or, in cases involving medical services that have different levels of services and reimbursement rates, if post-payment review determines that the medical records do not support the level of service that was billed, CMS will generally demand a refund, subject to the provider's right of appeal in most instances.

**B.    NAPA-PA's anesthesia billing system**

During the relevant period of June 2011 through July 2013, NAPA-PA used a one-page form to document anesthesia administered in the operating rooms at PMC (the "Anesthesia Record"). (*See* Doc. 218-1). The Anesthesia Record contained this statement followed by a line for the anesthesiologist's initials: "I was present for induction, key portions of the procedure and emergence: and immediately available throughout" (the "Attestation"). The Anesthesia Record was a paper, carbonless copy form, which created a duplicate of the writing on the Anesthesia Record on the duplicate form underneath. The original form stayed with the patient's hospital chart. The

anesthesiologist or CRNA would place the carbonless copy into a box in NAPA-PA's office at PMC to be used for billing.

Information on the Anesthesia Records formed the basis of the bills Defendant NAPA Management generated for NAPA-PA. NAPA Management provided business-related management services to NAPA-PA such as human resources, credentialing and contracting, malpractice, billing and collections, payroll, information IT, information technology. The NAPA Management billing department staff would create bills using the information from the clinical documents and the patient's demographic and financial information. The NAPA Management billing software automatically coded anesthesia services as "medically directed" if three pieces of information were entered in the software: the name of an anesthesiologist on the case; the name of a CRNA on the case; and a checkmark in the field indicated that the Attestation on the Anesthesia Record had been initialed. NAPA Management billing staff would then transmit those bills to the payors, including Medicare and Medicaid.

### C.    Defendants' alleged billing malpractice

Lord contends NAPA-PA anesthesiologists at PMC routinely pre-signed the Attestation prior to all key portions of the anesthetic. He says, in most cases, the anesthesiologists pre-signed the Attestations around the

time of induction, before surgery began, and sometimes before the patient even arrived in the operating room. Lord provides several time-stamped photographs he took of medical records purporting to show the records were signed before the key events took place. Defendants contend NAPA-PA maintained a policy that attestations were to be signed at the end of the procedure, and NAPA-PA anesthesiologists were trained that they were not to pre-sign medical records. Defendants point to deposition testimony of witnesses from NAPA-PA who testified that they were not aware of any instances of pre-signing.

Lord also asserts that the medical records Defendants produced for services provided on a randomly selected sample dates of services included nine instances in which the Attestation was not signed at all. In those cases, Lord avers, NAPA Management should not have billed for medical direction because, without a signed Attestation, the medical records did not adequately support the claim that the anesthesiologist completed the seven steps. Defendants point to deposition testimony to the effect that if the Attestation were not signed, the billing staff could attempt to confirm elsewhere whether the requirements of medical direction were met.

Lastly, Lord asserts that the medical records produced by Defendants for services provided on the randomly selected sample dates of service

include at least five instances in which a NAPA-PA anesthesiologist conducted pain management consultations with a patient, while claiming to be medically directing a CRNA on a separate case at the same time. Defendants contend that pain management consultations are permitted activities that may be performed while medically directing.

As explained more fully below, Lord brought these alleged violations to the attention of Defendants' upper-level management, which, according to Lord, set off a series of retaliatory adverse employment actions against him, culminating in his termination in or around June 2013.

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Aetna Cas. & Sur. Co. v. Ericksen*, 903 F.Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). The court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323–24. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003); *see also Celotex*, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (quoting *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The non-moving party must direct the court's attention to specific, triable facts by "*citing particular parts* of materials in the record." Fed. R. Civ. P. 56(c)(1)(A) (emphasis added); *see United States v. Starnes*, 583 F.3d 196, 216 (3d Cir. 2009) ("Judges are not like pigs, hunting for truffles buried in briefs.") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991)); *see also DeShields v. Int'l Resort Properties Ltd.*, 463 F. App'x 117, 120 (3d Cir. 2012) ("If factual support for [a plaintiff's] claim exist[s] in the record, it [i]s incumbent upon her to direct the District Court's attention to those facts.").

If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23; *Jakimas v. Hoffman–La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007).

The summary judgment standard does not change when the parties have filed cross-motions for summary judgment. *Applemans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987). When confronted with cross-motions for summary judgment, as in this case, "the court must rule on each party's motion on an individual and separate basis, determining, for each side,

whether a judgment may be entered in accordance with the summary judgment standard. " *Marciniak v. Prudential Financial Ins. Co. of America*, 2006 WL 1697010, at *3 (3d Cir. June 21, 2006) (citations omitted) (not precedential). If review of cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts. *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998) (citation omitted).

## III.   DISCUSSION

Defendants move for summary judgment on all of Lord's remaining claims. Lord moves for summary judgment on his False Claims Act (FCA) *qui tam* claims. The court will address the parties' arguments in turn.

### A.   FCA *qui tam* claims

"To prevail on an FCA claim, the relator must prove that the defendant (1) made a false statement, (2) with scienter, (3) that was material, (4) causing the government to make a payment." *United States v. Care Alternatives*, No. 22-1035, 2023 WL 5494333, at *2 (3d Cir. Aug. 25, 2023) (precedential) (citing *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 181–82 (2016)). Lord contends the undisputed facts establish all four elements. Defendants argue Lord cannot demonstrate

materiality as a matter of law, requiring summary judgment in their favor. "Materiality" is the only element where the parties' motions cross; and it is the element which torpedoes both motions since a reasonable jury could go either way on this record.

Materiality is an element under factual falsity and legal falsity theories (Lord proceeds on both theories). *See United States ex rel. Doe v. Heart Sols., PC*, 923 F.3d 308, 317 (3d Cir. 2019) ("[M]ateriality is an element of all FCA claims, regardless of whether the specific statutory provision lists materiality as an element.") (citing *Escobar*, 579 U.S. at 191–92). Materiality is a rigorous, demanding standard for an FCA relator to meet. *Escobar*, 579 U.S. at 181. This makes sense, because the FCA is not "an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* at 194. The FCA defines materiality as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money." 31 U.S.C. §3729(b)(4). The Supreme court explained in *Escobar* that materiality "turns on a variety of factors such as: (1) whether the government has expressly designated the legal requirement at issue as a 'condition of payment'; (2) whether the alleged violation is 'minor or insubstantial' or instead goes to the 'essence of the bargain' between the contractor and the government; and (3) whether the government made

continued payments, or does so in the 'mine run of cases,' despite 'actual knowledge' of the violation." *Care Alternatives*, 2023 WL 5494333 at *2 (citing *Escobar*, 579 U.S. at 193 n.5, 194–95). The materiality inquiry is holistic, considering the totality-of-the-circumstances. *Id.*

Starting with Lord, his motion fails because he has not shown that there is no genuine dispute as to the materiality of NAPA's alleged noncompliance with billing regulations. To be sure, Lord has identified several facts which favor a finding of materiality under the holistic approach, but they fall short of pushing this issue beyond dispute.

First, 42 C.F.R. §415.110(a), the primary regulation Defendants allegedly failed to comply with, identifies proper completion and documentation of the seven steps for medically directed anesthesia as a condition of payment. Indeed, even the regulation's title conveys it is a condition of payment: "Conditions for payment: Medically directed anesthesia services." This factor weighs in favor of materiality, but it is not dispositive. *Care Alternatives*, 2023 WL 5494333, at *4 (citing *Escobar*, 579 U.S. at 190).

Second, §415.110(b)'s medical documentation requirements are not insignificant. As Lord points out, when HHS adopted the medical documentation requirement in §415.110(b), it rejected a request from the

American Society of Anesthesiologists for a looser standard which provided: "the medical record must include an amount of documentation to enable a medical records' auditor to conclude that the physician was sufficiently involved to support the payment of a medical direction fee." 63 Fed. Reg. 58,844 (1998). Put simply, a strong documentation requirement "protects the public fisc and the overall integrity" of Medicare and Medicaid billing for anesthesia services, ensuring public funds go to pay for anesthesia services that actually occurred. *Care Alternatives*, 2023 WL 5494333, at *6.

Third, Lord has brought forth evidence suggesting NAPA-PA management and anesthesiologists knew they should not be pre-signing the Attestations. For example, in mid-2012, at the direction of NAPA Management's VP of HR and Compliance, the Chief Anesthesiologist for NAPA-PA at PMC sent an email stating in part that "the attestation statement must also be initialed indicating our presence in [sic] for induction, emergence, and any critical times during the case," and that "[f]ailure to comply with the above may result in what can be perceived as fraudulent billing." (Doc. 215 at 36–37). In addition, Defendants' compliance attorney and external auditor gave NAPA-PA management a presentation in 2012 in which the attorney explained, *inter alia*, CMS has counseled against pre-signing, which is "considered fraud." This weighs in favor of materiality.

- 14 -

On the other hand, the record reveals other circumstances that weigh against materiality. First, if the NAPA anesthesiologists failed to satisfy all the seven steps—what some call "broken medical direction"—Defendants have brought forth evidence that the claim would have been payable in the same amount under the "CRNA services without medical direction" category using the QZ modifier, instead of the modifiers for "medical direction." Defendants' expert asserts that, "for group practices like NAPA-PA, the practice receives the same amount whether it bills the services as personally performed, medically directed, or CRNA services without medical direction [QZ]. Thus, if the NAPA defendants incorrectly billed a case as medical direction but could have correctly billed the case under the QZ modifier, there would be no difference in the reimbursement they received from Medicare under either scenario." (Doc. 215-12 at 29). This cuts against materiality.

Second, a jury could consider Defendants' alleged regulatory violations to be relatively infrequent. *See Care Alternatives*, 2023 WL 5494333, at *6 (considering severity of alleged noncompliance by looking at percentage of noncompliant records in representative samples). The parties debate the math; but even by Lord's calculation, the record evidence supporting Lord's allegations of false claims amount to 6.1% of Defendants' medical direction

claims from approximately 2011 to 2013. This could be considered minor or insubstantial noncompliance cutting against materiality.

In light of the competing contentions pertaining to materiality described above, Lord has not met his burden as the moving party for summary judgment.

Turning to Defendants' motion, they similarly have not met their burden of showing there is no dispute of material fact as to the materiality of their alleged billing violations. Defendants' motion rests on the argument articulated above that even if they falsely billed for "medical direction," the relevant anesthesia services were still billable under the QZ modifier and payable at the same rate. While this argument and its supporting evidence cuts against materiality, it in no way establishes immateriality as a matter of law. Even assuming *arguendo* that all the alleged false bills could have been billed originally as QZ for the same rate—a proposition Lord disputes—Defendants have not offered sufficient evidence to demonstrate CMS would have still paid those bills. In other words, perhaps CMS would have paid the QZ rate had Defendants billed QZ. But would CMS had paid the QZ rate had Defendants falsely and knowingly submitted the bills under "medical direction," as Lord alleges? Defendants do not offer sufficient evidence supporting that contention, which is fatal to their motion.

- 16 -

Accordingly, the court will deny the parties' cross motions for summary judgment on Lord's FCA claims; there is a genuine dispute as to materiality.[1]

## B.   Employment-related claims

Next, the NAPA defendants seek summary judgment on Lord's FCA retaliation and breach of contract claims.

### 1.   Lord's employment with NAPA Management

NAPA Management argues Lord's FCA retaliation claim against it should be dismissed because it was not Lord's employer—NAPA-PA was. To determine whether NAPA Management was Lord's employer, we turn to *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323–24 (1992). *See United States ex rel. Watson v. Connecticut Gen. Life Ins. Co.*, 87 F. App'x 257, 261–62 (3d Cir. 2004) (applying *Darden* to FCA retaliation claim); *Crosbie v. Highmark Inc.*, No. CV 19-1235, 2021 WL 880212, at *4 (E.D. Pa. Mar. 9, 2021), *aff'd*, 47 F.4th 140 (3d Cir. 2022) (same).

In *Darden*, the Supreme Court articulated the test for deciding if a party qualifies as an employee. The Court listed the following factors as relevant for consideration: (1) the skill required, (2) the source of instrumentalities and tools, (3) the location of the work, (4) the duration of the relationship between

---

[1] The court, in its discretion, declines at this juncture to issue a Rule 56(g) order specifying uncontroverted facts on this record as Lord requests.

the parties, (5) whether the hiring party has the right to assign additional projects to the hired party, (6) the extent of the hired party's discretion over when and how long to work, (7) the method of payment, (8) the hired party's role in hiring and paying assistants, (9) whether the work is part of the regular business of the hiring party, (10) whether the hiring party is in business, (11) the provision of employee benefits, and (12) the tax treatment of the hired party. *Darden*, 503 U.S. at 323–24. The Third Circuit has generally focused on "which entity paid [the employee's] salaries, hired and fired them, and had control over their daily employment activities." *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 214 (3d Cir. 2015) (citation and internal quotation marks omitted). Even so, "all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *Id.* (citing *Darden*, 503 U.S. at 324).

Here, the fact that Defendants contend NAPA-PA was Lord's employer does not preclude a finding that NAPA Management was also Lord's employer. As the Third Circuit has explained:

> Significantly, the inquiry under *Darden* is not which of two entities should be considered the employer of the person in question. Two entities may be "co-employers" or "joint employers" of one employee . . . . *Graves v. Lowery*, 117 F.3d 723, 727 (3d Cir. 1997). Indeed, at common law, one could be a "dual servant acting for two masters simultaneously" or a "borrowed servant" who by virtue of being "'directed or permitted by his master to perform services for another may become the servant of such

other.'" *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1349 (3d Cir. 1991) (quoting Restatement (Second) of Agency §227 (1958)).

*Id.* at 215.

The evidence marshaled by Lord, viewed in the light most favorable to him, is sufficient to preclude summary judgment on the ground that NAPA Management was not Lord's employer. A rational jury applying the *Darden* factors could find that Lord and NAPA Management had a common-law employment relationship.

First, record evidence supports Lord's contention that NAPA Management and NAPA-PA are closely related entities. So it would not be beyond reason to conclude they are "co-" or "joint" employers of Lord. NAPA Management "provided management services [to NAPA-PA] in the form of human resources, credentialing and contracting, malpractice, billing and collections, payroll, information IT, information technology. Any other business-related but not clinical management type of responsibility." (Doc. 203-1). In addition, Leslie Russo, VP of HR and Compliance for NAPA Management, was closely involved in NAPA Management's response to Lord's reports of fraudulent billing. Ms. Russo was also responsible for enforcing the compliance plan for NAPA-PA and conducting investigations. (*See* Doc. 235 at 30).

Second, Lord has submitted evidence showing NAPA Management played a role in hiring Lord. For example, Ms. Russo authorized the hiring of Lord, NAPA Management handled the on-boarding process, and Lord was instructed to return all his employment and benefit forms to NAPA Management. In addition, NAPA Management's credentialing department was responsible for completing and submitting paperwork enrolling NAPA providers as participating providers with Medicare and Medicaid. NAPA Management also applied for a National Provider Identification number for Lord. (*See* Doc. 235-2).

Third, NAPA Management administered all insurance benefits that Lord received. (*See* Doc. 235 at 186–87).

Finally, NAPA Management played an active role at the conclusion of Lord's employment. Record evidence suggests that Ms. Russo encouraged Lord to leave his employment. Thomas Delaney, of NAPA Management, cut off Lord's access to his NAPA email account; he also advised PMC that "NAPA has terminated [Lord's] employment." (*See* Doc. 235 at 182–83).

A rational jury, running these facts through the *Darden* factors, could conclude that NAPA Management was Lord's employer in addition to NAPA-PA. Thus, the court will not grant NAPA Management summary judgment on this ground.

- 20 -

### 2. NAPA Management's obligations under the employment agreement

Next, NAPA Management seeks summary judgment in its favor on Lord's state law breach of contract claim. Lord brings this claim against the NAPA defendants for breach of his employment agreement. NAPA Management argues it was not a party to that agreement, NAPA-PA was, so none of the contract's provisions can be enforced against it under Lord's proffered legal theory. The court agrees.

Lord acknowledges NAPA Management was not a party to his employment agreement with NAPA-PA; but he contends NAPA Management is nonetheless liable thereunder because it "was a third-party beneficiary of Lord's work." (Doc. 234 at 33). Lord does not offer meaningful support for his argument that a party to an agreement can enforce that agreement against a non-party under Pennsylvania law. Contract law typically works in the opposite manner to what Lord posits: Third-party beneficiary status entitles the beneficiary to enforce the agreement against the parties to the agreement, not the other way around.

The cases cited by Plaintiff are unavailing. The Supreme Court in *Arthur Andersen* held a nonparty could seek relief under a contractual arbitration provision. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009). The Pennsylvania Superior Court similar dealt with a non-party trying

- 21 -

to enforce an agreement in *Provenzano*. *Provenzano v. Ohio Valley General Hospital*, 121 A.3d 1085, 1097 (Pa. Super. 2015) ("non-signatories to an arbitration agreement can enforce such an agreement when there is an obvious and close nexus between the non-signatories and the contract or the contracting parties").

The court is unaware of, nor has Lord brought to our attention, any authority supporting the proposition that a third-party beneficiary of a contract may also be contractually liable under the same agreement. Accordingly, here, NAPA Management cannot be liable as a non-party under Lord's employment agreement based on Lord's third-party beneficiary theory. Thus, the court will grant summary judgment in favor of NAPA Management on Lord's breach of contract claim.

### 3.    FCA retaliation claim against NAPA-PA

Next, Defendant NAPA-PA seeks summary judgment on Lord's FCA retaliation claim. Under the FCA's anti-retaliation provision, an employee is entitled to relief if he was "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts" conducted in furtherance of an FCA action. *DiFiore v. CSL Behring, LLC*, 879 F.3d 71, 76 (3d Cir. 2018) (citing 31 U.S.C. §3730(h)(1)). Courts in this Circuit have analyzed

FCA retaliation claims under the three-step burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g., Crosbie v. Highmark Inc.*, No. 19-1235, 2021 WL 880212, at *4 (E.D. Pa. Mar. 9, 2012). Defendants insist the court use this framework here. The Third Circuit, however, "ha[s] never held that this three-step framework governs False Claims Act claims." *Crosbie v. Highmark Inc.*, 47 F.4th 140, 144 (3d Cir. 2022). In any event, the court need not decide which framework applies because the sole ground offered by Defendants for summary judgment fails under their proffered framework.

Defendants say summary judgment on Lord's FCA retaliation claim should be granted in their favor because Lord cannot make out a *prima facie* case of retaliation. To make out a *prima facie* case, Lord must show "that he has been fired (or demoted or the like) for protected conduct." *Crosbie v. Highmark Inc.*, 47 F.4th 140, 144 (3d Cir. 2022). Defendants argue Lord has not come forward with evidence that he suffered an adverse employment action, *e.g.*, discharge, demotion, *etc*. Lord says he has, or, alternatively, that the evidence shows he was at least constructively discharged. The court need not dig into the parties' plethora of constructive discharge arguments, however, since there is a genuine dispute of fact as to whether Lord was fired—the quintessential "adverse employment action." *See generally Basri*

*v. Trustees of Univ. of Pennsylvania*, No. CV 19-4935, 2020 WL 7231357, at *6 (E.D. Pa. Dec. 8, 2020) ("Where there is a genuine issue of fact as to whether plaintiff quit [his] job or was terminated, summary judgment is not the proper means of disposing of the claim.") (citations and internal quotation marks omitted).

Lord argues that, from his perspective, NAPA-PA terminated him, and he points to several pieces of evidence on which a jury could find for him on this issue. The Third Circuit has "recognized that the reasonable belief of the employee is relevant to determining whether he or she had resigned or had been terminated." *Johnson-Winters v. Redner's Mkt. Inc.*, 610 F. App'x 149, 153 n.5 (3d Cir. 2015) (citing *Burton v. Teleflex Inc.*, 707 F.3d 417 (3d Cir. 2013)).

First, Defendants removed access to Lord's email on June 21, 2013. This came as a surprise to Lord and indicated to him that he was being terminated. Second, Lord provided a "Notice of Dispute Resolution" to Defendants that requested "a meeting to attempt to resolve [the ongoing employment] dispute in accordance with Paragraph 7 of Mr. Lord's Employment Agreement," and proposed a date of July 3, 2013. (Doc. 235 at 184). That paragraph of the employment agreement required written notice and mandated a meeting be held within one week. Defendants never

- 24 -

responded to this request, which indicated to Lord that he was being terminated. Third, Thomas Delaney, Defendants' Senior Vice President (SVP), stated in a letter to PMC's SVP that "NAPA has terminated [Lord's] employment." (Doc. 235 at 186). And fourth, Lord contends Defendants' VP of HR and Compliance modified the internal documentation of his separation of employment by changing the box that was originally checked "Termination" to "Voluntary" in August 2013. (*See* Doc. 235-69). Defendants did not respond to this argument.

Defendants retort that the above series of actions that Lord points to all occurred because of Lord's actions on June 20, 2013. On that day, Lord informed Dr. Nostro that he would not be returning to work. Lord in fact did not return to work, and by July 5, 2013, he had already secured other employment. This, Defendants aver, demonstrates Lord voluntarily resigned and thus did not suffer an adverse employment action. However, as Lord points out, the record contains evidence that his communication with Dr. Nostro on June 20 was not as definite as Defendants portray. Lord testified at his deposition that he told Dr. Nostro "until an investigation was done, [he] did not feel safe continuing to take responsibility for a life of a patient on an operating room table under anesthesia while [he] was looking over [his] shoulder at anesthesiologists falsifying records behind [his] back." (Doc. 235-

12 at 15–16). And, according to a notice he sent Defendants on July 5, 2013, Lord only sought substitute employment to mitigate his damages since he construed Defendants' actions as constructive termination of his employment.

On this record, there is a genuine dispute as to whether Defendants' terminated Lord. So summary judgment is inappropriate. The dispute surrounding Lord's alleged termination is also fatal to Defendants motion for summary judgment on Lord's breach of contract claim since Defendants motion with respect to those claims is largely premised on Lord's alleged voluntarily resignation. There is also a genuine dispute as to whether Defendants breached the employment agreement by failing to conduct a dispute resolution meeting with Lord, as noted above.

## C.    Motions to exclude expert testimony

Also before the court are two motions from Defendants to limit or exclude testimony from two of Lord's experts pursuant to Rule 702 of the Federal Rules of Evidence. (Docs. 208 & 209). That Rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>       (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>       (b) that testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702, along with the principles announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-94 (2000), requires a multi-faceted factual analysis of the proffered expert opinions. The determination of admissibility of an expert opinion is a task better suited for an evidentiary proceeding prior to trial. Indeed, the Third Circuit has cautioned that "[i]t would appear that the most efficient procedure that the district court can use in making the reliability determination is an *in limine* hearing." *United States v. Downing*, 753 F.2d 1224, 1241 (3d Cir. 1985). Considering this, the court will dismiss Defendants' expert motions as premature and without prejudice to renewal as motions *in limine* at an appropriate time.

IV.   <u>CONCLUSION</u>

In light of the foregoing, Defendants' motion for summary judgment will be **GRANTED in part** and **DENIED in part**. It will be **GRANTED** with respect to the breach of contract claim against NAPA Management and **DENIED** in all other respects. Lord's motion for partial summary judgment will be

**DENIED**. Defendants' motions to limit or exclude Lord's experts will be

**DISMISSED** without prejudice. An appropriate order follows.

*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: September 26, 2023**
13-2940-07